**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **AETNA LIFE INSURANCE COMPANY,** | § | **JURY DEMANDED** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:15-cv-491** |
| | § | |
| **ROBERT A. BEHAR, M.D.; NORTH** | § | |
| **CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY, LTD; and** | § | |
| **NORTH CYPRESS MEDICAL CENTER** | § | |
| **OPERATING COMPANY GP, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**<u>AETNA'S ORIGINAL COMPLAINT</u>**

Aetna Life Insurance Company files this Original Complaint ("Complaint") against Dr.

Robert A. Behar, North Cypress Medical Center Operating Company, Ltd. ("North Cypress,

Ltd."), and North Cypress Medical Center Operating Company GP, LLC ("North Cypress GP")

(collectively the "Defendants"),[1] and would respectfully show the Court as follows:

**I.**
**<u>INTRODUCTION</u>**

1.       This is a fraudulent medical billing case.  North Cypress is a 139-bed community

hospital with publicly reported annual gross revenues that exceed $1.5 ***billion*** dollars a year – an

amount that is more than twice that of other nearby hospitals that have substantially more patient

volume and provide a wider array of medical services than North Cypress.  North Cypress'

extraordinary revenues, which make it an extreme outlier in the healthcare industry, were not

achieved by creating a higher quality and more efficient hospital facility, but rather, through a

---

[1]   North Cypress, Ltd. and North Cypress GP are referred to collectively herein as "North Cypress."

fraudulent billing scheme that was masterminded by Dr. Robert Behar—North Cypress' Chief Executive Officer (CEO) and Chairman of the Board.

2.      The scheme includes paying illegal kickbacks to physicians in exchange for patient referrals disguised as ownership interests in North Cypress, charging grossly excessive fees, implementing improper billing techniques, and forgiving members' financial responsibility (*i.e.*, deductibles, co-pays, and co-insurance), in order to make the scheme work.  Absent this, patients would not knowingly be treated at North Cypress and agree to pay much higher out of pocket amounts required under the terms of their plan, when they could get the same services at a fraction of the cost at hospitals in Aetna's network within close proximity of North Cypress.

3.      Dr. Behar uses his "Physician Vital Statistics," which he calls his "sacred reports," to track the volume and value of each physician's referrals to North Cypress.  Lots of referrals result in Dr. Behar allowing the physician to not only become an owner in North Cypress, but also increase his/her ownership interest in North Cypress over time.  Physicians owners who do not refer enough patients, according to Dr. Behar, are not allowed to invest further in North Cypress and, in fact, are typically squeezed out of their ownership interest in North Cypress.

4.      North Cypress is a "non-participating" or "out-of-network" medical facility. North Cypress would not be able to submit such exorbitant fee requests to Aetna if it were contracted as an in-network hospital.  As described herein, Dr. Behar orchestrated an "out-of-network" business strategy employing fraudulent billing practices and a scheme which caused Aetna to overpay North Cypress as much as $120 million since January 1, 2009.

5.      The financial harm inflicted on Aetna and the healthcare system was not by happenstance, but by pure design.  Dr. Behar intended to harm Aetna as part of his greed and personal vendetta against the managed care industry and, in fact, routinely expressed his desire to

bilk Aetna and other payors. For example, on one occasion following an increase of North Cypress' already outrageous fees, Dr. Behar sardonically told an employee in North Cypress' billing department that "***I am sure happy you jacked up those rates. I have nothing but sympathy for Aetna.***"

6.      By engaging in the actions described herein, and reaping the rewards of its outrageous fees, North Cypress is able to advertise that its facility has "an upscale 5-star hotel-like ambience." More importantly, the physicians who own North Cypress (including Dr. Behar) have profited hundreds of millions of dollars at the expense of Aetna, employee benefit plans, other payors, and ultimately plan members in the long run. The scheme includes referring patients to North Cypress, rather than in-network hospitals, for the purpose of lining their pockets.

7.      The damages sought in this case pertain to facility fees and related fees charged by and paid to North Cypress. In essence, through the fraudulent billing scheme effectuated by Dr. Behar (and by others at the specific direction of Dr. Behar), North Cypress is gouging Aetna and its members for millions of dollars for the use of the brick, mortar, and equipment at its facility. Separately, and not part of the damages sought in this Complaint, the physicians are paid for their services provided at North Cypress. That said, because of the inherent conflict of interest involved in a physician referring patients to a facility in which the physician has an ownership interest, strict and complete disclosure to patients is mandated as a matter of ethics and law. North Cypress has fallen well short of its disclosure obligations, including those applicable to Aetna members covered by Medicare.

8.      Aetna asserts claims against Dr. Behar for violations of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"). Aetna also asserts a claims against

Defendants for tortious interference and breach of contract.  Aetna's claims seek redress for injuries it suffered as a result of the fraudulent billing scheme that Dr. Behar designed and implemented.

## II.
## PARTIES

9.      Plaintiff Aetna Life Insurance Company is a corporation organized under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

10.      Defendant Dr. Robert A. Behar is a citizen of the State of Texas and resides in Harris County, Texas.  On information and belief, Dr. Behar may be served with process at his residence located at 5100 San Felipe, Unit 351 E, Houston, Texas 77056, or at his place of employment located at 21216 N. West Freeway, Ste. 610, Cypress, Texas 77429, or wherever he may be found.

11.      Defendant North Cypress Medical Center Operating Company, Ltd. is a Texas limited partnership and regularly conducts business in Cypress, Harris County, Texas.  North Cypress Ltd. may be served with process through its registered agent Robert A. Behar, 21216 Northwest Freeway, Suite 610, Cypress, Texas 77429.

12.      Defendant North Cypress Medical Center Operating Company GP, LLC, which is the general partner of North Cypress Ltd., is a Texas limited liability company and regularly conducts business in Cypress, Harris County, Texas.  North Cypress GP may be served with process through its registered agent, Robert A. Behar, 21216 Northwest Freeway, Suite 610, Cypress, Texas 77429.

