**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **AETNA LIFE INSURANCE COMPANY** | § § § § | |
| **VS.** | § § | **CIVIL ACTION NO. 4:15-cv-491** |
| **ROBERT A. BEHAR, MD; NORTH CYPRESS MEDICAL CENTER OPERATING COMPANY, LTD; and, NORTH CYPRESS MEDICAL CENTER OPERATING COMPANY GP, LLC** | § § § § § § § § | |

**COUNTER-PLAINTIFFS'/THIRD-PARTY PLAINTIFFS'
ORIGINAL COUNTER-COMPLAINT AND THIRD PARTY COMPLAINT**

**TO THE HONORABLE JUDGES OF SAID COURT:**

COME NOW, the Counter-Plaintiffs/Third-Party Plaintiffs Robert A. Behar, M.D., North Cypress Medical Center Operating Company, Ltd. and North Cypress Medical Center Operating Company GP, LLC (collectively "North Cypress") complaining of Counter-Defendant Aetna Life Insurance Company and Third-Party Defendants Aetna, Inc., Aetna Health, Inc. (collectively "Aetna"), Mark T. Bertolini ("Bertolini"), Jeff D. Emerson ("Emerson"), Ed Neugebauer ("Neugebauer") and Clarence Carlton King ("King") and show the following:

**PREAMBLE**

1.     This is a **fraud** and **RICO** suit against **Aetna** and its officers, **Mark T. Bertolini**, **Jeff D. Emerson**, **Ed Neugebauer** and **Clarence Carlton King** for instigating unlawful and illegal decade-long **schemes** and "**Major Initiatives**" against physician-owned, out-of-network facility providers such as North Cypress not only in Houston, Texas but in the State of Texas as

well as other States in the United States in order to "**bring down**," "**destroy**" and **bankrupt** those entities so that Aetna can make more money, especially with regard to the "**Contingency Fees**" of **35% to 50%** of the "**Savings**" that Aetna artificially creates in the adjudication of out-of-network claims at the cost and expense of employer plan sponsors of self-funded plans, their employee beneficiaries and out-of-network providers.   Aetna's "**Savings'**" scheme creates conflicts-of-interest which are not only a violation of state law but also federal law.   This scheme and the **"Major Initiatives"** have assisted Aetna in collecting net revenues of **billions of dollars** *per annum.  The factual allegations made herein to support both the RICO and fraud claims are not based upon "information and belief," but rather, are established facts which directly implicate and indict* ***Bertolini***, ***Emerson***, ***Neugebauer*** *and* ***King****.*

## PARTIES

2.      Counter-Plaintiff/Third-Party Plaintiff Robert A. Behar, M.D. is a party to this case.

3.      Counter-Plaintiff/Third-Party Plaintiff North Cypress Medical Center Operating Company, Ltd. is a party to this case.

4.      Counter-Plaintiff/Third-Party Plaintiff North Cypress Medical Center Operating Company GP, LLC is a party to this case.

5.      Counter-Defendant Aetna Life Insurance Company is a business entity doing business in Texas, and during all material times acted as either the "third party administrator" of employers' self-funded healthcare plans or as an insurer of fully-insured healthcare policies. Aetna may be served with this pleading by serving its counsel, John Shely and Jeff Migit, Andrews & Kurth, LLP, 600 Travis, Suite 4200, Houston, Texas  77002.

6.      Third-Party Defendant Aetna, Inc. is a business entity doing business in Texas and during all material times acted as either the "third party administrator" of employers' healthcare plans and/or as an insurer of healthcare insurance policies and/or as the owner of the other Counter-Defendant/Third-Party Defendant entities.  Aetna, Inc. may be served with this pleading by serving its President, Karen Rohan, Aetna, Inc., 151 Farmington Avenue, Hartford, Connecticut  06156.

7.      Third-Party Defendant Aetna Health, Inc. is a business entity doing business in Texas and acted in concert with the other Counter-Defendants and Third-Party Defendants and may be served with this pleading by serving its agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas  75201-3136.

8.      Third-Party Defendant Mark T. Bertolini was during all material times the Chairman and Chief Executive Officer of Aetna and acted in concert with the other Counter-Defendants and Third-Party Defendants and may be served with process at Aetna, Inc., 151 Farmington Avenue, Hartford, Connecticut  06156.

9.      Third-Party Defendant Jeff E. Emerson was the former head of Healthcare Management and the Regions of Aetna, Inc. and prior to recently leaving Aetna acted in concert with the other Counter-Defendants and Third-Party Defendants and may be served with process at his current place of business, Complex Care Solutions, 75 Broad Street, Room 815, New York, New York  10004.

10.     Third-Party Defendant Ed Neugebauer is the Chief Litigation Officer of Aetna, Inc. and acted in concert with the other Counter-Defendants and Third-Party Defendants and may be served with process at 980 Jolly Road, U11S, Blue Bell, Pennsylvania  19422.

11.     Third-Party Defendant Clarence Carlton King is the Head of National Networks & Contracting Services as well as President of Aetna Health, Inc. and acted in concert with the other Counter-Defendants and Third-Party Defendants and may be served with process at 980 Jolly Road, U11S, Blue Bell, Pennsylvania  19422.

## JURISDICTION

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and cost.

13.     Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States.

14.     Venue is proper in the Southern District of Texas pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b)(1) because Aetna, Bertolini, Emerson, Neugebauer and King transact substantial business within this jurisdiction and make millions of dollars in profits therefrom and pursuant to 28 U.S.C. § 1391(b)(2)

## FACTUAL BACKGROUND

*Aetna's Gains From RICO and Fraudulent Activities:*

15.     This is a **fraud** and **RICO** case wherein **Aetna**, **Bertolini**, **Emerson**, **Neugebauer** and **King** conspired to unlawfully and illegally harm and damage North Cypress as well as other out-of-network facility providers owned by physicians not only in this jurisdiction, but in the State of Texas and most, if not all of the States.  Aetna has annual net revenues of approximately **$500 billion** and earns a good portion of that money by either underpaying or not paying physician-owned out-of-network facility providers such as North Cypress.  As a partial

result thereof, **Bertolini** makes **$30.7 million** per year, bonuses and stock options in excess of **$7 million** per year and is awarded hundreds of thousands of dollars for personal travel, airline travel and other personal expenses.  Bertolini is able to obtain these large sums of money and extensive corporate perks as a partial result of the illegal schemes which he master-minded and/or which are described herein.  It is publicly reported that *"[W]ith this compensation, Mr. Mark T.* **Bertolini** *made* **significantly more than the average public executive and significantly more than his executive colleagues at Aetna**."  It has also been publicly reported that Bertolini's salary, restricted stock awards, option awards, non-equity incentive plan compensation and other compensation are all "***more than the average public executive's other compensation and more than the other compensation of other executives at Aetna***."  Bertolini initially joined Aetna in 2003 as Head of Aetna Specialty Products and subsequently served as Executive Vice President and Head of Aetna's Regional Business. Bertolini harbors a deep-seated dislike for physicians who own facilities.  These personal feelings have spilled over into his professional life at Aetna which have served to support and create the schemes, conspiracies and other illegal and unlawful activities noted herein.  Furthermore, Emerson, Neugebauer and King also receive substantial salaries, bonuses, stock options and corporate perks all derived in part from the unlawful and illegal schemes noted herein.  Aetna, Bertolini, Emerson, Neugebauer and King have been involved in these illegal and unlawful actions for at least a 10 year period and the schemes were concocted and implemented during that period of time.