HOU:3520531.1

## III.
### JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States.

15.     Venue is proper in the Southern District of Texas pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(1) because North Cypress and Dr. Behar reside or may be found in this judicial district, and pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred here.

## IV.
### FACTUAL BACKGROUND

**A.     The Health Care Benefits That Aetna Provides Its Members**

16.     Aetna provides access to coverage and benefits to its members pursuant to a variety of health care benefit plans and policies of insurance, including (i) self-funded plans for which Aetna provides various third-party claims administrative services, (ii) plans insured under group policies issued by Aetna where plans are established and maintained by private employers, (iii) plans covering federal employees, (iv) plans covering employees of state governmental entities, (v) church plans, (vi) policies issued to individuals, and (vii) Medicare. The governmental plans include those that Harris County, Texas, and the Teachers Retirement System of Texas established for their employees.

17.     Aetna's health benefit plans include covered benefits for in-network services that participating providers having contracts with Aetna or its affiliates provide to its members.

Aetna's plans also include covered benefits for out-of-network services that non-participating hospitals or other facilities, such as North Cypress, provide to Aetna's members.  For each patient-beneficiary, North Cypress seeks money from Aetna for their fees, which it is now apparent were submitted regularly to "gouge" and abuse the healthcare system, and benefit the physician-owners of North Cypress in their wrongful self-referral scheme.

**B.     In-Network Benefits From Participating Providers**

18.     Aetna provides in-network health care benefits to its members through a network of "participating" medical providers who have entered into contracts with Aetna to render services to members in return for fees at contract rates.  Medical providers who enter into contracts with Aetna are commonly known as participating providers, and the contracts between Aetna and participating providers require the participating provider to accept in-network rates for services as payment in full.  The Aetna member ordinarily has no financial obligation to the participating provider beyond a small, fixed copayment, or coinsurance, and the participating provider is contractually prohibited from billing the subscriber for any other amounts (*i.e.*, balanced billing), except under limited circumstances.

19.     The in-network agreements between Aetna and its participating providers allow Aetna to deliver health care benefits efficiently through its provider network, to anticipate and control the cost of care, to reduce financial risk to both employer funded and fully insured plans, to reduce its members' financial risk for health care services, and to promote the quality of care through its credentialing and peer review processes.

20.     Health care benefit plans encourage patient/members to utilize participating providers, an arrangement beneficial to both the participating providers, who enjoy increased patient traffic or steerage, and the patient/members who receive appropriate, high-quality health care services at a fair and reasonable cost.  Plan provisions that require the member to pay

-6-

coinsurance, deductibles and other portions of a hospital's charges for services encourage the member to be sensitive to health care costs and utilize hospitals with lower fees, which makes medical insurance less expensive.

21.    Plan members have ready access to participating providers.  Aetna publishes directories of participating providers to its members who consume health care services in Texas. Members may obtain medical services from these providers with little or no financial risk or out-of-pocket expense.

**C.    Out-of-Network Benefits From Non-Participating Providers**

22.    Aetna provides health benefit plans and policies of insurance that include out-of-network benefits for services rendered to its members by non-participating providers, such as North Cypress, which have not entered into contracts with Aetna and have not agreed to accept in-network rates as payment in full for their services.  When North Cypress submits its claims to Aetna for reimbursement for the medical services performed at its facility, its fees are not set in advance by the terms of a fee agreement with Aetna.

23.    Typically, an out of network hospital would submit claims to Aetna relating to treatment of an Aetna member for a true emergency in which the Aetna member did not have time to consider his or her in-network hospital options.  North Cypress has knowingly admitted patients through its emergency room that did not require emergency services per Dr. Behar's direct order that all patients (emergent or not) be admitted through North Cypress's emergency room.  As described herein, this is done to assist North Cypress gouge the health care system through dishonest billing after the patient is discharged.

24.    Non-participating providers set their own fees for services rendered to their patients subject to the laws and regulations which govern the practice of medicine in Texas.  Due to the sheer volume of healthcare claims, and to help alleviate the administrative burdens related

-7-

to claims processing, many healthcare plans reimburse out-of-network benefits based upon a percentage of billed charges.   This payment methodology presumes that out-of-network providers submit honest, reasonable and customary charges, for their medical services in accordance with applicable law.   Under this methodology, however, egregious billing providers, such as North Cypress, have taken advantage of the healthcare system by charging exorbitant amounts – far in excess of reasonable and customary rates – knowing full well that the higher they charge, the more they can pocket, at least until its overall referral scheme was discovered.

25.     Aetna health benefit plans and policies of insurance that cover services by non-participating providers may limit the benefits available for out-of-network services and require members to contribute a much larger amount of the cost of care rendered by non-participating providers.   Pursuant to the terms of these benefit plans and policies of insurance, the patient/member may be responsible for payment of charges for services which their health care plan does not cover or exceed the amount of the reimbursement Aetna paid.   The amount by which a provider's charge reasonably exceeds the amount payable under the plan is commonly referred to as the "balance bill."

26.     North Cypress and Dr. Behar know that most patients would not agree to pay the larger balance bill amount that they would be responsible for under the terms of their employers employee benefit plans.   Thus, few if any rational cost-conscious patients in a non-emergent situation would agree to have services performed at North Cypress if it was going to cost them more.   So, North Cypress and Dr. Behar devised a misleading "prompt pay discount" sometimes referred to as the "Access NCMC program."   Simply put, North Cypress tells the patients that they will only have to pay the same amount as if the services were performed at an in-network hospital.   But, North Cypress does not treat the hospitalization as in-network when it bills Aetna.

To the contrary, it gouges Aetna and its customers with outrageous rates dwarfing the amounts it would be paid as an in-network provider.  Dr. Behar and North Cypress tell the member that the patients' costs will be the same as the minimal in-network charges, and then, treat the coverage administered by Aetna as an all-you-can-eat-buffet, while dishonestly billing Aetna as out-of-network provider for the same transaction.