***Evidence Of RICO and Fraudulent Conduct:***

16.     Aetna receives extraordinary revenues which make it an extreme outlier in the healthcare insurance industry with regard to payors which were/are *not* achieved by creating a higher quality or more efficient insurance product(s), but rather, through a fraudulent

conglomeration of schemes that were masterminded by Bertolini, Emerson, King and Neugebauer, Aetna's Chairman and Executive Officer, former Head of Healthcare Management and the Regions, Chief Litigation Officer and Head of National Networks & Contracting Services together with the assistance of outside legal counsel at Andrews Kurth in Houston, Texas.  These unlawful and illegal schemes include, but are not limited to,  the following:

    a. devising ways to "***jack-up copays***" and other patient responsibility amounts in order to make more money at the expense of the Plan Sponsors, members and providers;

    b. "***ESCALATE, ESCALATE, ESCALATE***" unnecessary claims, SIU investigations and "**Major Initiatives**" against physician-owned out-of-network facility providers such as North Cypress and to arbitrarily "***place 100% of their claims on intense review***";

    c. the creation of efforts to "***bring down***" and bankrupt physician-owned out-of-network facility providers such as North Cypress;

    d. arbitrarily placing "***permanent flags***" on physician-owned out-of-network facility providers' invoices when there is "***no evidence of substantiated fraud***" in violation of both law and Aetna's own written SIU policies;

    e. making reimbursement to physician-owned out-of-network facility providers such as North Cypress which Aetna knows are contrary to the applicable provisions of plans/policies and instead, Aetna intentionally ignores those plan/policy provisions and utilizes Aetna's own determinations as what to pay;

    f. admitting that physician-owned out-of-network facility providers such as North Cypress have "not violated any Texas statutory law," but continuing to take action to "***bring down***," **bankrupt**, and "***destroy***" such providers by falsely representing that they have violated both inapplicable Texas statutes and non-existent Texas statutes;

    g. utilizing the assistance of outside counsel at Andrews Kurth in Houston, Texas to formulate and frame the unlawful schemes against physician-owned out-of-network providers such as North Cypress;

    h. entering into unlawful agreements with plan sponsors wherein it "obtains a percentage of Savings earned from the adjudication of claims in amounts as much as ***35% to 50% of those Savings***" which

establish conflicts-of-interest – Aetna makes what it calls additional "Contingency Fees" from denying claims to physician-owned out-of-network facility providers such as North Cypress;

i. entering into unlawful arrangements as well as engaging in anti-trust activities with competing facility providers especially in the Houston, Texas area such as **Methodist Hospital** wherein the in-network facility providers agree to lower their rates with regard to in-network contracts with Aetna in order to obtain assurances from Aetna that Aetna will initiate unlawful "**Initiatives**" and place "***the tightest controls ever***" on North Cypress to assist the competing in-network providers by taking patients away from North Cypress and funneling those patients to the in-network providers;

j. making policy decisions to "deny all elective procedures from physician-owned out-of-network facility providers such as North Cypress in an arbitrary and unlawful manner;

k. requiring that all claims for emergency services from physician-owned out-of-network facility providers such as North Cypress be sent to "**Clinical Review**" by an **Aetna Medical Director** to determine from a medical perspective whether the claim is based upon a "True Emergency" contrary to the Affordable Healthcare Act and without identifying and defining in the plans what constitutes a "True Emergency";

l. with regard to claims emanating from the emergency rooms at physician-owned out-of-network facility providers such as North Cypress, also requiring that all such claims go to "**Clinical Review**" wherein all medical records are requested from the provider to determine if the service was for "an emergent or not an emergent situation" and if it is determined to be an emergent situation, rather than paying the claim, instructing claims adjusters to deny the claim for not being "medically necessary";

m. utilizing Aetna employees to "***ghost write***" letters on behalf of plan sponsors to send those letters to the "Texas Department of State Health Services" complaining of physician-owned out-of-network facility providers such as North Cypress to investigate and determine if North Cypress is engaged in "fee-forgiving" when Aetna knows that there is no Texas law prohibiting same;

n. "**targeting**" in-network physician providers who lawfully refer patients to physician-owned out-of-network facility providers such as North Cypress requiring them to disclose any interests with the facility

and threatening to terminate their in-network contracts in violation of Texas law;

o.  arbitrarily expanding "**implant audit of invoices against billed charges**" with regard to physician-owned out-of-network facility providers such as North Cypress;

p.  requiring pre-certifications from physician-owned out-of-network facility providers such as North Cypress when the applicable plans/policies do not so require;

q.  publicly claiming that investors/unit holders at North Cypress are paid to refer patients to North Cypress Medical Center when Aetna knows and has seen the evidence that such a claim is not true and that there is no correlation between (i) distributions made in due course to Unitholders or offers of units to potential unitholders and (ii) referrals to the hospital;

r.  publicly disseminating statements that physician-owned out-of-network facility providers such as North Cypress violate Federal Anti-Kickback statutes and Federal Anti-Referral statutes, Stark I and II, when they know that North Cypress has *never* engaged in such violations and that those statues have no application in the context of a commercial payor;

s.  calling and pressuring patient members who are in the emergency rooms of physician-owned out-of-network facility providers such as North Cypress to leave the hospital's emergency room even when they are in an emergent condition telling them that Aetna will not cover any of the expenses at North Cypress and that the patients will be left with a "huge medical bill to pay" and then directing the patients to tell North Cypress to obtain "an emergency ambulance to immediately transport the patient to a competing in-network facility" which would place the hospital in direct violation of EMTALA and without regard to the patient's serious, emergent medical condition;

t.  refusing to pay for substantial medical bills, *e.g.* the replacement of a cranial flap after emergency treatment because interim therapy before the cranial flap could be re-attached occurred at another facility in violation of the terms and conditions of the applicable plans/policies; and,

u.  according to in public filings in Cause No. 2006-79945, *Miguel Franco, M.D., et al. v. Memorial Hermann Healthcare Systems, et al., West Houston GP, L.P., et al.*, In the 61st Judicial District Court of

Harris County, Texas, Aetna initiates overall schemes in geographic areas such as Harris County wherein Aetna closely works with large, competing in-network hospitals such as **Memorial Hermann** to take all actions necessary to financially destroy, bankrupt, "bring down" and harm competing physician-owned out-of-network facility providers such as North Cypress. This was not only done with regard to North Cypress, but also with the physician-owned facility provider, **Town & Country Hospital** in west Houston which was "**brought down**" and bankrupted.