**D.** **North Cypress' "Out-of-Network" Strategy**

27. As a non-participating medical facility, North Cypress' has implemented an "out-of-network" strategy to target and siphon off high-value patients who would otherwise receive medical services from in-network facilities at discounted rates.  The target patients include those whose health benefit plans and policies of insurance provide ready access to out-of-network benefits for services that non-participating providers, such as North Cypress, render to Aetna's members.  In furtherance of its "out-of-network" strategy, North Cypress has employed various underhanded schemes and practices, which are described below, to overbill and be overpaid by Aetna for medical services provided to its members.  This suit is Aetna's effort to obtain reimbursement for those overpayments.

*i.*     *North Cypress' Excessive Billed Charges*

28. North Cypress has billed Aetna for both outpatient and inpatient medical services at rates that grossly exceed the usual, customary and reasonable fees in the same market area. North Cypress' billed charges are greatly in excess of those other comparable hospitals charge for the same medical services.  North Cypress has overcharged Aetna for routine procedures, such as over $200,000 for treatment of an abscess, nearly $83,000 for removal of a nasal polyp, and almost $29,000 for a hammertoe procedure.  North Cypress' charge for a simple urine pregnancy test is nearly five times the amount charged by other providers in the relevant market.

Its charges for CT scans and routine blood work, such as a basic metabolic panel, are similarly marked up.

29.     As part of its scheme to hide what it has really been doing, North Cypress has submitted claims under non-specific billing codes, including procedure code "A," totaling more than $350 million since 2009.  And, North Cypress has billed excessive fees for "emergency" care, including services provided at its emergency room or its freestanding emergency centers, billing Aetna more than $38 million.

30.     In addition to medical services and diagnostic testing, North Cypress has billed Aetna over $40 million for surgical supplies and implants under revenue code 278 at prices that far exceed its out-of-pocket costs for those items.  For example, North Cypress has charged over $3,100,000 for anchor screws for surgery at approximately $2,552 per screw, well above its invoice cost.  And, incredibly, North Cypress has billed Aetna more than $45 million for "sterile supplies" under revenue code 272.  North Cypress' egregious billed charges are motivated purely by greed and are in no way justified by higher costs, better quality of care, or greater patient acuity.

31.     North Cypress' excessive billed charges are also attributed to its fraudulent "upcoding" of medical claims submitted to Aetna and other payors.  When medical providers, like North Cypress, submit their medical bills for payment, they identify their medical services using Current Procedural Terminology ("CPT") Codes.  "Upcoding" occurs when a provider fraudulently bills for medical services using higher CPT Codes than actually performed, resulting in higher reimbursement to which the provider is not entitled.  North Cypress regularly engages in "upcoding" practices in its emergency room and other departments to further line its coffers.

32.     As a medical provider, North Cypress is required to bill for emergency care services using CPT Evaluation & Management ("E&M") Codes 99281-99285.  Providers are required to bill emergency room E&M Codes based upon the level of patient acuity.  CPT E&M Code 99281 represents the lowest patient acuity; whereas, CPT E&M Code 99285 reflects the highest patient acuity.  For example, if a patient presents at the emergency room with flu-like symptoms, the provider should bill using a lower CPT E&M Code than for a patient who presents with severe chest pains or serious injuries following an automobile accident.

33.     More importantly, medical claims submitted with higher CPT E&M Codes (*i.e.*, 99284 and 99285) typically result in higher reimbursement than claims submitted with lower CPT E&M Codes.  To further game the healthcare system and maximize reimbursement at the expense of payors like Aetna, North Cypress improperly bills its emergency room services using higher CPT E&M Codes, even though the patients' acuity levels require that such services be billed using the lower CPT E&M Codes.  In fact, during a North Cypress Finance Committee meeting, Dr. Behar and other executives at North Cypress concluded that "[p]atients need to be scored at a 4-5 before being admitted through the ER otherwise reimbursement is low."  In other words, North Cypress fraudulently bills its emergency room services using CPT E&M Codes 99284 and 99285, regardless of the patients' acuity level.

34.     By way of further example, North Cypress performs Intensity Modulated Radiation Therapy (IMRT), which is a form of radiotherapy used to treat cancer patients.  IMRT aims small beams of radiation of varying intensities at a malignant tumor from many angles, conforming to the shape of the tumor, and sparing surrounding tissue.  Image Guided Radiation Therapy (IGRT) is a more sophisticated form of radiotherapy that takes IMRT one step further and enables more precise alignment of the radiation beam to the tumor.  On information and

-11-

belief, after learning that North Cypress could receive higher reimbursement for IGRT (as opposed to non-guided IMRT), Dr. Behar, who is a practicing oncologist, instructed others at North Cypress to code and bill for non-guided IMPT procedures as if the patient were treated with IGRT.  By doing so, North Cypress has fraudulently overbilled for services that it did not perform, or alternatively performed services that were unnecessary solely to obtain a higher reimbursement for North Cypress and its physician owners.

35.     North Cypress' practice of overbilling Aetna is strategic and no accident. Tellingly, the gross revenues (*i.e.*, total billed charges) of other nearby hospitals pale in comparison to North Cypress, even though such hospitals have more inpatient bed capacity and higher patient utilization.  For example, in 2012, North Cypress had gross revenues that were $320 million **more than** those of Memorial Herman Memorial City Medical Center, even though Memorial Herman had three times the number of patient beds, more than twice as many inpatient admissions, and more outpatients than North Cypress. Similarly, North Cypress had gross revenues that were $540 million **more than** those of Methodist Willowbrook Hospital, even though Methodist Willowbrook had nearly twice as many patient beds and in-patient admissions.