*Aetna's Illegal "Savings" Scheme:*

17.    For years, Aetna has been engaged in a "Savings" scheme wherein Aetna extracts from self-funded plans what it describes as "**Contingency Fees**" as high as **35% to 50%** as a result of under-reimbursing out-of-network providers such as North Cypress. Upon the implementation of the "**Major Initiatives**" against North Cypress, Aetna SIU employees boasted of making "a huge" amount of "Savings" from North Cypress in the form of these "Contingency Fees" wherein Aetna made 35% to 50% of the aggregate difference between North Cypress' charges and what Aetna unilaterally determined to underpay North Cypress.

18.    There are approximately 2,500 to 3,000 plan sponsors/employers with regard to claims involving North Cypress who have Master Service Agreements/Administrative Service Agreements with Aetna. In those Agreements, the plan sponsors contract with Aetna, the third party administrator ("TPA") for the provision of administrative services which include the review and adjudication of all health insurance claims generated by the plan sponsors' participants and enrollees for both in-network and out-of-network benefits. Aetna is paid a percentage of the "Aggregate Savings" that it claims it obtains from out-of-network providers such as North Cypress as well as collecting the same fees from subrogation claims, audits and subsequent reviews of claims wherein alleged "Savings" are obtained. The primary program wherein Aetna receives these additional, "Contingency Fees," also known as "Access Fees," in

the form of a percentage of "Savings" is its **National Advantage Program** ("NAP") which governs out-of-network claims and how those claims are to be paid.  Under **NAP**, Master Service Agreements have percentages payable to Aetna from the "Aggregate Savings" ranges from 35% to 50%.  This means that whenever Aetna is able to either negotiate a lower rate via a Discount Agreement for a specific invoice with an out-of-network provider such as North Cypress or simply pays something lower than the billed amount, that constitutes a "Savings."  Each quarter and on an annual basis, the "Savings" are calculated and Aetna determines the "Aggregate Amount of Savings" and from those sums, it determines its percentage of additional "Access Fees" which are automatically debited from the plan sponsors' bank account.

19.     Aetna must provide both Quarterly Reports and Annual Reports to the plan sponsors indicating the "Aggregate Savings," the percentage the Agreement calls for and the dollar amount of the percentage that is being paid to Aetna which is debited from the plan sponsor's bank account.  Many of these plan sponsors are Counties in the State of Texas, such as Harris County, which employs thousands of individuals.   An example of the additional, "Contingency Fees" that Aetna earns is wherein one County paid $1,470,276.40 in one year and two companies/plan sponsors paid as much as an additional $500,000 to $1,000,000 per year.  When one considers these amounts taken from the bank accounts of just three plan sponsors out of thousands, the amounts of "Contingency Fees" debited/taken by Aetna are in the dozens of millions of dollars across the nation and over the years, this amount will probably be in the hundreds of millions of dollars.

20.     The Model Regulation Service/NAIC Guidelines for Third Party Administrators dated October, 2011 and originally adopted in 1977 states the following:

> A.      A TPA shall not enter into an agreement or understanding
> with a payor or, with regard to workers' compensation, a payor,

employer or co-employer in which the effect is to make the amount of the TPA's commissions, fees, or charges contingent upon savings effected in the payment of losses covered by the payor's obligations.   This provision shall not prohibit a TPA from receiving performance-based compensation for providing hospital or other auditing services, from providing managed care or related services, or from being compensated for subrogation expenses.

21.     § 4151.117(b), TEX. INS. CODE states the following:

A.     A TPA shall not enter into an agreement or understanding with a payor in which effect is to make the amount of the TPA's commissions, fees, or charges contingent upon savings effected in the payment of losses covered by the payor's obligations.   This provision shall not prohibit a TPA from receiving performance-based compensation for providing hospital or other auditing services, from providing managed care or related services, or from being compensated for subrogation expenses.

B.     A payor shall not enter into an agreement with a TPA in violation of this section.

C.     This section shall not prevent the compensation of a TPA from being based on premiums or charges collected of the number of claims paid or processed.

22.     Similarly, § 4151.117(b) provides:

An insurer or plan sponsor may not permit or provide compensation or another thing of value to an administrator that is based on the savings accruing to the insurer or plan sponsor because of adverse determinations regarding claims for benefits, reductions of or limitations on benefits, or other analogous actions inconsistent with this chapter, that are made or taken by the administrator.

23.     Twelve (12) other States have similar statues that are also based on the Model Act:   Connecticut, Idaho, Indiana, Nebraska, New Hampshire, Nevada, Oregon, Missouri, Mississippi, Rhode Island, South Dakota and West Virginia.

24.     These 13 statutes prohibit a TPA such as Aetna from entering into an agreement or understanding with a Plan Sponsor to pay the TPA fees or charges contingent upon the

11

"Savings" realized in the payment of losses covered by the payor's obligations.  As noted above, in its Administrative Services Agreements, Aetna even characterizes these charges as "*Contingent Fees*."

25.     Aetna has violated both Texas law as well as the similar statutes of the other 12 States.

26.     Pursuant to §4151.301, TEX. INS. CODE, for a violation of §4151.117, the Texas Department of Insurance can deny the application of a Certificate of Authority or discipline the holder (TPA) of a Certificate of Authority if the Department determines that the holder willfully violated an insurance law of Texas, or has engaged in fraudulent or dishonest acts or practices. §4151.302 provides remedies including the suspension or revocation of the TPA's Certificate of Authority and the assessment of an administrative penalty.  §4151.309 makes an offense under the Insurance Code a criminal misdemeanor act punishable by fine.

27.     §4151.308 provides for the imposition of sanctions on the TPA provided by Chapter 82 of the Insurance Code.  Chapter 82, §82.051 provides for the cancellation or revocation of authorization to practice in the State.  §82.052 also provides for the revocation of an authorization under §82.051.  Finally, §82.053 provides for the TPA that violates the Insurance Code to "*make complete restitution to each Texas resident, each Texas insured and each entity operating in this state that is harmed by the violation of, or failure to comply with, this code or a rule of the commissioner*."

28.     Aetna unilaterally determines to underpay out-of-network providers such as North Cypress in order to beef-up the "Contingency Fees" that it collects from its plan sponsors. Collecting such "Contingency Fees" not only creates a substantial conflict-of-interest but is also

illegal as noted above.  These "Contingency Fees" and Aetna's scheme has cost plan sponsors such as Texas Counties millions of dollars.

29.     The Fifth Circuit of Appeals has established in *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389 (5th Cir. 2006) that "Aetna has an inherent conflict-of-interest because it serves both as the administrator and insurer under the plan" citing *Lain v. UNUM Life Ins.*, 279 F.3d. 337, 343 (5th Cir. 2002); that "[A] conflicted administrator merits less deference" citing *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (*en banc*); "[t]he evidence of conflict on the part of the administrator, the less deference [the Fifth Circuit's] abuse of discretion standard will be" citing *Vega* at 297; and, the Fifth Circuit applies a "sliding scale" to determine how much deference to give under these circumstances.