36.     Significantly, the medical claims at issue in this Complaint were submitted under healthcare plans that chose to reimburse for out-of-network medical services at either full billed charges or some percentage of billed charges.  Indeed, North Cypress knew that its excessive fees (in some cases, more than **13 times** of what Medicare allows for the same medical services) might place a "bull's-eye" on its back with payors like Aetna.  Nevertheless, driven solely by avarice, Dr. Behar issued numerous "directives" to "jack up" North Cypress' already excessive billed charges, knowing full well that any increase in those charges would directly translate to increased collections due to the "high mix" of claims that are paid based upon a percentage of

billed charges, and as a result of North Cypress's failure to collect from its patients the increased costs for using an out of network hospital.

37.     Excessive billed charges, however, are only part of North Cypress' "out-of-network" strategy.  Non-participating providers, such as North Cypress, do not experience the patient traffic that an in-network provider receives in exchange for accepting discounted rates as full payment.  To account for the lack of patient volume, Dr. Behar and others at North Cypress devised a fraudulent scheme to substantially increase patient flow, while at the same time, North Cypress remained an out-of-network provider that charged (and was paid) excessive fees for its medical services (*i.e.*, so that North Cypress can "have its cake and eat it too").  Said another way, Dr. Behar and North Cypress have been sending the tab for their scheme to Aetna and its customers.

38.     As discussed in more detail below, this elaborate scheme to increase patient volume consists of three primary components:  (1) physicians who refer patients to North Cypress in exchange for certain financial incentives or "kick-backs" in the form of ownership interests in North Cypress; (2) the waiver of patient responsibility to entice patients to use North Cypress instead of an in-network facility; and (3) the improper use of the emergency room and "observation" status to not only generate more fees, but also, avoid the transfer of patients to in-network facilities upon admission.

### ii.     *North Cypress' Patient Referral "Kick-Backs"*

39.     For North Cypress' "out-of-network" strategy to work, physicians must be willing to refer their patients to North Cypress, even though by doing so, many of the physicians are violating their separate participating provider agreements with Aetna, which require referrals to available in-network facilities.  All of North Cypress' owners are physicians and only those physicians who have demonstrated a significant number of patient referrals are allowed to

-13-

initially invest, and continue investing, in North Cypress.  Simply put, in exchange for patient referrals, physicians receive a "kick back" in the form of an exclusive option to invest in North Cypress, which allows them to become millionaires virtually overnight.  In fact, Dr. Behar advised the physician investors in early 2007 that investing in North Cypress was a "financial opportunity of a lifetime," and that because North Cypress' extensive fixed costs had already been paid off, any referrals to North Cypress would result in "straight profit" that would go directly into the pockets of the referring physicians.

40.     Since North Cypress opened its doors in January 2007, it has distributed hundreds of millions of dollars to its physician investors.  For example, Dr. Mirtha Casimir, who along with Dr. Behar was one of the founders of North Cypress, invested $350,000 in North Cypress and, in less than five years, earned over $9 million in distributions (*i.e.*, more than 2500% return on her investment).  During that same time span, on information and belief, Dr. Behar made over $25 million, which he uses to fund his private 10-passenger airplane and lavish life style.

41.     Once physicians are admitted into North Cypress' exclusive ownership "club," Dr. Behar exerts substantial pressure on them to continue referring their patients to North Cypress or else face dire consequences.  As noted above, North Cypress regularly prepares reports entitled "Physician Vital Statistics," which Dr. Behar calls his "sacred" reports, to track the volume of patients (and resulting billed charges) for each referring-physician investor.  These reports identify the "top producers" of patient referrals, as well as those physicians who are "not pulling their end."  Dr. Behar uses these reports to target certain physicians, including other members of North Cypress' Board of Managers such as Dr. Michael Barnard, for not referring enough patients to North Cypress.  Those physicians who do not refer patients (or a sufficient number of patients) to North Cypress are reprimanded, threatened, and even forced by Dr. Behar to

relinquish their ownership interest in North Cypress, despite the fact that North Cypress' limited partnership agreement expressly prohibits such conduct. Dr. Behar's ruthless tactics to "strong arm" patient referrals, which include overt threats and intimidation, are essential to North Cypress' ability to increase patient volume as an "out-of-network" provider and generate maximum revenues in light of its excessive fees.

### iii.     North Cypress' Illegal Waiver of Patient Financial Responsibility

42.     Patient referrals, however, are only half of the equation. For North Cypress to carry out its illicit "out-of-network" scheme, it also needs patients who are willing to seek treatment at North Cypress, as opposed to an in-network facility at lesser cost to them. Ordinarily, an Aetna member's utilization of an "out-of-network" hospital, rather than a "participating" or "in-network" hospital, would result in higher out-of-pocket costs to the patient. Yet, to entice patients to use its out-of-network facility, North Cypress has implemented a deceptively entitled "prompt pay discount" program, under which North Cypress bills patients only for the amounts of patient financial responsibility that they would otherwise owe had they received treatment from an in-network facility. By entering into these illicit "side deals" with patients to reduce or waive their out-of-pocket costs as an inducement to choose North Cypress over available and reputable, in-network facilities, North Cypress interferes with the health care benefit plan between the patient and plan sponsor, violates Texas law, and reaps substantial windfalls.

43.     Moreover, by collecting only the in-network amount of patient responsibility, North Cypress breached its written representations to Aetna contained in every UB-04 form used to obtain payment, "that the beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts." To the contrary, waiving patient financial responsibility is exactly what North Cypress does as a matter of course. In fact, Dr.

-15-

Behar drafted a "script" for his staff to use to advise patients that they would only be responsible for the amount of their copayment, deductible, and co-insurance had they gone to an in-network provider.  Of course, however, when submitting bills to Aetna, North Cypress did not offer Aetna any type of "discount," but rather, sought payment of the entire inflated charges.