30.     Based upon the foregoing, Aetna will be required to not only reimburse North Cypress for underpayments of claims which were involved in illegal schemes, but also, will have to reimburse all of its plan sponsors, members and insureds from whom the illegal fees were obtained pursuant to the various states' statutes.  This means that Aetna will have well overstated its earnings during the last 10 years.  Applicable Governmental Regulations and the Securities and Exchange Commission will then require Aetna to properly restate those earnings without the inclusion of the ill-gotten gains.  In other words, Aetna will be required to restate its earnings on an annual basis for over a period of at least ten (10) years.

***Proof of RICO and Fraudulent Actions:***

31.     Aetna SIU employees discussed "**jacking-up copays**" and other patient responsibility amounts with regard to the "**Major Initiatives**" taken against North Cypress and other physician-owned out-of-network facility providers.  Emerson instructed his officers, department heads, SIU managers and employees to "***ESCALATE, ESCALTE, ESCALATE***" all

"**Initiatives**" against North Cypress and to arbitrarily "*place 100% of their claims on intense review*."   In response to that emphatic, must-obey instruction, King, the Head of National Networks and Civil Contracting Services wrote that all could see "**the pressure that [he] is under**" from Bertolini and Emerson and that he would "*bring down*" and bankrupt North Cypress with regard to the implementation of the "**Major Initiatives**" against that hospital. Aetna SIU Managers intentionally and arbitrarily placed "*permanent flags*" on North Cypress' claims even though there was "*no evidence of substantiated fraud*" in violation of both law and Aetna's own written SIU policies.   Upon direction from the Third-Party Defendants, an SIU manager admitted that North Cypress had "**not violated any Texas statutory law**" and could not have defrauded Aetna with regard to its prompt pay discount program because North Cypress had advised Aetna of same on thousands occasions of same, but continued to take action to "**bring down**" and financially destroy North Cypress by continuing to act as if there existed such violations of such non-existent statutes.   In a similar, other payor case, the Fifth Circuit Court of Appeals has ruled that under these circumstances of repeated notices of its prompt pay discount program, "fraud is inapt" as to North Cypress.   Aetna Product Division employees engaged in anti-trust activities with large competing facility providers such as **Methodist Hospital** wherein Methodist Hospital agreed to lower its rates with regard to in-network contracts with Aetna in exchange for Aetna initiating its unlawful "**Initiatives**" against North Cypress so that more patients would be funneled to Methodist Hospital rather than to competing providers such as North Cypress.   This fact is documented in a letter from Methodist Hospital's Senior Vice President, Bret Curran, to Aetna's Network Vice President, Karen Chotiner, dated July 14, 2011. The SIU Manager devised a scheme in conjunction with those of the Third-Party Defendants to have all ER claims at North Cypress go through a "**Clinical Review**" wherein all medical

records are requested to determine if the service was "for an emergent or not emergent situation" and thereafter, if the circumstance determined that it was an emergent situation, then to deny the claim as being not "medically necessary."   At the behest of the Third-Party Defendants, Aetna employees "**ghost wrote**" letters on behalf of plan sponsors to send to the "**Texas Department of State Health Services**" complaining of North Cypress and demanding an official, state investigation with regard to North Cypress' prompt pay discount program when it knew that no law in Texas prohibited such discount programs.   Pursuant to the directives and orders of the Third-Party Defendants, the Aetna SIU Department arbitrarily expanded "**implant audit of invoices against billed charges**" with regard to North Cypress and required pre-certifications for in-patient stays when the applicable plans/policies did not so require.   As a matter of fact, Aetna's outside counsel in Houston, Texas at Andrews Kurth was involved in these instructions even though several employees at Aetna stated that they knew that certain plans did not so require.   The individual Third Party Defendants also vowed and instructed that no negotiations occur with North Cypress to admit North Cypress as an Aetna in-network facility provider even though such an arrangement would benefit plan sponsors and members in northwest Harris County.

32.     Bertolini, Emerson, Neugebauer and King met and/or conversed and/or communicated via emails on many occasions with regard to the creation of the "**Major Initiatives**" and unlawful and illegal schemes imposed against North Cypress and other physician-owned facility providers and were directly involved in these "**Initiatives**" and schemes.   As a matter of fact, Neugebauer, the Head of Litigation has testified that indeed, Aetna schemed to attack and utilize "*Initiatives*" against physician-owned out-of-network facility providers such as North Cypress.   There is also sworn testimony that Aetna's outside counsel at

Andrews Kurth was involved in these schemes "from the outset" advising Aetna, Bertolini, Emerson, Neugebauer and/or King as to how to do same.

*Fines & Sanctions Against Aetna:*

33.     As a result of similar, unlawful and illegal activities, Aetna has been continually fined and sanctioned.  For example, In 2002, 700,000 physicians and medical societies sued Aetna for underpayment of claims wherein Aetna had to pay **$470 million** to settle the case; in 2002, the New York Department of Insurance issued a fine against Aetna for **$2.5 million** for "bungled claims, improper treatment denials, unlicensed health insurance agents and poorly performing claims processors using out-of-date software;" in 2007, the New Jersey Department of Banking and Insurance levied a **$9.5 million** fine against Aetna for refusing to appropriately cover services provided by out-of-network providers, including emergency treatment in violation of New Jersey rules and regulations; in 2010, CMS notified Aetna's CEO Bertolini that it was imposing immediate sanctions on Aetna **suspending** Aetna's marketing and enrollment activities for all Aetna Medicare Advantage-Prescription Drug Plan contracts; in 2010, Aetna was fined **$850,000** by the New York State Insurance Department for incomplete disclosures on EOBs; in 2000, Aetna was fined by North Carolina for faulty records and other violations; in 2001, Aetna was fined by the State of Maryland for **$1.4 million** for late payments of claims; in 2001, Aetna was fined in the amount of **$1.15 million** by the Texas Insurance Department for failing to promptly pay providers, in 2010, Aetna was assessed **$5 million** in fines in California for unfair and untimely payment to facility providers; in 2012, Aetna was fined by the State of Massachusetts for failing to cover health insurance benefits mandated by Massachusetts law; in 2013, Aetna was sanctioned by the State of California; in 2000, Aetna was sanctioned by the State of Texas for providing improper financial incentives to doctors to limit patient care and

other violations of Texas law; in 2010, Aetna was fined **$750,000** for violations of New York law; and, during the past four years, Aetna has been cited by the State of California for "*gouging*" citizens for unnecessary healthcare premiums.  Neither Aetna, Bertolini, Emerson, Neugebauer nor King care about these sanctions and penalties because they are a part of a huge, multi-billion dollar company and can always pass on these sanctions and fines to their customers, plan sponsors and members and to the public at large and continue unimpeded with their illegal and unlawful schemes and activities.  The actions and omissions on the part of Aetna, Bertolini, Emerson, Neugebauer and King together with their outside counsel at Andrews Kurth in Houston, Texas amount to substantial and serious conspiracies to defraud not only North Cypress, but all physician-owned out-of-network facility providers in Texas in the other States.