44.     Further, by waiving, reducing, or otherwise collecting only the in-network amount of patient responsibility, North Cypress breached its Participating Facility Agreement with MultiPlan, Inc. under which Aetna is an intended third-party beneficiary.  Under the Participating Facility Agreement, North Cypress was required to bill and collect from patients all applicable patient financial responsibility for out-of-network services as specified in the patients' healthcare benefit plans, not just the in-network portion.

### iv.     North Cypress' Fraudulent "Emergency Room" Billing Practices

45.     In addition to patient referral "kick-backs" and the illegal waiver of patient responsibility, North Cypress has engaged in other fraudulent acts to increase its patient volume, including Dr. Behar's self-proclaimed "Out of Network Emergency Room Based Strategy," under which North Cypress improperly admits non-emergent patients through its emergency room.  Rather than directly admitting patients with pre-scheduled, elective procedures, Dr. Behar issued a "directive" requiring *all* patients (both emergent *and* non-emergent) to be admitted through North Cypress' emergency room, even if there are beds available for a direct admission.[2] By doing so, not only did North Cypress receive more reimbursement than if the patients were directly admitted, but also avoided having to contact Aetna to seek authorization, at which time Aetna could have either denied North Cypress' requests for in-patient admission and/or sought to have the patients transferred to a nearby in-network facility for many elective procedures.

---

[2]  The only exceptions to this "directive" are Medicare patients and members in healthcare plans administered by Blue Cross Blue Shield, which has an in-network agreement with North Cypress.

### v.      North Cypress' Fraudulent "Observation" Billing Practices

46.      Another way North Cypress has managed to increase its patient volume and bill Aetna more than $700 million in fees since 2009 is to bill for unwarranted and unnecessary "observation" care.  In one instance, a patient was "observed" for 169 hours (*i.e.*, 7 full days) without being admitted for inpatient treatment.  Many of North Cypress's submissions to Aetna are for procedures where the patient does not leave the North Cypress' premises and is also never formally admitted to the facility.  Instead, the patient is simply "observed."  If the patient was admitted, of course, then North Cypress would have to contact Aetna for prior authorization, and Aetna would have the option of having a participating hospital provide the services if the patient could be safely transferred.  Moreover, North Cypress charges for "observation" care ranged from $201/hour to almost $230/hour – more than three times the market average.  As a result, North Cypress has billed Aetna up to $20 million to "observe" patients since 2009.

47.      For example, in May 2012, North Cypress treated a patient who presented with a simple rash.  On May 9th, North Cypress billed for 31 different services, including a level 5 emergency code (*i.e.*, CPT Code 99285) for high complexity evaluation and management services.  The patient was also observed for 9 hours for which Aetna was billed nearly $2,000, in addition to multiple other services including laboratory tests, a diagnostic chest x-ray, and intravenous supplies and therapy.  The next day, with the patient still in the emergency room or under "observation"—no doubt at the direction of the hospital—North Cypress billed for 6 separate services, including 24 hours of observation for more than $5,000.  On the third day, again with the patient still in the emergency or under "observation," the patient was "observed" for 20 more hours, for which Aetna was billed for more than $4,300.  All told, North Cypress billed Aetna approximately $25,000 for treatment of a simple rash over three days in an "emergency" or "hospital" setting, which included $11,580.50 for 53 hours of "observation."

HOU:3520531.1

And, because North Cypress characterized it as an "emergency," and is out-of-network, the amount charged and paid dwarfed what was a reasonable fee for the services.

48.     Similarly, in January 2011, North Cypress treated a patient for unspecified chest pain, who had a history of smoking and hypertension.  North Cypress never admitted the patient. Instead, on the first day, North Cypress billed for the most severe emergency condition requiring high complexity medical decision-making, CPT Code 99285, for nearly $2,100.  On the second day, the patient presented to the emergency or "observation" room again.  North Cypress billed CPT Code 99285, seeking nearly $2,100, and in addition billed almost $4,800 under CPT Code 99218 for 23 hours of low complexity "observation."  On the final day, while still "treating" the patient in the emergency room, North Cypress billed low level complexity observation for 13 hours for more than $2,700.  In total, North Cypress billed 36 hours of observation for nearly $7,500.  Once again, North Cypress used the "outpatient strategy" or "observation" strategy to increase the amount it could fraudulently bill Aetna.  North Cypress has repeatedly utilized this scheme to bill for both a severe emergency requiring high complexity medical decision-making, and contemporaneous low complexity observation on numerous occasions.

49.     By way of further example, in April 2010, a patient presented to the emergency room at North Cypress with dehydration, for which North Cypress billed $26,789.96.  On the first day, North Cypress billed 19 services, including multiple laboratory revenue codes and CPT Code 99218 for low complexity observation.  On the second day, North Cypress billed 18 services, including more than $1,000 in pharmacy charges and more than $1,200 for a hydration IV infusion.  Also, North Cypress billed nearly $2,100 for high complexity evaluation and management under CPT Code 99285, and nearly $5,000 for low complexity observation under CPT Code 99218.  On the last day, North Cypress billed for 4 services, including CPT Code

HOU:3520531.1

99218 for low complexity observation for $3,536.  In total, North Cypress billed $8,736 for 42 hours of low complexity observation, or 32.6% of the entire bill.

50.     North Cypress bills for observation in various manners.  Since May 1, 2009, it billed over $11.8 million for "Initial Observation Care" (CPT Code 99218) for 5,009 patients/claims - averaging more than $2,300 per patient.  It billed over $4.6 million for 1,760 patients/claims for "Hospital Observation Service, per hour" (G0378) - averaging over $2,600 per patient.  And, it has billed millions of dollars for observing patients in its Emergency Room.  In doing so, North Cypress has become the number "1" observing facility in the country for Aetna members.