***North Cypress' Standing to Sue:***

34.    The North Cypress entities receive from each and every patient, including Aetna members and enrollees, who receives treatment at North Cypress Medical Center a signed Assignment of Benefits that states, *inter alia*:

> "I hereby assign and transfer to North Cypress Medical Center Operating Company, Ltd., North Cypress Medical Center Operating Company GP, LLC and North Cypress Medical Center (collectively "North Cypress") all right, title, and interest in any and all health insurance and/or health plan proceeds/benefits from any of my plans or insurance policies arising from the provision of any goods and services provided by North Cypress and/or any physicians/healthcare providers thereof.  This Assignment is made in accordance with §1204.054, Tex. Ins. Code (Vernon's 2012) and any other applicable law, state or federal.  I hereby assign and transfer, and do intend to knowingly and expressly assign and transfer to North Cypress all claims and causes of action that exist (now or in the future) in my favor against any health benefits Plan, Plan Sponsor, insurance company, plan administrator, underwriter and/or ANY OTHER PARTY concerning (1) any action taken (or omission made) with regard to any claim that North Cypress submits on my behalf to any health benefits plan, insurance company and/or plan administrator, whether arising at law or in equity, pursuant to statute, pursuant to regulation or under any body of common law; (2) all claims and causes of actions based upon breaches of fiduciary duty pursuant to any statute, regulation or under any body of common law, including but not limited to the Employee Retirement Income Security Act ("ERISA") against any fiduciary, including (but not limited to) any health benefit Plan, Plan Sponsor, insurance company, payor, plan administrator or other fiduciary . . . ."

As such, North Cypress has standing to bring the causes of action asserted herein.

## CLAIMS FOR RELIEF

*A.*       *First Cause of Action — [Violations of RICO, 18 U.S.C. § 1962(c)]*

35.       North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

36.       This cause of action is against Third-Party Defendants **Bertolini, Emerson, Neugebauer** and **King**.  At all relevant times, each of Bertolini, Emerson, Neugebauer and King, as individuals, was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

37.       Aetna is an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4). Aetna has an ascertainable structure and purpose beyond the scope and commission of Bertolini's, Emerson's, Neugebauer's and King's racketeering activities as alleged herein, and Aetna is separate and distinct from Bertolini, Emerson, Neugebauer and King.  Specifically, Aetna is a Pennsylvania or other corporation/entity and regularly conducts business in Cypress, Harris County, Texas.  Aetna, Inc. owns Aetna which are corporations/entities that regularly conduct business in Cypress, Harris County, Texas.  Aetna has hundreds of investors and operates an insurance company with reported annual gross revenues that almost exceed **$500 billion** in 2014. At all relevant times, Aetna was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c). Such activities include, but are not limited to, selling insurance products as well as goods and services from out-of-state sellers; providing healthcare products to plan sponsors and members who travel from out-of-state; employing workforce personnel who travel from out-of-state in the performance of their duties; adjudicating healthcare claims to and receiving "Contingency Fees" and other fees from private entities and individuals located out-of-state or to those who receive benefits from the United

States Government through the Federal Medicare and Medicaid programs; and, developing plans and policies to finance operations and expansion projects through out-of-state lenders.

38.     At all relevant times, Bertolini, Emerson, Neugebauer and King were employed by or associated with Aetna, and they conducted and participated, directly or indirectly, in the conduct of Aetna's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), for the unlawful propose of intentionally defrauding North Cypress and other out-of-network facility providers, in violation of RICO, 18 U.S.C. § 1962(c).

39.     Bertolini, Emerson, Neugebauer and King engaged in "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) by engaging in numerous acts of mail fraud and/or wire fraud and/or money laundering, in violation of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. § 1343 (wire fraud) and/or 18 U.S.C. § 1956, 1957 (money laundering).

40.     Specifically, beginning on or about 2003, and continuing to the present, individual Third Party Defendants, Bertolini, Emerson, Neugebauer and King committed two or more of these acts of racketeering activity as follows:

    a.  devising ways to "***jack-up copays***" and other patient responsibility amounts in order to make more money at the expense of the Plan Sponsors, members and providers;

    b.  "***ESCALATE, ESCALATE, ESCALATE***" unnecessary claims, SIU investigations and "**Major Initiatives**" against physician-owned out-of-network facility providers such as North Cypress and to arbitrarily "***place 100% of their claims on intense review***";

    c.  the creation of efforts to "***bring down***" and bankrupt physician-owned out-of-network facility providers such as North Cypress;

    d.  arbitrarily placing "***permanent flags***" on physician-owned out-of-network facility providers' invoices when there is "***no evidence of substantiated fraud***" in violation of both law and Aetna's own written SIU policies;

e.   making reimbursement to physician-owned out-of-network facility providers such as North Cypress which Aetna knows are contrary to the applicable provisions of plans/policies and instead, Aetna intentionally ignores those plan/policy provisions and utilizes Aetna's own determinations as what to pay;

f.   admitting that physician-owned out-of-network facility providers such as North Cypress have "not violated any Texas statutory law," but continuing to take action to "***bring down***," **bankrupt**, and "***destroy***" such providers by falsely representing that they have violated both inapplicable Texas statutes and non-existent Texas statutes;

g.   utilizing the assistance of outside counsel at Andrews Kurth in Houston, Texas to formulate and frame the unlawful schemes against physician-owned out-of-network providers such as North Cypress;

h.   entering into unlawful agreements with plan sponsors wherein it "obtains a percentage of Savings earned from the adjudication of claims in amounts as much as ***35% to 50% of those Savings***" which establish conflicts-of-interest – Aetna makes what it calls additional "Contingency Fees" from denying claims to physician-owned out-of-network facility providers such as North Cypress;

i.   entering into unlawful arrangements as well as engaging in anti-trust activities with competing facility providers especially in the Houston, Texas area such as **Methodist Hospital** wherein the in-network facility providers agree to lower their rates with regard to in-network contracts with Aetna in order to obtain assurances from Aetna that Aetna will initiate unlawful "**Initiatives**" and place "***the tightest controls ever***" on North Cypress to assist the competing in-network providers by taking patients away from North Cypress and funneling those patients to the in-network providers;

j.   making policy decisions to "deny all elective procedures from physician-owned out-of-network facility providers such as North Cypress in an arbitrary and unlawful manner;

k.   requiring that all claims for emergency services from physician-owned out-of-network facility providers such as North Cypress be sent to "**Clinical Review**" by an **Aetna Medical Director** to determine from a medical perspective whether the claim is based upon a "True Emergency" contrary to the Affordable Healthcare Act and without identifying and defining in the plans what constitutes a "True Emergency";

l.   with regard to claims emanating from the emergency rooms at physician-owned out-of-network facility providers such as North Cypress, also requiring that all such claims go to "**Clinical Review**" wherein all medical records are requested from the provider to determine if the service was for "an emergent or not an emergent situation" and if it is determined to be an emergent situation, rather than paying the claim, instructing claims adjusters to deny the claim for not being "medically necessary";