51.     Simply put, Dr. Behar concocted a fraudulent billing scheme using North Cypress to gouge the health care system, Aetna, and its members out of tens of millions of dollars.  Prior to Aetna filing this suit, Dr. Behar and North Cypress had succeeded, at least temporarily.  North Cypress' billing practices are examples of greed over need and its abuse must be stopped.  Aetna brings this action under state and federal law for the disgorgement of these excessive fees and for other damages, as set forth more particularly herein.  Aetna also seeks declaratory and injunctive relief concerning North Cypress' wrongful billing practices.

**E.     Violations of Texas Statutory Law**

52.     North Cypress has violated numerous Texas statutory laws concerning the billing practices of medical providers providing treatment and services in the State of Texas.  These violations are pertinent to the causes of action Aetna asserts in this Complaint.

### *i.     Violations of Texas Occupations Code § 101.203*

53.     Section 101.203 of the Texas Occupations Code mandates that "[a] health care professional may not violate Section 311.0025, Health and Safety Code."  Section 311.0025(a) consists of the following prohibition:

(a) A hospital, treatment facility, mental health facility, or health care professional may not submit to a patient or a third party payor a bill for a treatment that the hospital, facility, or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary.

54.     North Cypress, at Dr. Behar's direction, submitted charges for medical treatment that it knew were improper or unreasonable and violated § 101.203.

55.     Furthermore, North Cypress treats patients pursuant to a set pattern of seeking patients based upon their financial viability and reimbursement potential, rather than any determination of patient need.

### ii.     Violations of Texas Occupations Code § 105.002

56.     Section 105.002 of the Texas Occupations Code concerns unprofessional conduct. It prohibits a health care provider, in connection with the provider's professional activities, from knowingly presenting (or causing to be presented) a false or fraudulent claim for the payment of a loss under an insurance policy.  It further prohibits a health care provider, in connection with its professional services, from knowingly preparing, making, or subscribing to any writing, with the intent to present or use the writing, or allow it to be presented or used, in support of a false or fraudulent claim under an insurance policy.

57.     North Cypress, at Dr. Behar's direction, has produced, or cause to be produced, various reports, itemized billing statements and UB-04/CMS-1450 forms to Aetna seeking payment for its services at fees far higher than the reasonable charges for the same services in the relevant market.  North Cypress knew that the billed amounts were false charges because it never intended to bill and/or collect the patients proportional share of financial responsibility.  North Cypress also knew that these requests for reimbursement included false and inflated charges for treatment and services that were not reasonable.  North Cypress also knew that these billing

-20-

forms would be presented to Aetna in regard to claims for benefits under Aetna-insured and employer-funded healthcare plans.

### iii.     Violations of Texas Insurance Code § 1204.055

58.     Section 1204.055 of the Texas Insurance Code mandates that "[a] physician or other health care provider may not waive a deductible or copayment by the acceptance of an assignment."   To implement its "out-of-network" strategy, however, North Cypress, at Dr. Behar's direction, routinely waives patients' financial responsibility in exchange for accepting the patients' assignment of benefits in violation of Section 1204.055.   North Cypress then bills Aetna inflated amounts that fail to reveal that the patients' share has been waived and/or the amounts that North Cypress will not seek to collect from the patients.   Such conduct is fraudulent, or at a minimum, materially misleading, and has caused Aetna to pay more than what is otherwise required under the terms of the applicable healthcare plans.

### iv.     Violations of Texas Occupations Code § 102.001 & § 102.006

59.     Section 102.001 of the Texas Occupation Code provides that "[a] person commits an offense if the person knowingly offers to pay or agrees to accept . . . any remuneration . . . to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency."   North Cypress, at Dr. Behar's direction, entered into agreements with physicians or practice groups pursuant to which North Cypress provided exclusive investment opportunities in exchange for the physicians or practice groups referring their patients to North Cypress.   North Cypress' remuneration-for-referral arrangements are part of its fraudulent scheme because North Cypress is able to increase its patient flow by incentivizing in-network physicians to send their patients to North Cypress.   This arrangement violates Texas law prohibiting any remuneration for the referral of patients.

60.     In addition, Section 102.006 of the Texas Occupation Code provides that "[a] person commits an offense if . . . the person . . . accepts remuneration to secure or solicit a patient or patronage for a person licensed, certified, or registered by a state health care regulatory agency; and . . . does not, at the time of initial contact and at the time of referral, disclose to the patient . . . that the person will receive . . . remuneration for securing or soliciting the patient." Neither North Cypress nor the physicians disclosed this remuneration-for-referral arrangement to Aetna when North Cypress submitted its healthcare reimbursement claims, or to Aetna's members before the medical services were provided, thereby violating Section 102.006, even assuming that the remuneration-for-referral arrangements were lawful.

### v.     Violations of Texas Insurance Code § 552.003

61.     Section 552.003 of the Texas Insurance Code addresses a medical provider's wrongful charging of different prices for the same product or service provided to patients with differing medical coverage.  A medical provider, such as North Cypress, violates Section 552.003 when it intentionally or knowingly charges two different prices for providing the same product or service, where the higher price is based on the fact that an insurer will pay all or part of the price of the product or service.

62.     North Cypress has violated Texas Insurance Code § 552.003 by seeking inflated reimbursements from Aetna for treatment and services rendered to members or insureds that were not reasonable simply because the particular patient had medical coverage through an Aetna policy or an Aetna-administered healthcare plan.  Upon information and belief, North Cypress does not routinely seek similar charges for similar services provided to uninsured or underinsured patients, or when submitting claims to Medicare.  North Cypress intended that its overinflated billings submitted to Aetna, an insurer, would be paid through healthcare benefits provided to Aetna plan members under their fully-insured or employer-funded healthcare plans.