m.   utilizing Aetna employees to "***ghost write***" letters on behalf of plan sponsors to send those letters to the "Texas Department of State Health Services" complaining of physician-owned out-of-network facility providers such as North Cypress to investigate and determine if North Cypress is engaged in "fee-forgiving" when Aetna knows that there is no Texas law prohibiting same;

n.   "**targeting**" in-network physician providers who lawfully refer patients to physician-owned out-of-network facility providers such as North Cypress requiring them to disclose any interests with the facility and threatening to terminate their in-network contracts in violation of Texas law;

o.   arbitrarily expanding "**implant audit of invoices against billed charges**" with regard to physician-owned out-of-network facility providers such as North Cypress;

p.   requiring pre-certifications from physician-owned out-of-network facility providers such as North Cypress when the applicable plans/policies do not so require;

q.   publicly claiming that investors/unit holders at North Cypress are paid to refer patients to North Cypress Medical Center when Aetna knows and has seen the evidence that such a claim is not true and that there is no correlation between (i) distributions made in due course to Unitholders or offers of units to potential unitholders and (ii) referrals to the hospital;

r.   publicly disseminating statements that physician-owned out-of-network facility providers such as North Cypress violate Federal Anti-Kickback statutes and Federal Anti-Referral statutes, Stark I and II, when they know that North Cypress has *never* engaged in such violations and that those statues have no application in the context of a commercial payor;

s.  calling and pressuring patient members who are in the emergency rooms of physician-owned out-of-network facility providers such as North Cypress to leave the hospital's emergency room even when they are in an emergent condition telling them that Aetna will not cover any of the expenses at North Cypress and that the patients will be left with a "huge medical bill to pay" and then directing the patients to tell North Cypress to obtain "an emergency ambulance to immediately transport the patient to a competing in-network facility" which would place the hospital in direct violation of EMTALA and without regard to the patient's serious, emergent medical condition;

t.  refusing to pay for substantial medical bills, *e.g.* the replacement of a cranial flap after emergency treatment because interim therapy before the cranial flap could be re-attached occurred at another facility in violation of the terms and conditions of the applicable plans/policies; and,

u.  according to the public filings in Cause No. 2006-79945, *Miguel Franco, M.D., et al. v. Memorial Hermann Healthcare Systems, et al., West Houston GP, L.P., et al.*, In the 61st Judicial District Court of Harris County, Texas, Aetna initiates overall schemes in geographic areas such as Harris County wherein Aetna closely works with large, competing in-network hospitals such as **Memorial Hermann** to take all actions necessary to financially destroy, bankrupt, "bring down" and harm competing physician-owned out-of-network facility providers such as North Cypress.  This was not only done with regard to North Cypress, but also with the physician-owned facility provider, **Town & Country Hospital** in west Houston which was "**brought down**" and bankrupted.

41.     The acts of mail fraud and/or wire fraud and/or money laundering set forth above constitute a "**pattern of racketeering activity**" within the meaning of 18 U.S.C. § 1961(5) because there were multiple acts of racketeering activity within the past 10 years. The acts alleged were necessary for **Bertolini, Emerson, Neugebauer** and **King** to execute the schemes to defraud the Counter-Plaintiffs/Third-Party Plaintiffs and other physician-owned out-of-network facility providers and/or third-parties. The acts alleged were also related to each other by virtue of a common participant, common victims, a common method of commission, a common purpose, and a common result of defrauding the Counter-Plaintiffs/Third-Party

Plaintiffs and other physician-owned out-of-network facility providers and/or third-parties, while enriching Bertolini, Emerson, Neugebauer and King and concealing their fraudulent activities.

42.     Aetna reasonably relied on the misrepresentations and omissions that were part of Bertolini's, Emerson's, Neugebauer's and King's scheme to defraud and racketeering activities. As a direct and proximate result of Bertolini's, Emerson's, Neugebauer's and King's racketeering activities and violations of 18 U.S.C. § 1962(c), Counter-Plaintiffs and Third-Party Plaintiffs have been injured with regard to their business and property and have incurred a substantial and tangible financial loss by the underpayment and non-payment of thousands of healthcare claims in an amount to be determined at trial.

43.     North Cypress seeks to recover their actual damages, treble damages, exemplary damages and attorneys' fees incurred from the foregoing actions.

**B.      Second Cause of Action — [Fraud]**

44.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

45.     The acts and omissions described in Paragraphs 16(a) – (u) and 31-32, *supra,* amount to common law fraud perpetrated by Counterclaim-Defendants and Third-Party Defendants, with extreme malice, against North Cypress.

46.     Specifically, Aetna, Bertolini, Emerson, Neugebauer and King willfully, intentionally and maliciously defrauded plan beneficiaries by entering into compensation arrangements with certain plan sponsors (including, but not limited to, ConocoPhillips and Harris County), pursuant to which Aetna is compensated with a percentage of savings from denied claims.  Aetna, Bertolini, Emerson, Neugebauer and King each were fully aware that such compensation arrangements present a direct conflict-of-interest under which Aetna stands to reap tremendous financial gains by denying and/or underpaying patients' claims that rightfully should

be paid in full under the applicable plans and applicable law.  This constitutes fraud against the patients whose claims are so denied and/or underpaid, because Aetna promised to make payment on such claims in accordance with the applicable plans and applicable law.

47.    The foregoing fraudulent acts and omissions of Aetna, Bertolini, Emerson, Neugebauer and King fraudulent directly and proximately caused injury to patients whose claims were fraudulently denied and/or underpaid.  Counter-Plaintiffs North Cypress Medical Center Operating Company, Ltd. and North Cypress Medical Center Operating Company GP, LLC, as assignees of the rights of patients whose claims were fraudulently denied and/or underpaid by virtue of Aetna's illegal compensation scheme, are entitled to actual and compensatory damages in the full amount of payments that should have been made, in an amount to be determined at trial.

C.    *Third Cause of Action — [Malicious Tort of Economic Harm against North Cypress]*

48.    North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

49.    Each of Aetna, Bertolini, Emerson, Neugebauer and King willfully, intentionally and maliciously engaged in the acts and omissions described in Paragraphs 16(a) – (u) and 31-32, *supra*, for the direct purpose of inflicting economic harm against North Cypress, to the extent of wrecking North Cypress' business and putting North Cypress out of business.

50.    The acts and omissions described in Paragraphs 16(a) – (u) and 31-32, *supra,* were accompanied with extreme malicious intent on the parts of Aetna, Bertolini, Emerson, Neugebauer and King.

51.    The acts and omissions described in Paragraphs 16(a) – (u) and 31-32, *supra*, in which Aetna, Bertolini, Emerson, Neugebauer and King engaged with extreme malicious intent,

directly and proximately caused injury to North Cypress which resulted in actual and compensatory damages to be determined at trial.