-22-

# V.
## CLAIMS FOR RELIEF

**A.      First Cause of Action — Violation of RICO, 18 U.S.C. § 1962(c)**

63.      Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

64.      This cause of action is against Defendant Dr. Behar.  At all relevant times, Dr. Behar, an individual, was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

65.      North Cypress is an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).  North Cypress has an ascertainable structure and purpose beyond the scope and commission of Dr. Behar's racketeering activity as alleged herein, and North Cypress is separate and distinct from Dr. Behar.  Specifically, North Cypress GP is a Texas limited liability company and regularly conducts business in Cypress, Harris County, Texas.  North Cypress GP is the general partner of North Cypress, Ltd., which is a Texas limited partnership that regularly conducts business in Cypress, Harris County, Texas.  North Cypress, Ltd. has 100 or more investors and operates a 139-bed acute care hospital with publicly reported annual gross revenues that exceeded $1.5 billion in 2012.  At all relevant times, North Cypress was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).  Such activities include, but are not limited to, purchasing medicines, supplies, and equipment from out-of-state sellers; providing healthcare services to patients who travel from out-of-state; employing workforce personnel who travel from out-of-state in the performance of their duties; submitting healthcare claims to and receiving reimbursement from private commercial insurers and/or third-party administrators (including Aetna) located out-of-state or to the U.S. Government through the Federal Medicare and Medicaid programs; and developing plans to finance operations and expansion projects through out-of-state lenders.

66.     At all relevant times, Dr. Behar—North Cypress' CEO and Chairman of the Board—was employed by or associated with North Cypress, and he conducted and participated, directly or indirectly, in the conduct of North Cypress' affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), for the unlawful propose of intentionally defrauding Aetna, as well as other commercial insurers and/or third-party administrators, in violation of RICO, 18 U.S.C. § 1962(c).

67.     Dr. Behar engaged in "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) by engaging in numerous acts of mail and/or wire fraud, in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).  Specifically, beginning on or about January 1, 2007, and continuing to the present, Dr. Behar committed two or more of these acts of racketeering activity as follows:

a.     Dr. Behar devised a scheme or artifice to defraud Aetna and other healthcare payors by (i) intentionally causing North Cypress to enter into secret remuneration-for-referral agreements with physicians or practice groups pursuant to which North Cypress provided exclusive investment opportunities and other remuneration in exchange for the physicians or practice groups referring their patients, including Aetna members, to North Cypress and monitoring the referrals via his "sacred reports" (*i.e.*, Physician Vital Statistics); (ii) intentionally causing North Cypress not to disclose such remuneration-for-referral arrangements to patients, including Aetna members, before providing medical services; (iii) intentionally causing North Cypress to waive and/or reduce out-of-network deductibles, co-pays, and co-insurance of commercially insured patients, including Aetna members, in violation of Texas law; and (iv) intentionally causing North Cypress to submit through the mails and/or wires hundreds of thousands of separate healthcare reimbursement claims to Aetna, which failed to disclose the existence of the abovementioned remuneration-for-referral agreements and falsely represented that the patients' cost share was not waived or reduced when in fact it was.

b.     Dr. Behar devised a scheme or artifice to defraud Aetna and other healthcare payors by intentionally inflating North Cypress' charges for medical services to amounts that grossly exceed the usual, customary, and reasonable fees for such services in the relevant market.  Dr. Behar thereafter caused North Cypress to submit through the mails and/or wires hundreds of thousands of separate healthcare reimbursement claims to Aetna, which falsely represented that such charges were reasonable and customary when in fact they were not.

c.      Dr. Behar devised a scheme or artifice to defraud Aetna and other healthcare payors by intentionally causing North Cypress to hold patients, including Aetna members, in an "observation" status for unreasonably long periods of time without formally admitting the patient to the hospital.  Dr. Behar thereafter caused North Cypress to submit through the mails and/or wires thousands of separate healthcare reimbursement claims to Aetna with excessive charges, which falsely represented that such "observation" services were medically necessary and that the associated charges were reasonable and customary when in fact they were not.

d.      Dr. Behar devised a scheme or artifice to defraud Aetna and other healthcare payors by intentionally causing North Cypress to admit patients, including Aetna members, through the emergency room, despite the lack of any medical emergencies.  Dr. Behar thereafter caused North Cypress to submit through the mails and/or wires thousands of separate healthcare reimbursement claims to Aetna, which falsely represented that such "emergency" services were medically necessary and that the associated charges were reasonable and customary when in fact they were not.

68.      The acts of mail and/or wire fraud set forth above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because there were multiple acts of racketeering activity within the past 10 years.  The acts alleged were necessary for Dr. Behar to execute the scheme to defraud Aetna and other commercial insurers and/or third-party administrators.   The acts alleged were also related to each other by virtue of a common participant, common victims, a common method of commission, a common purpose, and a common result of defrauding Aetna, and other commercial insurers and/or third-party administrators, while enriching Dr. Behar and concealing his fraudulent activities.

69.      Aetna reasonably relied on the misrepresentations and omissions that were part of Dr. Behar's scheme to defraud and racketeering activities.  As a direct and proximate result of Dr. Behar's racketeering activities and violations of 18 U.S.C. § 1962(c), Aetna has been injured in its business and property and has incurred a substantial and tangible financial loss by overpaying thousands of healthcare claims in an amount to be determined at trial.

70.      Aetna seeks to recover its actual damages, treble damages, and attorneys' fees incurred from the foregoing actions.

**B.**      **Second Cause of Action — Tortious Interference With In-Network Agreements**

71.      Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

72.      In addition, or in the alternative, Defendants are liable for tortious interference of Aetna's in-network agreements.   Aetna has valid in-network agreements with numerous participating medical providers that make up a network of providers through which Aetna provides in-network health care benefits to its members.   Among other things, Aetna's in-network agreements require participating medical providers to accept Aetna's contracted rates as payment in full for medical services provided to Aetna members.   The in-network agreements also require participating medical providers to provide all non-emergency medical services to Aetna members at participating facilities and, when referral to another provider is necessary, to refer Aetna members to available healthcare facilities that are part of Aetna's network.

73.      Defendants knew or had reason to know of Aetna's in-network agreements and Aetna's interest in such contracts.   Some of Aetna's participating medical providers are owners in North Cypress and regularly treat Aetna members at North Cypress.