**D.       Fourth Cause of Action — [Tortious Interference with Patient Agreements]**

52.       North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

53.       In addition, or in the alternative, Aetna, Bertolini, Emerson, Neugebauer and King are liable for tortious interference of North Cypress' agreements with its patients to medically treat the patients in consideration of the patients' financial obligations.  North Cypress has valid agreements with its patients through which North Cypress provides health care goods and services.

54.       Counter-Defendants and Third-Party Defendants knew of the existence of these agreements.

55.       Aetna, Bertolini, Emerson, Neugebauer and King willfully and intentionally interfered with North Cypress' agreements with its patients by demanding North Cypress to transfer those patients to other facilities and by "bullying" and intimidating the patients to leave North Cypress Medical Center when they are sick, scared and nervous and should not be placed under such additional pressures; and, by conspiring with competing facility providers such as **Methodist Hospital** and **Memorial Hermann Hospital** to harm North Cypress and other physician-owned out-of-network facility providers.

56.       Aetna's, Bertolini's, Emerson's, Neugebauer's and King's interference proximately caused injury to North Cypress, which resulted in actual damages or losses in an amount equal to an amount to be determined at trial but no less than what North Cypress would have been paid for the provision of said goods and services absent such tortious interference.

E.      *Fifth Cause of Action — [Statutory Claims for ERISA Breach of Fiduciary Duties]*

57.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

58.     ERISA prohibits compensation arrangements creating conflicts-of-interest. Section 406(b) of ERISA, 29 U.S.C. 1106(b), provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

59.     By virtue of entering into a compensation arrangement with certain plan sponsors (including, but not limited to, ConocoPhillips and Harris County), pursuant to which Aetna is compensated with a percentage of savings from denied claims, Aetna engages in precisely the kind of conflict-of-interest that Section 406(b) of ERISA, 29 U.S.C. 1106(b), expressly prohibits.

60.     Aetna, along with Bertolini, Emerson, Neugebauer and King are fiduciaries within the meaning of 29 U.S.C. 1002(21)(a)(i), (iii)  because they exercise discretionary authority or control with respect to management of the plan or disposition of plan assets and/or authority or responsibility for the administration of the plan, including  (but not limited to) possession of final authority to pay claims; possession of signature authority over fund accounts; power to pay all fun obligations; and power to independently determine which of the funds obligations would be paid and in what order.

61.     Bertolini, Emerson, Neugebauer and King acted in their capacities as fiduciaries when  they  conceived,  authorized,  approved  and/or  implemented  the  aforementioned

compensation scheme under which Aetna is compensated with a percentage of savings from denied claims, including (but not limited to) negotiating and signing ASO) agreements with plan sponsors that included such a compensation scheme.  Doing so constituted a direct violation of Aetna's Bertolini's, Emerson's, Neugebauer's and King's fiduciary duties due to the inherent conflict-of-interest that arises when a fiduciary stands to gain financially by denying claims, as codified in Section 406(b) of ERISA, 29 U.S.C. 1106(b).

62.     By virtue of the foregoing, North Cypress Medical Center Operating Company, Ltd. and North Cypress Medical Center Operating Company GP, LLC, as assignees of the rights of patients who were underpaid by virtue of Aetna's illegal compensation scheme, are entitled to damages in the full amount of payments that should have been made; and further demands the equitable relief of removal of Aetna, Bertolini, Emerson, Neugebauer and King from acting as a fiduciary to any ERISA plan, anywhere, going forward.

**F.     Sixth Cause of Action — [Prohibited Transactions Between Plan and Parties-in-Interest]**

63.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

64.     Bertolini, Emerson, Neugebauer and King are fiduciaries within the meaning of ERISA, 29 U.S.C. 1002(21)(a)(i), (iii) because they exercise discretionary authority or control with respect to management of the plan or disposition of plan assets and/or authority or responsibility for the administration of the plan, including (but not limited to) possession of final authority to pay claims; possession of signature authority over fund accounts; power to pay all fund obligations; and power to independently determine which of the funds obligations would be paid, and in what order.  Said individual counterclaim-defendants specifically (but without

limitation) are fiduciaries with regard to various plans that denied claims or underpaid claims to North Cypress (as assignee of patients' benefits).

65. ERISA defines certain parties to be "parties-in-interest" as to an employee benefits plan. 29 U.S.C. 1002(14). Among ERISA's numerous definitions of such "parties-in-interest," ERISA defines as a "party-in-interest" "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan." 29 U.S.C. 1002(14)(A). Since the individuals Bertolini, Emerson, Neugebauer and King are fiduciaries with regard to various plans that denied claims or underpaid claims to North Cypress (as assignee of patients' benefits), said individuals are "parties-in-interest" with regard to such plans, pursuant to 29 U.S.C. 1002(14)(A).

66. Another of ERISA's numerous definitions of "parties-in-interest" is "an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors), or a 10 percent or more shareholder directly or indirectly, of a person described in subparagraph (B), (C), (D), (E), or (G), or of the employee benefit plan." 29 U.S.C. 1002(14)(H). Bertolini, Emerson, Neugebauer and King are "employee[s], officer[s] [and/or] director[s] ([and/or] individual[s] having powers or responsibilities similar to those of officers or directors)" of Aetna, which is "a person providing services to such plan," which is a definition of a "party-in-interest" under 29 U.S.C. 1002(14)(B). As such, said individual counterclaim-defendants are "parties-in-interest" with regard to plans to which Aetna provides services, pursuant to 29 U.S.C. 1002(14)(H).

67. ERISA prohibits certain transactions between a plan and "parties-in-interest." 26 U.S.C. 1106(a). Specifically, 26 U.S.C. 1106(a)(1) states that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such

transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party–in-interest; [or] (D) transfer to, or use by or for the benefit of a party–in-interest, of any assets of the plan."  29 U.S.C. 1002(14) defines a party-in-interest to include, *inter alia*, "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan," 29 U.S.C. 1002(14)(A); "a person providing services to such plan," 29 U.S.C. 1002(14)(B); and "an employee, officer, director (or an individual having powers or responsibilities similar to those of officers or directors) …" 29 U.S.C. 1002(14)(H).

68.    Aetna, acting in its capacity as a fiduciary, caused certain plans (including, but not limited to, ConocoPhillips and Harris County) to enter into prohibited transactions with parties-in-interest Bertolini, Emerson, Neugebauer and King when Aetna entered into compensation agreements with such plans that compensated Aetna with a percentage of savings from denied and/or underpaid claims, which savings was passed on (at least in part) to parties-in-interest Bertolini, Emerson, Neugebauer and King, in the form of salaries and bonuses, which monies rightfully should have been paid to patients (and/or to the patients' assignees North Cypress Medical Center Operating Company, Ltd. and/or North Cypress Medical Center Operating Company GP, LLC) in full reimbursement for medical services provided to such patients.  Due to the fundamental conflict-of-interest that such compensation arrangements present to parties-in-interest Bertolini, Emerson, Neugebauer and King, it was unreasonable for said parties-in-interest to derive compensation from savings from such denied and/or underpaid claims, Aetna, in its own capacity as a party-in-interest, similarly illegally benefitted from the aforementioned prohibited transaction by increasing its own profits.