74.      Defendants willfully and intentionally interfered with Aetna's in-network agreements by directing medical providers (who are contracted with Aetna's network and also investors in North Cypress) to refer their patients to North Cypress in direct breach of Aetna's and the participating providers' in-network agreements.   When those physicians did not refer patients (or a sufficient number of patients) to North Cypress, they were reprimanded, threatened, and even forced by Dr. Behar to relinquish their ownership interest in North Cypress.

75.      Defendants' interference proximately caused injury to Aetna, which resulted in actual damages or loss in an amount equal to an amount to be determined at trial but no less than the difference between what Aetna would have paid for the relevant medical services had they

been performed at an available in-network facility and the amount that Aetna paid to North Cypress. In addition to actual damages, Aetna seeks the recovery of consequential damages, incidental damages and costs incurred from the foregoing actions.

**C.      Third Cause of Action — Tortious Interference with Healthcare Benefit Plans**

76.      Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

77.      In addition, or in the alternative, Defendants are liable for tortious interference of the relevant healthcare benefit plans.  Patients treated at the North Cypress are members or beneficiaries of health care benefit plans and policies of insurance, including (i) self-funded plans for which Aetna provides various third-party claims administrative services, (ii) plans insured under group policies issued by Aetna which plans are established and maintained by private employers, (iii) plans covering federal employees, (iv) plans covering employees of state governmental entities (v) church plans, and (vi) policies issued to individuals.  The plans or policies of insurance are contracts the terms of which govern the co-pay, deducible, coinsurance and other portions of a hospital's charges for services for which the member or beneficiary is contractually obligated to pay.  These and other plan or policy terms encourage members and beneficiaries to make responsible and cost effective health care decisions.

78.      Defendants knew or had reason to know of the plans or policies of insurance and that such plans or policies of insurance required the collection of applicable patient responsibility for out-of-network benefits, but Defendants took numerous overt steps aimed at avoiding the patient-responsibility requirements for out-of-network benefits, including, but not limited to, designing and implementing a "prompt pay discount" policy to be used only for select commercially insured patients, like Aetna members.

79.     Defendants willfully and intentionally interfered with these plans or policies of insurance by waiving the patients' co-pays, coinsurance, and/or deductibles.   In doing so, Defendants caused Aetna members to receive healthcare benefits for which they did not pay their contractual share of financial responsibility.

80.     Defendants' acts and omissions induced patients to receive treatment at North Cypress (an out-of-network facility) rather than available in-network facilities, thereby proximately causing injury to Aetna, which resulted in actual damages or loss in an amount to be determined at trial.

81.     In addition to actual damages, Aetna seeks the recovery of consequential damages, incidental damages and costs incurred from the foregoing actions.

**D.      Fourth Cause of Action — Breach of Contract**

82.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

83.     In addition, or in the alternative, North Cypress is liable for breach of contract. On or about September 15, 2010, North Cypress entered into a valid Participating Facility Agreement with MultiPlan, Inc. pursuant to which North Cypress obtained the right to, and began participating in, Aetna's National Advantage Program, which provides plan sponsors and members access to contracted rates for healthcare services performed by out-of-network providers like North Cypress, who are not directly contracted with Aetna as an in-network provider.

84.     Under the Participating Facility Agreement, Aetna is a third party beneficiary because North Cypress and MultiPlan Inc. entered in the agreement with the express intention of benefiting Aetna and because the agreement was entered into directly and primarily for Aetna's benefit.

85.     Under the Participating Facility Agreement, North Cypress was required to bill and collect from patients all applicable patient financial responsibility for out-of-network services as specified in the patients' healthcare benefit plans.  By waiving or reducing patient financial responsibility, or otherwise collecting only the in-network amount of patient responsibility, North Cypress breached its Participating Facility Agreement with MultiPlan, Inc., thereby causing injury to Aetna, which resulted in actual damages or loss in an amount to be determined at trial.

86.     In addition to actual damages, Aetna seeks the recovery of consequential damages, incidental damages and costs incurred from the foregoing actions.

## VI.
## ATTORNEYS' FEES

87.     Aetna realleges and incorporates by reference the foregoing paragraphs of the Complaint.

88.     Aetna seeks to recover its reasonable and necessary attorneys' fees and costs incurred in connection with prosecuting this action under, without limitation, 18 U.S.C. § 1964(c) and TEX. CIV. PRAC. & REM. CODE § 38.001.

## VII.
## CONDITIONS PRECEDENT

89.     Aetna has performed all conditions precedent, or they have otherwise been waived.

## VIII.
## JURY DEMAND

90.     Aetna demands a trial of this action by jury on all issues.

HOU:3520531.1

## IX.
## PRAYER

Plaintiff Aetna Life Insurance Company respectfully requests that Defendants Dr. Robert

A. Behar, North Cypress Medical Center Operating Company, Ltd. and North Cypress Medical

Center Operating GP, LLC be cited to appear and answer, and that on final trial hereof, Plaintiff

have judgment against these Defendants, jointly and severally, for the following:

a.    An award of both actual damages and consequential damages;

b.    An award of treble damages;

c.    Reasonable and necessary attorneys' fees;

d.    Costs of court;

e.    Prejudgment and post-judgment interest; and

f.    Such other and further relief at law or in equity to which Aetna may be
      justly entitled.

Respectfully submitted

By:  */s/ John B. Shely*
JOHN B. SHELY
State Bar No. 18215300
jshely@andrewskurth.com
600 Travis, Suite 4200
Houston, Texas 77002
(713) 220-4200
(713) 220-4285 – Fax

OF COUNSEL:

ANDREWS KURTH LLP
and
JEFFREY D. MIGIT
State Bar No. 00794306
jmigit@andrewskurth.com

ATTORNEY-IN-CHARGE FOR AETNA
LIFE INSURANCE COMPANY