69.     By virtue of the foregoing, North Cypress Medical Center Operating Company, Ltd. and North Cypress Medical Center Operating Company GP, LLC, as assignees of the rights of patients who were underpaid by virtue of the aforementioned prohibited transactions with parties-in-interest, are entitled to damages in the full amount of payments that should have been made; and further demand the equitable relief of removal of Aetna, Bertolini, Emerson, Neugebauer and King from acting as a fiduciary to any ERISA plan, anywhere, going forward.

G.     **_Seventh Cause of Action — [Statutory Claims for Co-Fiduciary Liability under ERISA]_**

70.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

71.     29 U.S.C. 1105 provides that "[i]n addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

72.     Bertolini, Emerson, Neugebauer and King are fiduciaries within the meaning of 29 U.S.C. 1002(21)(a)(i), (iii) because they exercise discretionary authority or control with respect to management of the plan or disposition of plan assets and/or authority or responsibility for the administration of the plan, including (but not limited to) possession of final authority to pay claims; possession of signature authority over fund accounts; power to pay all fund

obligations; and; power to independently determine which of the funds' obligations would be paid, and in what order.

73.     Aetna, in its own capacity as a fiduciary, breached its fiduciary duties when it implemented the aforementioned illegal compensation scheme under which Aetna is compensated with a percentage of savings from denied claims.  Likewise, each of Bertolini, Emerson, Neugebauer and King, in their own capacities as fiduciaries, breached their fiduciary duties.

74.     Each of Bertolini, Emerson, Neugebauer and King, themselves fiduciaries, participated knowingly in the aforementioned breach of Aetna's fiduciary duties; enabled Aetna to commit the aforementioned breach of Aetna's fiduciary duties; and, had knowledge of the aforementioned breach of Aetna's fiduciary duties.   Specifically, each of individual counterclaim-defendants Bertolini, Emerson, Neugebauer and King conceived, authorized, approved and/or implemented the aforementioned illegal compensation scheme under which Aetna is compensated with a percentage of savings from denied claims, including (but not limited to) negotiating and signing ASO agreements with plan sponsors that included such a compensation scheme.  As such, each of Bertolini, Emerson, Neugebauer and King are liable as co-fiduciaries under 29 U.S.C. 1105.

75.     By virtue of the foregoing, Counter-Plaintiffs North Cypress Medical Center Operating Company, Ltd. and North Cypress Medical Center Operating Company GP, LLC, as assignees of the rights of patients who were underpaid by virtue of the aforementioned prohibited transactions with parties-in-interest, are entitled to damages in the full amount of payments that should have been made; and further demand the equitable relief of the removal of each

individual, Bertolini, Emerson, Neugebauer and King from acting as a fiduciary to any ERISA plan, anywhere, going forward.

**H.     Eighth Cause of Action — [Statutory Claims for Violation of Section 1125(a) of the Lanham Act, 15 U.S.C. § 1125(a)]**

76.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

77.     Aetna, Bertolini, Emerson, Neugebauer and King have violated Section 1125(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false advertising.  North Cypress asserts their cause of action under the Lanham Act in their individual capacities (not as assignees of patients), as **competitors** of Aetna who were damaged by Aetna's false advertising.

78.     Specifically, Aetna and North Cypress are competitors because Aetna seeks to induce members to procure health care services from providers who participate in Aetna's network rather than from North Cypress on an out-of-network basis.

79.     The conduct of Aetna that North Cypress alleges violates the Lanham Act consists of Aetna's having repeatedly communicated to various plan sponsors untrue statements about North Cypress' business practices, including that North Cypress was engaged in a pattern of fraudulent billing; admitted non-emergent members through its ER in order to make more money; provided non-medically necessary services in order to make money; and, waived patient responsibilities."  Aetna further violated the Lanham Act by sending mailings to all members within five miles of North Cypress Medical Center advising them not to go to North Cypress (later increased to ten miles).

80.     The foregoing actions by Aetna violate the Lanham Act, which provides for a cause of action against "[a]ny person who . . . uses in commerce any . . . false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the

nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).

## ATTORNEYS' FEES

81.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

82.     North Cypress seeks to recover its reasonable and necessary attorneys' fees and costs incurred in connection with prosecuting this action under, without limitation, pursuant to 18 U.S.C. § 1964(c) and §§ 38.001, *et seq*., Tex. Civ. Prac. & Rem. Code.

## CONDITIONS PRECEDENT

83.     North Cypress realleges and incorporates by reference the foregoing paragraphs of this pleading.

84.     North Cypress has performed and/or met all conditions precedent with regard to its right to make claims herein and to recover hereunder, or they have otherwise been waived.

## JURY DEMAND

85.     North Cypress timely demands a trial of this action by a jury on all issues.

## PRAYER

86.     Counter-Plaintiffs/Third-Party Plaintiffs North Cypress request that **Aetna Life Insurance Company**, **Aetna, Inc.**, **Aetna Health, Inc.**, **Mark T. Bertolini**, **Jeff D. Emerson**, **Ed Neugebauer** and **Clarence Carlton King** be cited to appear and answer, and that on final trial hereof, North Cypress have judgment against these parties, jointly and severally, for the following:

      a.      an award of both actual and consequential/compensatory damages;

      b.      an award of treble damages;

c.      an award of exemplary and punitive damages;

d.      reasonable and necessary attorneys' fees;

e.      costs of court;

f.      pre-judgment and post-judgment interest;

g.      removal of Counterclaim-Defendants as fiduciaries;

h.      all relief pursuant to Rule 54(c), Fed. R. Civ. P.; and,

i.      such other and further relief, at law and/or in equity, to which North Cypress may be justly entitled to receive.

Respectfully submitted,


By:     */s/ J. Douglas Sutter*
        J. DOUGLAS SUTTER
        Federal ID No. 3791
        State Bar No. 19525500

        NEIL PRUPIS
        Federal Bar No. NP-5500
        State Bar No. 270641971

        ATTORNEYS-IN-CHARGE FOR COUNTER-PLAINTIFFS AND THIRD-PARTY PLAINTIFFS


**OF COUNSEL:**

KELLY, SUTTER & KENDRICK, P.C.
3050 Post Oak Blvd., Suite 200
Houston, TX 77056
(713) 595-6000 – Telephone
(713) 595-6001 - Facsimile
dsutter@ksklawyers.com


LAMPF, LIPKIND, PRUPIS & PETIGROW, PA
80 Main Street, Suite 305
West Orange, New Jersey  07052
(973) 325-2100 – Telephone
(973) 325-2839 - Facsimile
prupis@llpplaw.com

## **CERTIFICATE OF SERVICE**

I certify that on this the 11th day of August, 2015, a true and correct copy of the forgoing was served on all counsel of record via ECF and email.

John B. Shely
Jeffrey D. Migit
Andrews Kurth, LLP
600 Travis, Ste. 4200
Houston, Texas 77002-3090


                                                    */s/ J. Douglas Sutter*
                                                    J. DOUGLAS SUTTER