1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4   AETNA LIFE INSURANCE          §      CASE NO. 4:15-CV-491
    COMPANY                       §
5                                 §      HOUSTON, TEXAS
    VERSUS                        §      WEDNESDAY,
6                                 §      MARCH 16, 2016
    ROBERT A. BEHAR, M.D., ET AL  §      2:06 P.M. TO 3:35 P.M.

7

8                            MOTION HEARING

9              BEFORE THE HONORABLE NANCY K. JOHNSON
                   UNITED STATES MAGISTRATE JUDGE

10

11                            APPEARANCES:

12

        FOR PLAINTIFF/DEFENDANT:      SEE NEXT PAGE

13

        COURT RECORDER:               PAUL YEBERNETSKY

14

        COURT CLERK:                  SHANNON JONES

15

16

17

18

19

20                    TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                    935 ELDRIDGE ROAD, #144
22                   SUGAR LAND, TEXAS 77478
                Tel: 281-277-5325 / Fax: 281-277-0946
23                  www.judicialtranscribers.com

24

        Proceedings recorded by electronic sound recording;
25         transcript produced by transcription service.

1                              APPEARANCES:

2

3   FOR THE PLAINTIFF:              JOHN BRUCE SHELY, ESQ.
                                    JEFF MIGIT, ESQ.
4                                   BRIAN PIDCOCK, ESQ.
                                    ANDREWS KURTH, LLP
5                                   600 Travis
                                    Suite 4200
6                                   Houston, TX  77002

7   FOR THE DEFENDANTS:             J. DOUGLAS SUTTER, ESQ.
                                    CHARLES KELLY, ESQ.
8                                   KELLY, SUTTER & KENDRICK, P.C.
                                    3050 Post Oak Blvd.
9                                   Suite 200
                                    Houston, TX  77056

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     <u>HOUSTON, TEXAS; WEDNESDAY, MARCH 16, 2016; 2:06 P.M.</u>

2        THE COURT:  Good afternoon, everyone, please be

3 seated.  All right.  We're here in Aetna versus Robert Behar

4 and others.  Let's see for Aetna, Mr. Shely --

5        MR. SHELY:  Good afternoon, Judge, also Mr. Jeff

6 Migit and Mr. Brian Pidcock.  Mr. Kendell Gray is my law

7 partner, he's on the benches.

8        THE COURT:  Okay.  And, Mr. Sutter.

9        MR. SUTTER:  Right and Charles Kelly is with me,

10 Your Honor.

11        THE COURT:  All right.  Good afternoon.

12        MR. KELLY:  Good afternoon.

13        THE COURT:  Now, it looks like the oldest thing

14 I've got on the docket today is Mr. Sutter's motion for

15 rehearing.  What say you on that?

16        MR. SUTTER:  That is correct, Your Honor.  We had

17 filed a motion for rehearing under the amended Rule 26 that

18 was amended on December 1, 2015 that applies to this case,

19 under Rule 26(b)(1) as well as 26(b)(2), (c)(iii) and

20 finally also under Rule 26(g).  And it is with regard to a

21 motion of rehearing with regard to verbal orders as well as

22 your two written orders came out in Docket Nos. 120 and 121.

23        And Rule 26(g) as amended now starts out with

24 regard to discovery in each specific case, the person who is

25 propounding the discovery is required first to certify that

1 │ the request is consistent with federal rules, not for

2 │ improper purpose, not to harass or delay, increase costs,

3 │ not unreasonable and not unduly burdensome.

4 │         THE COURT:  Right.  But, Mr. Sutter, you would

5 │ agree that this is not your $10,000 fender bender case.  How

6 │ much are you seeking in this lawsuit?

7 │         MR. SUTTER:  The amount of damages that we have

8 │ will probably be in the range of about $2 million that we're

9 │ trying --

10 │        THE COURT:  2?

11 │        MR. SUTTER:  -- to add up right now.  Only based

12 │ upon miscalculation with regard to the cost base

13 │ reimbursements, because we all now know as you can see from

14 │ the documents that's been produced by Aetna, the manner in

15 │ which they were calculating our claims under cost basis

16 │ starting in 2013 and 2014, and as far back as 2012.

17 │        We now have the formula, which will really drive

18 │ down the amount of damages substantially low because under

19 │ the plans we have to utilize the cost base that they have in

20 │ their plans.  And the only issue there is whether or not

21 │ they calculated properly under their --

22 │        THE COURT:  Okay.

23 │        MR. SUTTER:  -- guidelines.  And as a matter of

24 │ fact, we got four of them yesterday that indicated that the

25 │ cost basis that they used out of the Center for Medicare and

1   Medicaid services was incorrect.

2           So the amount for claim is going to be a small

3   amount because we have to go by that, we can't go outside

4   the portion of --

5           THE COURT:  Right.  And -- but they're seeking

6   from you the big billions, right, Mr. Shely --

7           MR. SHELY:  Yes, Judge.

8           THE COURT:  -- what are you seeking?

9           MR. SHELY:  Yes, millions, Judge, about tens of

10  millions.  Keep in mind, Judge, this is related litigation

11  where they already sued Aetna and lost for 40 or $50 million

12  Judge Wick's court.  There's yet another --

13          THE COURT:  There's a 40 or $50 million judgment

14  from Hoyt?

15          MR. SHELY:  No, they sued for that much and they

16  got nothing.  He threw their case out after trial.

17          So what my point is, the documents are relevant to

18  the relationship of the parties for both that suit and for

19  that matter, they relate to one of Judge Ellison's cases.

20          THE COURT:  All right.

21          MR. SUTTER:  Judge, to answer that question --

22          THE COURT:  So go back to -- you know, you're

23  arguing for portionality, but I've got to look this is not a

24  small case.

25          MR. SUTTER:  Judge, you have to look at what their

1  damages are, and their damages are not in the tens of

2  millions.  As a matter of fact, we specifically called them

3  out on that in pleadings --

4          THE COURT:  Well, we'll get to that.  I agree that

5  their production on damages is insufficient.  But I don't

6  know what it is.

7          MR. SUTTER:  I'm not talking about -- well, we

8  have --

9          THE COURT:  And neither do you.

10          MR. SUTTER:  Well, we have -- well, Judge, yes, we

11  do.  We have submitted you evidence that shows -- because

12  their claims are a discreet number of claims.  They had to

13  do that in order to avoid a dismissal in this case for the

14  previously filed case in Judge Hoyt's court.

15          So they said they're only going to sue on claims

16  from January 25th, 2014.  At that time and prior to that

17  time, the reimbursements to North Cypress had been reduced

18  to 38 percent and thereafter to 17 percent.  There are no

19  damages, there are no tens of millions of dollars in

20  damages, and we filed a document with you yesterday where

21  they have amended their answers to interrogatories.  And

22  they show on there, you can see on the billed amount, the

23  allowed amount is a tiny fraction.

24          There are -- I don't care if they say there's 40 -

25  - they never said there's 40 million in this claim, they

1    said 40 million in the three lawsuits that they have.  This

2    claim has nothing because they have reduced the

3    reimbursements to North Cypress to 17 percent.  And that

4    what is the Court has to look at with regard to

5    portionality.

6              And we submitted to you yesterday documents

7    themselves indicating that as far back as 2010, they sent

8    all of our claims to SIU for intense review.  Thereafter,

9    they came up with new ways in which to send all of our

10   claims to the special investigation unit to review, and

11   after that, they came up with a cost based plan of

12   repayments that aren't in the plans, but the plans say that

13   Aetna can do it.

14             THE COURT:  All right.  Well --

15             MR. SUTTER:  They have no damages, that's

16   portionality.

17             THE COURT:  What I want to focus on is, my prior

18   order and your efforts to comply with that prior order, you

19   have gotten together the emails as I understand it --

20             MR. SUTTER:  Correct.

21             THE COURT:  -- yes?

22             MR. SUTTER:  Yes.  Well, we --

23             MR. SHELY:  Judge --

24             MR. SUTTER:  If I may not be interrupted please.

25             What we had got together is -- are the emails and

1    we have segregated the emails under Rule 26 under our

2    arguments under constitutionality, as well as

3    attorney/client.  We have three lists.  We have lists of the

4    business emails that are to/from with regard to Dr. Behar,

5    to/from and the subject matter.

6            We then have another list that pertains to his

7    confidential private matters that don't have anything to do

8    with the business, that have the same thing.  We also have

9    the attorney/client that literally involves dozens of

10   attorneys, the to/from and the reference number.  And we

11   have submitted to you Exhibit No. E that is the privileged

12   log which we submitted in camera that indicates all of

13   the --

14           THE COURT:  The privileged log was a list of law

15   firms.

16           MR. SUTTER:  That's right, Judge.

17           THE COURT:  That's not a privileged log.

18           MR. SUTTER:  We have over 12,000 to 20,000 emails

19   that are all with those law firms, and it is our position

20   they're all protected by the attorney/client privilege.

21   That is if the Court's --

22           THE COURT:  Hard for me to tell.

23           MR. SUTTER:  Well, Judge, we have the to/from and

24   the reference number that we can submit to the Court for

25   review in camera.

1            Now, if the Court's going to require us to take

2    the time -- which we have offered to tender to the Court for

3    review.  We have that ready for the Court's review.

4            THE COURT:  Well, I mean, I can't tell anything

5    from a list of attorneys and such explanations as regulatory

6    and litigation, I mean, I don't -- it may be.  I don't want

7    to review 10,000 emails, I don't want to do it.  I don't

8    have time to this kind of silly stuff.

9            MR. SUTTER:  I understand that, Judge, but we're

10   not required to give to the other side our attorney/client

11   for a ten year period of every lawyer that North Cypress has

12   communicated with, just to find if there's anything in there

13   with regard Dr. Behar and what they're asking for.

14           THE COURT:  All right.  So let's talk about the --

15   if I spot you the attorney/client and you got "confidential

16   materials".  How is that the "confidential materials"

17   relevant to this dispute?

18           MR. SUTTER:  They're not relevant at all, but

19   that's the thing to ask for.  They wanted all the emails to

20   and from Dr. Behar, everything, including attorney/client as

21   well as confidential and that's why we split them up.

22           THE COURT:  Well, mostly the focus of my order was

23   the fact that they have emails that you somehow don't have

24   anymore.

25           MR. SUTTER:  Correct.  Which we are searching for.

1   But that doesn't -- Judge, it's not --

2            THE COURT:  And have they come up on this list?

3            MR. SUTTER:  Have those emails that they have from

4   2006 and 7 come up on your list of emails here?

5            MR. SUTTER:  There are some emails that have come

6   up and others that have not.  Why would anybody expect that

7   every single email is going to be present for a nine or ten

8   year period?  Somebody would come to me and say, give me

9   every email that you have for a ten year period, I couldn't

10  do that.  And we have found the same thing.  We have found

11  from their production that we have emails that they did not

12  produce.

13           THE COURT:  All right.  So --

14           MR. SUTTER:  The fact is, they may not have them.

15           THE COURT:  Have you turned over the emails that

16  they got from third parties to them?

17           MR. SUTTER:  Some of them are in there and some

18  are not.  We have gotten the emails and we have applied all

19  of the searches.  We have three difference sheets of search

20  terms that we utilized that came directly from their

21  request, and we did three different searches and we are

22  producing and have produced everything that comes up in

23  those searches.

24           Now, whether or not it's identical that in 2006 or

25  2007 what SDP may have maintained that North Cypress doesn't

1    have.  There's no guarantee that every single email is going

2    to be there for a nine year period.

3              THE COURT:  Well, I understand that.  But the

4    whole point was to check because, you know, your IT person

5    was less than impressive on that.

6              MR. SUTTER:  Well, that's exactly what we're

7    doing, we're running the checks on everything and we have

8    the search terms that we've applied.  And, of course, they

9    don't like what they get.  We produced since the last

10   hearing on December 2nd in the Conoco Phillips case and this

11   case because I'm not double producing 24,000 pages of emails

12   and documents which they call fluff.

13             Well, you know, Judge, I got at one point almost

14   900,000 documents from them, only 7,000 were emails in the

15   other case, and most of it was fluff that I never could use.

16   But that's how broad the requests are.

17             THE COURT:  Well, that's what you ask for.  So --

18             MR. SUTTER:  Not necessarily.  I got a lot of

19   stuff I --

20             THE COURT:  On the confidential, the second

21   category of confidential material, how --

22             MR. SUTTER:  That's Dr. Behar's personal emails

23   that he has that we're ready to tender to the Court also.

24             THE COURT:  How many?

25             MR. SUTTER:  I think in that one it's, well,

1    probably over 10,000.  I need to go back and look at my

2    pleadings, there's a lot.

3              THE COURT:  Personal emails to whom?

4              MR. SUTTER:  There's emails to his wife, to his

5    children, the stockbrokers, to business people, to

6    investment people, vacation homes, you name it, it's in

7    there.

8              THE COURT:  And how is this -- so you've got these

9    confidential materials, they're coming up because you

10   requested all his emails, or they requested all his emails.

11             MR. SUTTER:  That's what we were told to do, get a

12   list of everything to, from, subject matter, and date for

13   Dr. Behar.

14             THE COURT:  Okay.  So you've got that on

15   confidential materials?

16             MR. SUTTER:  Correct, we have it separate that

17   we're ready to tender to the Court.

18             THE COURT:  Okay.  So I can just look at the

19   subject matter and --

20             MR. SUTTER:  A to/from list just like the Court

21   said.

22             THE COURT:  All right.  I'll look at that.

23             MR. SUTTER:  And so is the attorney/client.

24             THE COURT:  Just -- I'll look at that.  I don't

25   want to read the emails.

1      MR. SUTTER:  They're not the emails, Judge.  You

2 told us it'd be the to/from list --

3      THE COURT:  Right.

4      MR. SUTTER:  -- and that's what we put together.

5      THE COURT:  All right.  I'll look at that, I'll

6 look at the attorney/client to verify that it is to or from

7 an attorney, and the business emails, what's the problem on

8 that?

9      MR. SUTTER:  There's not a problem.  We have the

10 business emails now, and we're searching the emails with the

11 search terms.  And we submitted the three pages or three

12 different search terms that we're using.  One is a very

13 general one that came directly from their request.  The

14 second one is where we try to particularize the general one,

15 and the third one is even more particularized that we are

16 applying.

17      THE COURT:  So it sounds like you're kind of

18 filtering out then how -- are they in agreement with all

19 these filters/

20      MR. SHELY:  No, Judge.

21      MR. SUTTER:  I'm sure they're not, but those are

22 the search terms.  That's what Rule 26 requires to begin

23 with.  The parties are supposed to get together, agree to

24 the search terms and then do a certification.

25      THE COURT:  Well, that's in a perfect world and we

1    aren't in a perfect world right now.

2           So I'm just trying to understanding what you've

3    got.  You've got business emails that satisfy certain search

4    terms, right?

5           MR. SUTTER:  We have business emails that we

6    pulled for the term that we applied the search terms.  We

7    still have those on relativity where we're searching them.

8           THE COURT:  Okay.

9           MR. SUTTER:  That's where we got --

10          THE COURT:  And so how are you -- it sounded like

11   you were going from the big pool and filtering out and

12   filtering out and that's what I wasn't understanding.

13          MR. SUTTER:  But that's what we do.  If you look,

14   we have three lists.  We took their request for production,

15   because remember the only thing -- issue is the request of

16   Dr. Behar.

17          THE COURT:  Uh-huh.

18          MR. SUTTER:  We took the request and we used some

19   very general, which I'm sure they'll say that's too general,

20   to pull documents.  We then had a more specified one where,

21   for example, you would have the name of somebody plus

22   another information, for example, Dr. Behar plus BR plus

23   whatever.

24          Then we did that search and then we did a more

25   even refined search to review documents out of the main

1  documents, of which we have a list of to/from and subject

2  matter like the Court required us.

3          THE COURT:  So why can't they see the to/from and

4  the subject matter and tell you what they'd like to fight

5  over next?

6          MR. SUTTER:  Well, I mean, that has to do with all

7  the business of North Cypress and had nothing to do with

8  their request.  The reason we're here is because they've

9  made a claim that we did something wrong in Judge Hoyt's

10  court.

11         THE COURT:  I get it.  But this is what I'm trying

12  to understand.  It sounds like once you get the business

13  emails, you are filtering for this term, then filtering for

14  more terms, and then filtering, and so you keep dropping out

15  of emails.

16         MR. SUTTER:  Trying to get specific emails we

17  want, right.

18         THE COURT:  And --

19         MR. SUTTER:  We get a lot of junk when we pull

20  these emails, a lot of junk.  When we use their search

21  terms, Aetna and this lawsuit, and everything about an ER,

22  it pulls up tons of stuff, articles about Aetna, things that

23  they've received in the email about Aetna, negotiations,

24  tons of stuff on negotiations when we were negotiating, and

25  then that word contract, which is not discoverable and it's

1   not at issue in the case, which we have to filter that.

2          And they've gotten emails where we're talking

3   about negotiations, but not the attachments to those.  But

4   that's what these things pull up, it's a huge amount.

5          THE COURT:  So what are you -- I guess I'm just

6   still confused on what are you filtering out that you don't

7   think that they're entitled to see?

8          MR. SUTTER:  Judge, the only thing that we would

9   be filtering out, for example, if you look at -- let me get

10  out a list.

11         THE COURT:  What document?

12         MR. SUTTER:  If you look at Docket 145, Exhibit C.

13         THE COURT:  Hold on.

14         MR. SUTTER:  I think it came after that, hold on a

15  minute.  No, it's in Docket 156, I'm sorry.

16         THE COURT:  Okay.  If you go to Exhibit A, these

17  are basically their requests for production on Dr. Behar.

18  Because if you recall there was a request from number I

19  through whatever, I think it was Roman Numeral lower case 24

20  or 25.

21         Then that's the first one that pulls up tons of

22  materials.  Exhibit B is a more refined one, where we take

23  those same requests and try to refine them more with regard

24  to their requests.  And then --

25         THE COURT:  You're adding more terms then?

1       MR. SUTTER:  Adding more terms and we're trying to

2  particularize.  You can see where we've added on to it,

3  balance billing plus patient, formulate, calculate,

4  determine, bill, charges.

5       Then Exhibit C you can see where there are more

6  terms and connectors and you can see where certain things

7  are left out.  For example, with regard to not news, because

8  whenever we put news in, every newsletter that's ever come

9  to North Cypress and Dr. Behar pops up, which are thousands.

10      We'll put in there and not Blue Cross and not Blue

11 Shield, not Aetna -- I'm sorry, not Cigna and not the other

12 payers.  Those are the things that would be filtered out,

13 and they're still getting stuff that we have that we

14 produced.  There's discussions about Cigna and the other

15 payers.

16      But this is what we are trying to use, to pull out

17 based upon their requests, the information that they want.

18 And we're doing this both in the Conoco Phillips case, as

19 well as in this case.

20      THE COURT:  Okay.

21      MR. SUTTER:  But you can see they're the ones that

22 have denied on it.

23      MR. KELLY:  All right.  Judge, I'd like to add

24 something if I could, hopefully to clarify.

25      After the hearing on December the 2nd, what we

1  asked North Cypress to do was to export the to and from Dr.

2  Behar emails going back as far as they could go into a

3  searchable database.  As I understand the process, and I'm a

4  lawyer, not an IT guy, as I understand the process, the

5  emails were maintained on a Microsoft Exchange server.  They

6  are exported from Microsoft Exchange server and converted

7  into what are called PST, personal storage data files, which

8  are maintained on a searchable database which is

9  superintended by our discovery vendor, a company called

10 Relativity, okay.

11        So everything that North Cypress had on its

12 servers and on its archive servers that initially were

13 exported from this database.  When Mr. Sutter just explained

14 to you in terms of Exhibits A, B, and C was kind of an

15 evolving, or an increasingly sophisticated search of the

16 PSDs on the Relativity database.

17        Let me give you an example.  On Exhibit A, we did

18 business plans regarding out of network.  Well, without

19 putting in what are called booming (phonetic) and search

20 term which is the plus and the minus and not the

21 (indiscernible) you're probably not going to get a whole lot

22 of hits with business plans regarding out of network.

23        So then on B, we switched that to say, business

24 plan/P out of network.  Now that --

25        THE COURT:  Okay.  I see where that it is on B --

1          MR. KELLY:  Yeah.

2          THE COURT:  But I don't -- where is it -- oh, I

3   see where it is on A, business plans regarding out of

4   network, all right.

5          MR. KELLY:  And every time that we modified, Mr.

6   Sutter modified the search terms, Judge, it resulted in

7   increasing likelihood of producible hits.

8          THE COURT:  All right.  So how many did you get on

9   A, do you know?

10         MR. KELLY:  On A, I'm sorry, Judge, I don't have

11  the numbers.

12         THE COURT:  You don't have that?

13         MR. KELLY:  I think Mr. Sutter put that in the

14  pleadings.

15         MR. SHELY:  Not by search term, just what we

16  found.

17         MR. KELLY:  Just the general volume.  We didn't

18  track it that way.

19         THE COURT:  Was that in 156?

20         MR. SUTTER:  The one with the number that we had

21  would be in -- just a moment.  Yes, 156 indicates the

22  documents we have found is in paragraphs 1 -- paragraph 1

23  the preamble.  We did not track and nullify each search.

24         MR. KELLY:  I suppose that could be generated, we

25  didn't particularly care about that at this point.

1           THE COURT:  Well, I was just kind of curious.

2           MR. KELLY:  Yeah, and I understand that, Judge.

3   We can view the -- but to show that again on C, Judge, just

4   to make sure --

5           THE COURT:  Uh-huh.

6           MR. KELLY:  -- that we were generating as many

7   producible hits as we could, we further refined the search

8   terms, and I believe we came up with documents and we're

9   continuing to do so.

10          THE COURT:  Okay.  So when you finally get down to

11  the C search terms, how many emails are relevant?

12          MR. KELLY:  I can't give you that answer, Judge,

13  but I can say that we -- our most recent production I'm

14  aware of, supplemental production I should say took place on

15  March the 8th.

16          THE COURT:  And did that produce everything from A

17  to B then to C, so you produced --

18          MR. KELLY:  Unless they were privileged, Your

19  Honor, because see what you did on December the 2nd, Judge,

20  you said, look, I want lists prepared, and I want you to

21  turn those over to these lawyers.

22          THE COURT:  Right.

23          MR. KELLY:  We moved for re-hearing, Judge, but at

24  the same time, we said, no, we're going to start doing it

25  the way it should have been done under a Rule 26 conference,

1   we're going to take their search terms, we're going to

2   explore everything and do a searchable PST database, we're

3   going to start searching, we're going to start getting hits,

4   and we're going to start producing, and that's exactly what

5   we've done.

6            THE COURT:  All right.  So you can't tell me if

7   you've produced all of the C search terms?

8            MR. KELLY:  Here's what I can tell you, Judge.

9   We've produced them up to this point.  We just got -- I

10  wasn't here, Mr. Sutter told me yesterday, we just got

11  another eight to ten discs of documents from North Cypress

12  that we're putting to Relativity.  If you want me to, I

13  believe I could explain that too.

14           THE COURT:  Well, what are you doing about the

15  documents that you think are confidential or privileged?

16  Are you preparing a privileged log?

17           MR. KELLY:  I think we're preparing a privileged

18  log on that, Judge.

19           THE COURT:  You need to do that, how else are you

20  going to do with it?

21           MR. KELLY:  Again, Judge, because of your order on

22  December the 2nd, what we said was, Judge, we are prepared

23  to tender to you the list that we generated so that you,

24  Judge, can see in the reference line, for example, my most

25  vivid memory is, there is a name of a female patient and it

1    identifies what's about to happen with her breast surgery.

2            We thought to ourselves, the reference alone,

3    alone with her name violates her HIPAA rights.  But we have

4    to show you, Your Honor, that it does this, and we said we

5    will tender to you in camera, because we appreciate the

6    procedure you have decided over saying, okay, I'll accept

7    your tender.  You haven't done that yet, and I get that.

8            When you do, we'll give it to you.  We prepared

9    the list, but we can't produce it to Aetna first.

10           THE COURT:  Right.  Well, this is the problem.  I

11   am not in a position to be your discovery master, and if you

12   really think you need one, I'll appoint one, and you all

13   will be paying.

14           MR. KELLY:  I don't think we're there yet.  I

15   think, Judge, if you --

16           THE COURT:  I may be there because this is -- I

17   mean, you're really expecting a lot of the Court to sit down

18   and, you know, double-check everything and --

19           MR. KELLY:  Judge, I don't think you're going to

20   need to do that and I'll tell you why.  Because my

21   perception is, Judge, yeah, sure, I'm new to the case, but

22   my perception is the process is working as it's supposed to

23   and I can give you an example.

24           In their last response, they said, hey, we're

25   getting emails, where are the attachments.  Good point, we

1    investigated it.  And what we found out was in our server

2    configuration here's what happens, we have two server

3    configurations, one's for the hospital side and one's for

4    the general practice and business side.

5         When an email to Dr. Behar, for example, hits the

6    hospital server, I understand it automatically goes over to

7    the business server side, which as I understand it, it stays

8    there for six months.  After six months in the Microsoft

9    Exchange server on the general practice side, the entire

10   email with the attachment migrates over to the archive

11   server.

12        Now, when Ms. Casper did her ten searches for Mr.

13   Sutter, that she talked about during the last hearing, I

14   talked to her today, Judge, and I'll tell you again, I

15   searched the Microsoft Exchange server and I searched the

16   archive server.  But what we didn't know was, when an email

17   migrates over to the archive server, the attachment goes

18   there, but it's not on the exchange server anymore.

19        There is a, what I will call a second level search

20   procedure that you run through the archive server, and that

21   will pick up the email and the attachment, the essence of

22   which they're complaining about.

23        We found that out, we instructed them, go ahead,

24   run that second level search procedure through the archiver

25   server and give us the attachments.  As Mr. Sutter can tell

1  you, they're starting to come in, a ton of them came in

2  yesterday, they're a ton of spreadsheets.

3          So in an ordinary case, Judge, your opponents

4  says, hey, where are the attachments, you go look into it.

5  We did.  We found a response and we will be producing those

6  subject to approval.  Based upon what I've seen in the

7  hearings, the pleadings in this case, they're going to

8  complain about that too.

9          But if you step back and take back all the

10 acrimony and all the personal in fighting, the procedure is

11 working the way it's supposed to.

12         THE COURT:  So what's your calculation on when

13 that can all be complete.

14         MR. KELLY:  I'll tell you what, Judge, we're

15 giving it top priority, he's working on it, I'm working on

16 it, we've got a paralegal working on it, I think we'll be in

17 position to produce the attachments that were detected by

18 the second level search term within two weeks, just for the

19 volume.

20         THE COURT:  And what about the privileged log?

21         MR. SHELY:  Judge, with the privileged log, with

22 regard to attorney/client that is all the attorneys,

23 including my communications.  Is the Court going to require

24 us to do a privileged log with regard to my communications.

25         THE COURT:  Settle down, Mr. Sutter.  I -- we're

1   talking about the business emails now.  I already said I

2   would look at your list on attorney/client and the

3   confidential material just to and from and the subject

4   matter, that's all I want to see, all right.  I'm not asking

5   you to produce a privileged log on those documents.

6          But we're now talking about the business emails

7   and so that seems to be a third category that you've

8   separated out.

9          MR. SUTTER:  There shouldn't be attorney/client in

10  there, there shouldn't be privileged.

11         THE COURT:  Exactly.  But if you're telling me

12  something is privileged, you're going to have to put it on a

13  log.

14         MR. SUTTER:  That I agree with but I haven't found

15  where we have done that, where communications, a couple of

16  them with lawyers that come up, because some lawyers we

17  didn't even know about, that when I got it I could see

18  they're talking to some lawyer in Washington that I didn't

19  even know about, which is true.  But there's still tons of

20  documents in that 150,000 plus that don't have anything to

21  do with any of their requests.  They're not privileged, but

22  they're not requesting them for subject matter of the

23  request for production.

24         But I understand that if we find anything in that,

25  we'll pull those ones out and make a privileged log.  And

1  that's only because we missed the lawyer and didn't know

2  some lawyer's name.

3         MR. KELLY:  And, Judge, what I would ask you to do

4  is sign the order accepting the tender of the list.  I'm not

5  asking you to read all 12,000 entries, but particularly on

6  those HIPAA and doctor/patient list, I'd ask you just to go

7  through every other page and look at the references, and

8  you'll see the patient's name is in there, the medical

9  procedure is in there and that's what they --

10         THE COURT:  What are we talking about because I

11  haven't seen anything that looked like a list.

12         MR. KELLY:  You have not -- Judge, our view of the

13  procedure, is you have to say okay, I accept your tender in

14  camera, we can't just produce it to you, because otherwise

15  we waive it.  If you sign the order saying I accept your

16  tender in camera this list, that we haven't waived

17  privilege, they don't need to see it, and you'll see -- when

18  you see that list of patients, Judge, the descriptions in

19  the reference of the patients and procedures and medical

20  conditions and such that it would violate HIPAA for us to

21  turn that over.

22         And in the mean -- you know, we can create a

23  privileged log --

24         THE COURT:  You know, Aetna sees private patient

25  records all the time.

1          MR. KELLY:  Yes, Your Honor, but some of these

2    patients are Dr. Behar's under different payer plans.  Their

3    own patients, I get that.  But what if it's Cigna?  What if

4    it's Blue Cross?  That's a clear HIPAA violation for us to

5    say, here is Ms. Johnson, and I am going to be discussing

6    her breast surgery for her breast cancer and it's not under

7    an Aetna plan.  That's a dead in the water HIPAA violation.

8          THE COURT:  So how is it coming up as a relevant

9    search?

10         MR. KELLY:  Because it's Dr. -- they asked for all

11   of Dr. Behar's --

12         THE COURT:  I know, but you're filtering out

13   stuff.  You're filtering out.  How is her breast surgery

14   coming out under -- I mean --

15         MR. KELLY:  Judge, if you give us the authority to

16   add a search term that has only in Aetna, that would solve

17   that problem.  You got me there.  Right now, you told us and

18   again it's because of their disproportionate search terms

19   all of Dr. Behar's emails going back to 2006.  So we did

20   that.

21         We're here demonstrating to you the problems --

22         THE COURT:  All right.

23         MR. KELLY:  -- that that poses, Judge, and how we

24   are working in the spirit of Rule 26 to solve the issue.

25   Period.

1          THE COURT: Okay. Thank you. Mr. Shely?

2          MR. SHELY: Judge, I have to look at my watch.

3          THE COURT: Because you're timing yourself?

4          MR. SHELY: No, Judge, but because we remember

5    where we had been before we decide where we're going on

6    this. You told North Cypress twice in two days, December

7    2nd and December 4th to give Aetna those lists, not you,

8    Aetna. They asked for a rehearing on the 4th, we had a

9    telephone conference, you were abundantly clear that North

10   Cypress was to give the list to Aetna.

11          I can appreciate Mr. Kelly coming into the case

12   late. But the point that the notion that they have just

13   discovered that attachments weren't being produced with

14   their production is simply not accurate. We talked about

15   that in December, Your Honor. I gave you specific examples.

16          All of this talk about how careful they're trying

17   to be on their searches, Judge, for another day, we can

18   decide whether North Cypress really intends to produce and

19   comply with its discovery obligations, someday we'll get to

20   that issue.

21          But what we have here, Judge, is whatever it is

22   they're doing isn't working. And you know that, and Aetna

23   knows that. And we know that because we have obtained

24   documents and other evidence showing that directly relevant,

25   you called some of them smoking guns, were not produced by

1    North Cypress in any of the related litigation, none.

2          Now, they cited to you a pleading that they just

3    filed at 156.  And at paragraph 9, kind of on the nonchalant

4    side of doing it, Judge, look what they said.  Remember what

5    they --

6          THE COURT:  What?

7          MR. SHELY:  On paragraph 9, page 5 of document

8    156.  And you heard the testimony, you've commented on the

9    testimony of their IT person, no litigation hold was put in

10   place, you got another issue, nothing's changed, they've

11   presented nothing to you to establish that that isn't

12   exactly the case.

13         And now what they look what they say.  As

14   previously advised, many of the old documents, emails from

15   '06 to '09 were archived long ago.  That's actually not what

16   they previously advised you, Judge, and what they previously

17   told Aetna.

18         What they told Aetna was, oh, they're corrupt,

19   we've got a server and it's corrupt, we may not be able to

20   get them.

21         Now, look at what they say.  "The attachments to

22   the emails are believed to be in the North Cypress archive

23   servers."  Let's think about that a minute.

24         So we've been in litigation with North Cypress for

25   over three years, and suddenly they've discovered in the

1  corner of a big box that there's a server and archive, and

2  they've never looked in there before for responsive

3  documents.  Just how many cases does Aetna have to try

4  against North Cypress before we get the basic documents?

5          We've shown you to the STP documents not produced.

6  And this notion that they're doing these great search terms

7  right now and they feel like they're really getting it so it

8  works.  All they're doing, Judge, is when we produce a

9  document that we get from a source or a third party, says,

10 you didn't produce, they come in and produce over us.  Oh,

11 here's our copy of that.  But that's all they do.

12         THE COURT:  What's your problem with their search

13 terms?

14         MR. SHELY:  It's not search terms by -- it's

15 categories of documents, and I'll give you an example,

16 Judge, real world example.  Search term that we ought to

17 use, and what you have already ordered is to/from Behar.

18 That's where we should start.

19         All -- that is not a production order.

20         THE COURT:  They've done that.

21         MR. SHELY:  No, they haven't, Judge.  You ordered

22 them to give Aetna that list, they have not done so.  They

23 still haven't given it to you.  The to/from will be the

24 universe.  We have never taken the position, didn't take it

25 in December, and I'm not taking it today that we will get

1    each one of those documents.  But we have proven, Judge,

2    that North Cypress cannot be trusted in terms of producing

3    what is responsive.  I've shown that to you.  All they have

4    is talk.

5            Here's another example of what they've produced,

6    Judge.  Check this out.  I've got a copy for you.  May I

7    approach, Your Honor?

8            THE COURT:  Of course.

9            MR. SHELY:  So finally they said, well, here's

10   another document we didn't produce.  And so they redact

11   everything out of it.  I've got just -- this is just a

12   sampling, Judge, a smattering.  But they redact everything.

13           So their notion that well, we have to do with

14   Cigna isn't relevant to your case.  Nonsense.  They filed

15   the same so-called prompt pay discount to all of their

16   commercial payers.  So what we have here, Judge --

17           THE COURT:  But why is it relevant to your

18   dispute?

19           MR. SHELY:  Because, Judge, we have at least some

20   emails that we determined from other parties where Dr. Behar

21   says things about issues that are relevant to our case, and

22   it may not be directed only to Aetna.  So they are unfairly

23   narrowing the search.

24           They have, Your Honor, with the utmost of respect,

25   forfeited the right to be solely in charge of what is

1    responsive.  And the reason for that, Judge, is because we

2    have established that they have not complied with their

3    discovery obligations.

4            The way that we can determine that once and for

5    all, Your Honor, is to do exactly what you've previously

6    ordered, which is to do a -- have an expert, get an image of

7    their servers, and now we know from their recent filing the

8    archive servers, the archived emails, let's see what's in

9    there.

10           It may be that the STP documents that they claim

11   they couldn't find are in there.  It may be that they're

12   not.  There are a number of reasons of why it might be the

13   case.

14           But to require Aetna, Judge, in this case to rely

15   on more Cypress to comply with its discovery obligations

16   based on the record before you is simply not fair.  And the

17   way to make sure that we get what we're entitled to, is to

18   have the image of the server done as we have submitted to

19   you, we have given you a protocol.

20           They are no longer to be trusted to say, this is a

21   business email, and this is a personal email.  I understand

22   their arguments about the privilege, and it may very well be

23   that many of those documents are not to be produced.

24           You getting the server image doesn't get us the

25   documents, Judge.  What it gets us is data as to what is

1   there, what is there now.  And that is precisely what we

2   ought to do.

3          Then we get a to/from and the reason, Judge, they

4   had so burdensome, the reason we are in this position in the

5   first place is because we have shown you repeatedly that

6   North Cypress, for whatever reasons, does not produce what

7   is directly relevant and we need to make sure we are getting

8   what we're entitled to.

9          THE COURT:  All right.

10          MR. SHELY:  So your imaging order is exactly on

11   point, it's what we should do.  We filed this morning a few

12   questions that we would ask that their IT people answer by a

13   week from today.  And we're ready to go and do the imaging,

14   starting the week of March 28th.

15          It doesn't harm them in any way.  They've got no

16   proof that it harms them.  They want to keep it secret.  As

17   to their attorney/client privilege, I completely understand

18   they may not want to log all those, that's not the issue.

19          First of all, we don't even know that -- I don't

20   know what they're talking about if that's all that something

21   went to Dr. Behar or not.  But keep in mind you have already

22   ruled correctly that they did waive some of their legal

23   advice with respect to the so-called legality of a prompt

24   pay discount.  That's established.

25          It may be that however many emails they have on

1   attorney/client privilege we don't get.  I am not claiming

2   otherwise.  I'm not even claiming that I get everyone of his

3   emails.  What I am asking this Court to do is confirm its

4   prior order, that we are going to do is get an image of the

5   servers, the archiver, so we know what is out there.  They

6   will have some explaining to do some day if they have

7   deleted data and emails.  We don't have to decide that issue

8   today, Judge.

9          All we have to today is have them comply with your

10  order of three months ago, which is to give us the to/from

11  list and then allow us to do the search of the server.  It's

12  not like they don't get to use it, it's not like they won't

13  be able to have it also, but I no longer, Judge, am in a

14  position to allow North Cypress and its lawyers to determine

15  whether I get something or not.  Because they've proven

16  they're not reliable, for whatever reason or reasons.

17          THE COURT:  All right.

18          MR. SHELY:  And for that basis, Judge, you -- I

19  don't know how many more times you can order them, but maybe

20  you can give them a deadline to say, here's what we're going

21  to do, you're going to give them the list and we're going to

22  do the imaging and we're going to do it the week of March

23  28th.  That's what I'm asking for, Judge.

24          THE COURT:  All right.  Thank you, Mr. Shely.  Mr.

25  --

1         MR. KELLY:  I'm sorry, I didn't hear you, Judge.

2         THE COURT:  I said thank you.  This document, on

3    what grounds are you redacting?  Clearly this is not

4    privileged.

5         MR. SUTTER:  Judge, they never requested documents

6    with regard to Cigna, Blue Cross/Blue Shield, United

7    Healthcare.

8         THE COURT:  It doesn't matter.  If this comes up

9    and it's relevant, why do you get to redact for some unknown

10   reason.

11        MR. SUTTER:  They're not entitled to see our

12   information with other papers.  That's what's out there,

13   that's --

14        THE COURT:  No, I don't understand.  Because that

15   is not -- what privilege is that that makes it non-

16   producible.

17        MR. SUTTER:  One, it's not requested.  It's not

18   even in their request for production.  And two, it's not

19   even relevant to any issue in this lawsuit what we

20   communicate with other commercial payers, just like they

21   will not give us what they communicate with other providers

22   who are in competition with us.  They didn't even request

23   it.  This thing has gotten so broad, so fast, that anything

24   -- they now want to seek everything.  You just heard Mr.

25   Shely say everything --

1          THE COURT:  Well --

2          MR. SUTTER:  -- with regard to Cigna.

3          THE COURT:  You know, this is my worry, is that

4  when you are blacking out things that's not on a privileged

5  log, it's just no, we decided that you don't get to know

6  this.  This is a document -- I mean, we go from what is

7  discoverable and then you --

8          MR. SUTTER:  Which are very few.  There's only a

9  couple of them like that, we did it because everything was

10 included on one email with regard to all payers.  They are

11 not entitled to see everything with regard to our other

12 payers, and it's rare that that happens.

13         THE COURT:  On what legal grounds?

14         MR. SUTTER:  It's not relevant and it hasn't been

15 requested.

16         THE COURT:  Well, relevance is --

17         MR. SUTTER:  They never requested it.

18         THE COURT:  -- generally, you know --

19         MR. SHELY:  It's got our name in it.

20         MR. SUTTER:  Not under Rule 26.

21         MR. SHELY:  It's got our name in it.

22         MR. SUTTER:  Not under Rule 26.  First, they've

23 got to request it, which they have not done.

24         MR. SHELY:  That's not true.

25         MR. SUTTER:  And two, it's got to be relevant and

1   it's got to be under Rule 26, and how is other payers'

2   information and what money do you make for other payers and

3   the communications we have with other payers have anything

4   to do with this lawsuit.  That's overreaching.

5          MR. SHELY:  Judge --

6          MR. SUTTER:  And that is a rare situation that

7   that happened, and that was the only reason for it.

8          MR. SHELY:  It is not.

9          MR. SUTTER:  And we advised them in one of the

10   letters that that's what we did.

11          MR. SHELY:  It is not rare, Judge.  They've done

12   the same thing with board minutes.  They selectively redact

13   what they --

14          MR. SUTTER:  They're not even at issue in this

15   case.

16          MR. SHELY:  -- don't want us to know.  Aetna's

17   name is in the document and we don't get to see the whole

18   document.  And I will tell you, Judge --

19          THE COURT:  See, I don't think you get to just

20   redact for no reason, and I don't think that, well, they're

21   not entitled to know is really striking home with me on

22   these cases.  I mean --

23          MR. SUTTER:  That I'm required to give them

24   everything about other payers?

25          THE COURT:  Yeah, why not.

1          MR. SUTTER:  Because it's not relevant, and didn't

2    request it, and they wouldn't dare give us any information

3    on others.

4          THE COURT:  It's in an email that was requested,

5    that's the point.

6          MR. SUTTER:  The fact that they requested, that --

7    they haven't requested it.  They didn't request anything on

8    the other payers.  We can give them, but it's not their

9    business what monies we're making from other payers.

10         THE COURT:  I'm concerned that you're just

11   redacting anything you don't want them to know on a document

12   that's producible --

13         MR. SUTTER:  Which is very rare, Judge.

14         THE COURT:  -- that's the problem.

15         MR. SUTTER:  There's not even a handful --

16         THE COURT:  I don't care if it's rare.

17         MR. SHELY:  It's very common, Judge.

18         MR. KELLY:  Judge, can I jump in a minute?  I

19   respect the point, Judge, the redaction issue is a slightly

20   different issue than the one we're on today.  The redaction

21   -- it's on a produced document, they know it happened.  They

22   can come in and fight with Mr. Sutter and on whether that's

23   proper or not, and I'm kind of getting the sense about

24   what's going to happen there.

25         What I would ask you, Judge, to hear me out on is

1 two things.  This forensic imaging which is just an

2 absolutely critical, horribly (indiscernible) for a couple

3 of reasons.

4          One, they don't get to forensically image

5 anybody's servers because --

6          THE COURT:  All right.  Let me just stop you right

7 there.  I agree with you and I'm not going to allow a

8 forensic image.

9          MR. KELLY:  Okay.  Judge, I appreciate that very

10 much.  The second thing I'd like you to do, Judge, I heard

11 what you said about being a discovery master.  I would like

12 you to give us another two weeks to let our supplemental

13 production play out with regard to the search terms that

14 we've used on that second level search of the archive

15 servers, to see what we sent.

16          I don't know what's there, Judge.  Mr. Sutter's

17 seen something, he just says it's a ton of spreadsheets.  We

18 will produce what we say is producible and called for.  If

19 there's a privilege, we've got to make a privileged log, we

20 heard you loud and clear on that, okay.

21          The last thing I'd like you to do, Judge, because

22 again this is what is supposed to happen at the beginning of

23 the case, and it's supposed to be initiated by the

24 plaintiff, it is with regard to EDI, electronically

25 discoverable information, we're supposed to sit down, find

1    out how the reviews work --

2            THE COURT:  But you --

3            MR. KELLY:  -- and compare search terms.  Now, Mr.

4    Sutter has given them three lists of what search terms are

5    used.  If they don't like them, they don't think it's good

6    enough, we think the Court should tell Aetna, you submit

7    your search terms to North Cypress.

8            If we have a fight, we can fight about it then.  I

9    think what they're trying to do, Judge, is win this non-case

10   on sanctions, I understand they want our documents, they

11   want to try and catch us and they're not going to.

12           If they have search terms they want us to use that

13   they think will show these documents that he didn't produce

14   in another case and someone else did, give us the search

15   terms, we'll run it, let's see what happens.  That's the way

16   it ought to work, Judge.  Thank you.

17           THE COURT:  Mr. Shely.

18           MR. SHELY:  The problem with that, Judge, is

19   you're letting the people and the entity that we have proven

20   is not trustworthy to decide whether or not they want to

21   give us a document, whether they think it's relevant, and

22   whether they think -- we didn't hit our search term.  That's

23   nonsense, Judge.  I have shown you --

24           THE COURT:  Well, what search terms do you think

25   would help your -- you get the relevant universe?

1              MR. SHELY:  Judge, they haven't said that they got

2    STP, every document -- they haven't even told you -- they

3    haven't had the courtesy to tell the Court whether or not

4    the specific examples that we established they failed to

5    produce and then found by their search haven't done that.

6              So how do I know?  That's why, Judge, with due

7    respect --

8              THE COURT:  Do you know the answer to that?

9              MR. SHELY:  You should, in fact, Judge --

10             MR. KELLY:  Then we'll do it.

11             THE COURT:  No, it should have already come up in

12   the universe of Dr. Behar's emails --

13             MR. KELLY:  I don't know that it hadn't, Judge, I

14   haven't reviewed everything --

15             THE COURT:  Yes or no?

16             MR. KELLY:  I have not seen a lot of the emails,

17   there's not that many of them, from 2006 through --

18             THE COURT:  Right, so it would pop up if it was

19   these --

20             MR. KELLY:  I would think they'd pop up because

21   we're getting stuff in 2005 even that's not even within the

22   period of time.  We do have 2006.  I have not yet seen all

23   of them.  They are some of them in there, but the ones I

24   know they're talking about, they keep calling the smoking

25   guns, I have not seen.

1           THE COURT:  Because they're --

2           MR. SUTTER:  And that's no surprise to me.

3           THE COURT:  -- they haven't come up.

4           MR. SUTTER:  They have not come up in the search.

5           MR. SHELY:  Judge, the reason that you should

6  require, at least with a minimum, at a minimum with respect

7  to the archive, a copy of that archive to be made, because

8  if they have STP documents from the relevant time period,

9  they're going to have to explain how it is that they have

10 some and not others.

11          And again, Judge, I mean, if they've gotten rid of

12 some documents, we're entitled to know that.  They've been

13 in litigation with us for years.  They have been in

14 litigation with Cigna for years before that.  And the notion

15 that they just to get pick and choose what they want to give

16 us has been established to not be a working system, Judge.

17          THE COURT:  Well, this is what I am going to do.

18 I am going to look at the to/from/re on the confidential

19 materials and the attorney/client --

20          MR. SHELY:  But that's not a complete list, Judge.

21          THE COURT:  I know.

22          MR. SHELY:  They just told you.

23          MR. KELLY:  I don't think you finished talking,

24 Judge.

25          THE COURT:  So that leaves the business emails

1  that they are running the search terms on.  Yes?

2         MR. KELLY:  Yes.

3         THE COURT:  They'll turn them down to something

4  that's --

5         MR. KELLY:  Yes, Your Honor.

6         THE COURT:  -- relevant.  And if you want those

7  search terms added, tell Mr. Kelly on search terms that you

8  think that are going to pull up.

9         MR. SHELY:  Judge, they haven't even established

10 nor provided you any evidence the common emails we're

11 talking about with Dr. Behar.  They haven't.  There's no

12 evidence or record here.  It's a bunch of talk.  They have

13 failed to show that it would be in any way burdensome or in

14 addition to Aetna's must figure out what we have now.

15        You heard that IT person, they have been, it

16 appears, not keeping documents.  This is directly relevant.

17 If you wait a day or you wait a week or a year to do it,

18 we're going to lose more.

19        THE COURT:  Exploitation is a completely different

20 analysis than we're talking about.

21        MR. SHELY:  But, Judge -- and that's why we need

22 the imaging.  It is the only fair way to do it on this

23 record, otherwise you leave me in a --

24        THE COURT:  They've got a list of all the emails.

25        MR. SHELY:  I don't believe that's the emails,

1  Judge.  They have never come clean with what they do have

2  until they get caught cheating, that's my problem, Judge.

3  Whether it's North Cypress or someone else.

4         THE COURT:  Then it's going to be your problem,

5  because I think at this point I've decided to reconsider my

6  ruling, I'm not going to require an image of the server.

7  The list of all the emails was -- the whole point of getting

8  to see where, if those lost, allegedly lost emails of Dr.

9  Behar's were on the server at all -- from 2006, anything can

10  be deleted.

11         I'll look through those two categories and you're

12  searching on this first business emails category.  If you've

13  got something that -- search terms that you want added or

14  deleted --

15         MR. SHELY:  Judge --

16         THE COURT:  -- that you're not interested in, you

17  can do that.  Now, on your production, I'm not in love with

18  your we just don't want them to see what --

19         MR. KELLY:  Heard you loud and clear, Judge.

20         MR. SUTTER:  We'll get those, Your Honor, there's

21  so few of them.

22         THE COURT:  I mean --

23         MR. SUTTER:  They're going to show what that is is

24  a list of --

25         THE COURT:  I don't think it means -- I agree with

1  you, I don't think it means anything but I don't know

2  because this case -- I don't know.

3           MR. KELLY:  Judge, we'll mark it confidential and

4  give it to them.

5           THE COURT:  Right.

6           MR. KELLY:  All right.  May we, Judge, since we're

7  taking this, can we prepare an order and submit it there for

8  approval and have everybody --

9           THE COURT:  You can see --

10           MR. KELLY:  I want to make sure that everybody

11  knows exactly what's happening and what's not happening,

12  including I'm asking you to accept our tender of those lists

13  for those very preliminary purposes, so you can see our

14  lists are in good faith, that's all we're asking.  We don't

15  want you to be a discovery master, we think you've got

16  things well under control.

17           THE COURT:  Discovery masters are very expensive.

18           MR. KELLY:  Yes.  And we're both -- we should give

19  them --

20           THE COURT:  And I will find the meanest one

21  possible.

22           MR. SHELY:  Judge, what is the criteria they are

23  using, Judge, for what they say is related to this case and

24  personal?

25           THE COURT:  Well, you've just seen the terms in A,

1   B and C, if you've got some problem now, speak now or

2   forever hold your peace.

3          MR. SHELY:  Judge, I don't think it's asking too

4   much that Dr. Behar has commented on an issue relevant to

5   this case, whether I can know what words he used until they

6   find it in a search term or not, I can't know what I haven't

7   seen.

8          What I do know is what I've shown you.  That they

9   have not been honest about their production.  It has

10  happened not once, not twice, it's happened over and over,

11  so you're now allowing the fox to guard the hen house.  You

12  let them decide --

13         THE COURT:  It happens all the time, Mr. Shely.

14         MR. SHELY:  Well, you know, it does, Judge, but

15  what doesn't happen all the time is when the other side

16  proves that the other side is cheating and we've done that.

17         And because we've done that, Judge, this is a

18  different case.  It is not right to allow them to continue

19  to obstruct and that is what they're doing.

20         THE COURT:  I'm not finding obstruction at this

21  point, so if there's any other terms that you want added,

22  let Mr. Sutter or Mr. Kelly know.

23         MR. KELLY:  Thank you, Your Honor, appreciate you.

24         THE COURT:  Now, let's talk about I think it's

25  123, I think that's defendant's motion to compel on the

1  damages claim, right, Mr. Sutter?

2          MR. SUTTER:  Yes, Your Honor.

3          THE COURT:  So what I am not clear on and I've

4  seen so many documents on this, I'm probably not going to be

5  able to find it.  But, Mr. Shely, you submitted or someone

6  submitted like a spreadsheet that showed claims, claims

7  filed, claims paid, what document was that?  That might have

8  been you, Mr. Sutter, do you remember?

9          MR. SUTTER:  Yes, Your Honor, I filed it --

10          THE COURT:  I found it, if I look at this on line,

11  and then I look at it -- you know, and then I --

12          MR. SUTTER:  It's a supplement that I filed

13  yesterday.

14          MR. MIGIT:  Judge, I can tell you what those are.

15  Those were -- we supplemented answers to interrogatories for

16  the limited partnership, it's interrogatories number 9 and

17  10.

18          THE COURT:  Okay.  I think this is 160, the sealed

19  document on 160.

20          MR. SUTTER:  It was filed yesterday, Judge.

21          MR. MIGIT:  What those are, Judge, those were

22  claims that were paid under the two updated methodologies

23  for inpatient and outpatient.  Just 200 percent of cost.

24  It's not all the claims at issue, it's some of the claims at

25  issue.

1          THE COURT:  Well, what I don't understand, Mr.

2    Migit, is how does this show your damages?

3          MR. MIGIT:  It's not our damages model.

4          THE COURT:  This is not your damage model.

5          MR. MIGIT:  No, Judge, we're going to -- we intend

6    to prepare a damages report, an expert report, pursuant to

7    the course of the scheduling order at the point in time when

8    the Court enters one to give us an expert deadline.

9          THE COURT:  Well, what's your expert going to base

10   his report on, this stuff?

11         MR. MIGIT:  It's going to be based upon -- well,

12   it's going to be based upon the claims data that we've

13   already identified in our interrogatory answers.  That's not

14   -- that's part of the claims data.  The claims data is much

15   more comprehensive than that, and it's going to be based on

16   the claims that were at issue from January 25th, 2014 to the

17   present.

18         And so we're in the process of formulating our

19   damages theories and models, we'll come up with a report,

20   which will be line-by-line, by claim, identifying the

21   damages for each claim.

22         THE COURT:  So you're claiming that portion of the

23   allowed amount, the amount you paid was fraudulent.

24         MR. MIGIT:  That's correct.  I'll give you an

25   example.  Let's say, for example, and this is one of our

1  allegations and we have proof of this, that they

2  fraudulently run a non-emergent patient through the ER.

3  They charged for it, they billed for it, we paid it.

4  They --

5          THE COURT:  They run who through the ER?

6          MR. MIGIT:  They fraudulently run a non-emergent

7  patient through the ER as opposed to a direct admission to

8  avoid the preauthorization process.  We have direct -- we

9  have emails from Dr. Behar, the smoking guns that you talked

10  about, are the ones that he says, everyone goes to the ER

11  except for Medicare, which would be a problem because -- I

12  mean, Medicare fraud.  And Blue Cross/Blue Shield because

13  they were in contract with them at the time.  And so he

14  says, everyone else goes to the ER even if they are beds

15  available.

16          So he runs non-emergent patients through the ER,

17  and we have evidence where he did that, and they bill for

18  it, and they're paid for it, they're not entitled to it.

19  That's just one example.

20          There's also fraudulent observation billing

21  practices, there's the illegal waiver of patient

22  responsibility, a number of things that --

23          THE COURT:  So where are these documents to show

24  them what -- you know, where your claim is, because I look

25  at some of these documents and --

1          MR. MIGIT:  Well, Judge, it all starts with --

2          THE COURT:  -- I'm not doing it.

3          MR. MIGIT:  It all starts with the claims data.

4    And we've provided specific claims data for the claims at

5    issue.

6          THE COURT:  And we're talking about Exhibit A

7    here?

8          MR. MIGIT:  It's going to be more comprehensive

9    than that.  I mean, our damages expert that we'll hire is

10   going to take those claims as she has done in two other

11   cases, and analyze the claims data and come up with damages

12   models to show the overpayments that were made.  And so

13   that'll be done pursuant to the Court's order on expert

14   reports.

15         MR. SUTTER:  Judge, if I may respond to that.

16         THE COURT:  Go ahead.

17         MR. SUTTER:  First, they're talking about an email

18   from Dr. Behar in 2007.  Dr. Behar has explained exactly

19   what that email meant with regard to the problems with the

20   bed board count, 2007.

21         Their claims arise in January 25, 2014 after what

22   I filed yesterday, every one of our claims were rounded to

23   the special investigation unit starting in 2011 to be

24   personally reviewed, individually reviewed.

25         In 2013, they reduced all outpatient or inpatient

1  claims only 200 percent of cost pursuant to Medicare.

2  Medicare reimbursement is the second lowest reimbursement in

3  the United States, second only to Medicaid.

4          And then in 2014, the year in which the claims

5  arise, they reduce the inpatient down to 200 percent.  Our

6  claims have gone down payment to less than 17 percent of

7  billed charged --

8          THE COURT:  Uh-huh.

9          MR. SUTTER:  -- under a flag that I showed

10  yesterday that they have put on all of our accounts.

11          THE COURT:  Right.

12          MR. SUTTER:  And you can see from the allowed

13  amounts, they're barely allowing anything.  And as they can

14  see from the emails that we have produced, where we talk

15  about the substantial drop in income from Aetna.  By 2014,

16  Judge, 2014, eight years later, they still want to claim

17  that this email that it had to do with the bed board count

18  in 2007 somehow is getting people through the ER when they

19  are looking --

20          THE COURT:  Right.

21          MR. SUTTER:  -- with their medical records at

22  every claim.

23          THE COURT:  You're going to have to, you know,

24  talk to a jury about that, because that's your argument,

25  they've got another argument.  I mean --

1          MR. SUTTER:  I understand, I was just trying to

2     explain.  Now, getting to the damages, by that time, they

3     know if they have any damages, and how they're going to do

4     it.  When they get the expert, the expert is not going to

5     come in, if they're using the same expert I just heard

6     they're going to, she uses benchmark figures based upon our

7     billed charges, and say our billed charges are too high and

8     therefore we shouldn't have paid on billed charges.

9          Well, in the past, they did pay on billed charges

10    because they were running everything through the national

11    advantage program.  They quit that in 2012, two years before

12    they even filed this lawsuit.

13         The point I'm trying to make, Judge, is they have

14    to know their damages and what they give me in an answer to

15    an interrogatory which is not verified, go look at all these

16    spreadsheets and somehow figure out what their damages are.

17    I know their damages are going to be nothing or next to

18    nothing.

19         MR. MIGIT:  Judge, we're not asking --

20         MR. SUTTER:  But the point I'm trying to make is,

21    they've got to give me something under a verified answer as

22    to what they're claiming we did on a claim-by-claim basis

23    because ERISA requires that.  And I get nothing but go look

24    at these documents and figure out and divine what the

25    damages are.  And Rule 26 and 33 requires them to give me

1   what their damages are.

2           MR. MIGIT:  And, Judge --

3           MR. SUTTER:  We're calculating ours right now.

4   We're not going to wait till August because we now know

5   exactly how they're calculating our claims piddly off CMS.

6           THE COURT:  All right.  So when is your expert

7   report due?

8           MR. MIGIT:  Well, we don't have a deadline yet,

9   Judge, and I would ask that you probably do that, and I

10  would ask that the --

11          MR. SUTTER:  Judge --

12          MR. MIGIT:  Let me finish, please.  I would ask

13  that the deadline be for the parties with the burden of

14  proof, and that includes him because Mr. Sutter has not even

15  identified the claims at issue, much less his damages.

16          THE COURT:  Hold on, hold on.

17          MR. MIGIT:  And so typically what we've done in

18  other cases, we have a deadline for the party with the

19  burden of proof, and then 60 days later, the rebuttal

20  experts for those reports.

21          THE COURT:  Okay.

22          MR. MIGIT:  Real simple, I think we can do that.

23          MR. SUTTER:  The case is stayed and Judge Flake

24  has specifically said experts will not even be determined,

25  the deadlines won't be determined till August of 2016.

1          THE COURT:  So he's given you six months of

2     discovery, written discovery, and remind me, he had one

3     other date in that scheduling order --

4          MR. SUTTER:  Six months for deposition.

5          THE COURT:  Six months for deposition and --

6          MR. SHELY:  Well, another six months and we don't

7     have the documents.

8          MR. SUTTER:  Six months and then we come back in

9     August and he then determines the expert dates.

10          THE COURT:  Okay.

11          MR. SUTTER:  Which we haven't got that, so all

12     we're doing now -- because everybody's stayed.  All we can

13     do is discovery.

14          MR. MIGIT:  Well, then, Judge, we can give our

15     expert report then.

16          MR. SUTTER:  Yeah, but the discovery is for them

17     to give us what their numbers are.

18          THE COURT:  To give you the documents that support

19     -- I mean, you're going to be totally behind the eight ball

20     with me if you haven't turned over every document that

21     you're giving to your expert.

22          MR. MIGIT:  Oh, no problem, Judge.  They work from

23     the claims data, that's what they look at.

24          THE COURT:  See, I think this is the unusual case

25     where the expert is going to have to crunch the numbers

1  because these numbers are incomprehensible.

2        MR. MIGIT:  And, Judge, it's not just based upon

3  billed charges as Mr. Sutter alleges.  There's other models

4  involved.  The damages look strictly at the billed charges.

5        And so we will have a more than sufficient damages

6  model prepared at the time the Court tells us to prepare it.

7        THE COURT:  Well, I agree, because right now you

8  ain't done it.  Not any good.  But I see that this is an

9  expert issue really, not a production issue presently.

10        MR. SUTTER:  The other issue that --

11        THE COURT:  Go ahead.

12        MR. SUTTER:  The other issue that we had, Judge,

13  is what you recall you -- you held them to produce, the

14  three and four page annual reports to their -- with regard

15  to the savings issue.  And what I can show you are two

16  different things here, what we've gotten.

17        THE COURT:  What document?

18        MR. SUTTER:  If I could hand them to you.

19        THE COURT:  So Mr. Migit can follow along --

20        MR. SUTTER:  Correct.

21        THE COURT:  -- give him something.

22        MR. SUTTER:  I have a copy for him.  And we put

23  this in our pleadings.  The document that is marked Exhibit

24  35 are the -- out of the 3,000 plus plan members, we have

25  received the annual reports from BMC Software and

1    Continental Airlines and from Harris County.

2            And if you look at the reports that clearly go

3    out, this is where we had requested all of them before, they

4    go out to every plan sponsor at issue, and you can see they

5    show what their savings are, their alleged savings and the

6    fee they collect on the annual basis for hospital and

7    ancillary, that would be North Cypress.

8            For this example, for BMC Software got charged

9    32,000 for that, and then there's a yearly total.  What we

10   have received is, and Mr. Migit will argue is that they have

11   given us all of them, but if you look at the second stack,

12   these are the spreadsheets of numbers, literally what they

13   have given us is every single patient from every single plan

14   sponsor on an itemized basis what the savings were.

15           You can see on this one the savings 158, $100, and

16   the problem is, we have thousands and thousands of these

17   pages which takes thousands of hours -- hundreds of hours to

18   go through to try to add up whether the savings and what

19   departments during the four year period when all they have

20   to do is give us the year end for each plan sponsor like

21   this which is three to four pages, which is all there and

22   these thousands of pages go away and we don't have to do it.

23   And that's what the Court ordered to be produced and that

24   makes it extremely easy to add up the savings per plan

25   sponsor.

1    This way we have to hunt through thousands of
2    documents, looking for the quarterly, then looking for the
3    annual, and trying to figure out from each plan sponsor what
4    it is when each plan sponsor gets a three-paged report every
5    year, just like we see here, that we can look at and
6    literally my paralegal ten hours, could go through and
7    figure out what every plan sponsor paid in savings and paid
8    in fees every year.
9    MR. MIGIT:  Judge, there is no three to four page
10   report, I can tell you that right now.  May I approach?
11   THE COURT:  Right.  You've just got this one page.
12   MR. MIGIT:  Let me show you, I can clear this up
13   pretty quick.
14   THE COURT:  All right.
15   MR. MIGIT:  This is -- these are three examples of
16   the last page of the fourth quarter reports for each of the
17   plan sponsors.  I'll give Mr. Sutter a copy.
18   Okay.  Now, what Mr. Sutter gave you is a portion
19   of a quarterly report.  What he didn't do is the very last
20   page of the quarterly report, which is all he has to do.
21   For any plan sponsor, the 380 that we produced, you go to
22   the fourth quarter report at the end of the year, you go to
23   the very last page, and lo and behold, look what you get,
24   annual savings, fees and net savings.
25   Which coincidentally looks identical to Mr.

1   Sutter's hodge podge collage he put together.  By the way,

2   this thing he gave you, this Exhibit 35, is actually five

3   different documents.  There's no three to four page report.

4           In addition to these quarterly reports --

5           THE COURT:  Well, there might be a four paged

6   report.

7           MR. MIGIT:  And all Mr. Sutter has to do is go to

8   the fourth quarter reported company, Harris County, the EMC

9   software, go to the very last page, as I've shown you, print

10  it off, and that takes about a second.  And there you go for

11  that particular plan year.

12          MR. SUTTER:  It's not that easy, you have to

13  search.  Why don't we just get the annual, as the Court

14  ordered, the annual notice that goes to the plan sponsor.

15          MR. MIGIT:  Judge, we don't have -- what he

16  attached for examples and excerpts from reports that were

17  specifically done for particular plan sponsors.  Plan

18  sponsor liaisons will have meetings with customers, they'll

19  do presentations.  And so they'll put together a few pages

20  and none of these are three to four pages, by the way.  I

21  can show you what Mr. Sutter has given you is --

22          THE COURT:  Well, let's look at Continental

23  Airlines.

24          MR. MIGIT:  Sure.

25          THE COURT:  That looks like it's several pages

1  long.

2          MR. MIGIT:  Would you like to see the actual full

3  document, Judge?

4          THE COURT:  Sure, why not.

5          MR. MIGIT:  This is Mr. Sutter's exhibit, really

6  the -- it's five separate documents.

7          THE COURT:  Okay.

8          MR. MIGIT:  And, Your Honor, I went to the client,

9  I asked him, if he had a three to four page narrative as Mr.

10  Sutter said at the last hearing, they said no.  What they

11  have are the quarterly reports, which that information that

12  I've shown you that the plan sponsor lays on, so we'll work

13  with the plan sponsors, we'll take that information from the

14  quarterly report, and insert it in a specialized

15  presentation that they do for the client.  That's what he

16  has.

17          He has all the information he asked for.  He just

18  needs to go to the very last page of the quarterly reports,

19  that's it.  He can print it off, that's done.

20          THE COURT:  So like this top thing is BMC, it

21  looks like it's what, 20 pages long.

22          MR. MIGIT:  Yeah, my understanding that's

23  especially done for BMC, that's not for every plan sponsor.

24          THE COURT:  Okay.  And that last -- it's not the

25  last page, but --

1          MR. MIGIT:  But if you look in there, yeah, if you

2    look in the page he's talking about, which gives the savings

3    and the fees, that's directly from the documents we produced

4    to him.  Go to the very last page.  He talks about how you

5    have to go through thousands and thousands of page, but all

6    you have to do is an Excel spreadsheet, is go to the very

7    last page and print it off --

8          MR. SUTTER:  It's not an Excel spreadsheet, these

9    are PDF files.

10         MR. MIGIT:  Or it's a document, you go to the very

11   last page and print it off.

12         THE COURT:  You're getting that information, I

13   mean, you're getting what, this whole thing?

14         MR. SUTTER:  No, I'm getting everything on a line-

15   by-line basis for all four years, for every service provided

16   literally.  If they have $100 in --

17         THE COURT:  So you're not getting this document?

18         MR. SUTTER:  No, at the end, but you've got to

19   search for everything.  All I asked for was the fourth

20   quarter annual reports, so I can get what they send to them

21   instead of getting literally -- I bet there's 50,000 pages

22   of line items over a four year period for every patient.

23         MR. MIGIT:  Judge, let me show you what he gave

24   you.  This has -- he's right, he talks about individual

25   patients, but what he didn't give you was the last page of

1    the report, which shows a year to date, savings, and --

2             MR. SUTTER:  Yes, we did.  We --

3             MR. MIGIT:  No, you just took it out of the

4    document.

5             MR. SUTTER:  No, I didn't take anything out of the

6    document, we had to hunt through all of these thousands and

7    thousands of pages to get to the last quarter.  When all we

8    asked for was the fourth quarter annual report.

9             THE COURT:  So, Mr. Migit, is there some way you

10   could search for this end of the fourth quarter report?

11            MR. MIGIT:  Judge, we have produced for about 380

12   plan sponsors, to the extent they've just gone back to 2007

13   the quarterly reports, all the way to -- through 2015.

14   Okay.  And again, at the end of each quarterly report, it'll

15   have a year to date amount, real simple, identical to the

16   page that Mr. Sutter is showing you, and the fourth quarter

17   is going to show the year to date.

18            THE COURT:  Got it.

19            MR. MIGIT:  Okay.  I could go back and we can pull

20   those pages, but they can easily do that.

21            THE COURT:  Tell him how to easily do that.

22            MR. MIGIT:  I told him.  I've sent letters to him,

23   I told him this repeatedly.  I said, go to the fourth

24   quarter report for any given year, and print out the last

25   page.

1          THE COURT:  This is all EDI, right?  And so you're

2    looking through screen after screen after screen --

3          MR. SUTTER:  Correct.

4          THE COURT:  -- that's what you're complaining

5    about.

6          MR. SUTTER:  Correct.

7          THE COURT:  You don't want to look through screen-

8    after-screen, you just want to hit -- have someone hit a

9    button fourth quarter I want it.

10         MR. SUTTER:  That's correct.

11         THE COURT:  The question is, can you search, is it

12   possible to search through the electronic database and just

13   pull up the fourth quarter without seeing everyone smiling,

14   happy faces, and all this other information?

15         MR. MIGIT:  Judge, if you want me to do that,

16   we're more than happy to do that, but he can easily do this.

17   There's no searching.

18         THE COURT:  It doesn't sound like it, if he goes

19   to through page-by-page 50,000 pages.

20         MR. MIGIT:  Judge, he doesn't.  He just pulls up

21   the document, okay, like for example, the ones that -- the

22   examples I gave you.  Look at the examples that I gave you,

23   and you notice -- notice the very bottom of the right-hand

24   corner of the page, and I think I gave you three samples.

25         First one is Harris County, the second one is

1   Comcast, and the third one is Bechtel Corporation.  And if

2   you notice, it says, page 621 of 621.

3           THE COURT:  Yeah.

4           MR. MIGIT:  The next page, page 306 of 306, and

5   the next one, page 165 of 165.  All he has to do is scroll

6   down to the last page and print it off.  This is ridiculous.

7           MR. SUTTER:  Judge, it's exactly what you said, we

8   have to scroll down and look at every image to try and find

9   out where the last page is, because we don't have the

10  ability to search for it in the way that it's been provided

11  to us.

12          THE COURT:  All right.  Do you have the ability to

13  search for it, other than to scroll through 165 pages or --

14          MR. MIGIT:  Well, there's no searching, Judge, you

15  pull up the document to the last page and print it.

16          THE COURT:  And --

17          MR. SUTTER:  That begs the question.

18          THE COURT:  You're still --

19          MR. MIGIT:  I mean, Judge, let me tell you another

20  thing --

21          THE COURT:  I mean --

22          MR. MIGIT:  -- I mean, this is coming from a man

23  who produces documents to us, 800 emails in one PDF.

24          THE COURT:  Cry me a river.  So the point is, you

25  know, how do you get to the last page without looking at the

1   prior 620 pages.

2           MR. SHELY:  Judge, you could have that assistant

3   that he said would have -- has ten hours on their hands now,

4   just go to the last page and pull them off, that's what he

5   could do.

6           THE COURT:  Let's be sympathetic to the paralegal.

7           MR. SHELY:  Judge, this is real easy --

8           MR. SUTTER:  That's what she's trying to do right

9   now, that's why I'm here, she's the one doing it, looking

10  through everyone trying to find the last sheet.

11          THE COURT:  And so how many clients do you have?

12          MR. MIGIT:  There's about 380 plan sponsors.

13          THE COURT:  380.

14          MR. MIGIT:  And there's quarterly reports for each

15  one, and it goes -- I sent him a letter on this, it's not

16  secret.  He ignores it, of course.  I said, Mr. Sutter --

17          MR. SUTTER:  That's why I filed a motion, I

18  understand exactly what he said.

19          MR. MIGIT:  Judge, the reason he files a motion to

20  reflect attention away from their failure to respond, he's

21  trying to complain about --

22          THE COURT:  You know, you all need to settle down,

23  because all this antagonism just gets me worked up and

24  that's a bad thing for each of you.

25          MR. MIGIT:  I apologize, Your Honor.

1          THE COURT:  You don't want an unhappy judge.

2          MR. MIGIT:  But I told Mr. Sutter in the letter,

3  and in prior and subsequent correspondence, if you look at

4  the fourth quarter for any given plan sponsor, whether it's

5  Bechtel or Harris County or the Archdiocese of Galveston, go

6  to the very last page of the fourth quarter, it's going to

7  give you the entire year of savings and fees.

8          THE COURT:  So like on this document, where would

9  it be?

10          MR. MIGIT:  I'll show you.

11          THE COURT:  Okay.

12          MR. SUTTER:  But that's not the document --

13          MR. MIGIT:  It's not the document.

14          MR. SUTTER:  We're getting these documents that

15  have all the patients and all of their --

16          THE COURT:  Yeah.

17          MR. SUTTER:  -- entries, we don't get that year-

18  end report that has --

19          THE COURT:  I don't know if you want that report.

20          MR. MIGIT:  Here it is, Judge.  Yeah, this is --

21          THE COURT:  What page is it on?  Not the last

22  page.

23          MR. MIGIT:  It's not the last page.  But this is

24  not what he's asking for.  Or this is what he's asking for,

25  this is not what -- what we produced is the very last page.

1  This is not in the very last page, but if you look, it gives

2  you the fourth quarter, see, it's October through December,

3  and it has all the information you want --

4          THE COURT:  All right.  All right.

5          MR. MIGIT:  -- but if you were to go to the report

6  that I produced to him for the fourth quarter for that

7  particular year for Harris County it's going to be the same

8  exact thing, what they do is they took when they prepared

9  this, and Harris County is a big customer, what they did is

10 they went and pulled from this report and stuck it in there.

11         THE COURT:  But --

12         MR. MIGIT:  He has all the information.

13         THE COURT:  And you gave me these, right?  You

14 gave me these reports.

15         MR. MIGIT:  Those, what I gave you was a set of

16 the five documents which represents Mr. Sutter's exhibit

17 that he gave you, to let you know that it's not a three or

18 four paged document we're talking about here.  It's actually

19 five different documents.

20         MR. SUTTER:  All I care about is the year end

21 fourth quarter that shows the summary of it, and that's what

22 I was pressing, if there's a way they can -- if they gave it

23 to me in a searchable format, where I could put the fourth

24 quarter in and do it, I could search it myself, but I don't

25 have it in that kind of searchable form.

1          MR. MIGIT:  Judge --

2          MR. SUTTER:  If they want to give me the

3   searchable format, Judge, I'll search it myself, but it's

4   got to come to me where I can put on the machine and search

5   it without having to read every screen shot, which I'm happy

6   to do.

7          MR. MIGIT:  Judge, it's easy to do.  You go to the

8   fourth quarter report and go to the last page.  It's not

9   like -- what he just pointed out, it's not -- at the very

10  end, where you have to read through the entire document.

11  You simply go down to the very last page.  If you had a PDF

12  document, which I don't think these are PDFs, I think it's

13  an Excel spreadsheet.  When you go to the very last page for

14  either one of those two, you can go straight down to the

15  very bottom and print off the page.

16         THE COURT:  Okay.  Then you can do that for him.

17  These belong to somebody, I know the plaintiffs --

18         MR. SHELY:  Judge, how we -- we can print it, but

19  since I know we're all environmentalists, at least try to

20  be, how about we just send him a letter with the pages.

21  We've already given him all the documents.  If he can't seem

22  to print it out, I don't know what to say about that, but.

23         MR. SUTTER:  Well, that's fine, if they want to

24  print the pages out to give them to me I --

25         MR. SHELY:  I don't, that's what I'm saying, I

1    don't want to print out the pages.  We'll just have our

2    assistant go to the last page of the fourth quarter, write

3    down the Bates number and send it to him, for the 380

4    reports.  It's all --

5              THE COURT:  You said Bates number?

6              MR. SHELY:  Well, it's actually --

7              MR. SUTTER:  Yeah, I can search the Bates number,

8    that I can go down and find.  The Bates number, you go down

9    and just pull 'em, you can do that because they're

10   numerical.

11             THE COURT:  Okay.  All right.  Give him the Bates

12   number.

13             MR. SUTTER:  My paralegal can do that.

14             MR. MIGIT:  Judge, I think -- it's an Excel

15   spreadsheet, it's not going to have a Bates number on every

16   page.  What we'll do is we'll take the last page of fourth

17   quarter reports and produce it.

18             THE COURT:  Does that resolve all our outstanding

19   discovery --

20             MR. SUTTER:  Yes, ma'am.

21             THE COURT:  -- issues?

22             All right.  I always ask this, where are the

23   parties on settlement?  Mr. Shely sits down, leaving the

24   question to Mr. Migit.  Settlement?

25             MR. MIGIT:  Judge, there have been no discussions.

1    We've tried one case --

2              THE COURT:  Why not?

3              MR. MIGIT:  -- we've got two more to do.  That's

4    where we're at.  In the other case, they were the plaintiff

5    and made a demand, we tried it, we won.  So we're ready to

6    do some --

7              THE COURT:  And you're done with that, the Hoyt

8    the case is done.

9              MR. MIGIT:  Well, we're done with their ERISA

10   benefits claim --

11             THE COURT:  Right.

12             MR. MIGIT:  -- against Aetna.  What's coming up

13   next, Judge Hoyt is going to give us a date, is Aetna's

14   claims and their counterclaim against North Cypress, those

15   are our claims, and in front of a jury, that's what I

16   suspect will be the next case that's tried.  Then we have

17   this case, which is stayed except for discovery, and then

18   there's a case related, not the exact same parties, but

19   that's the North Cypress sued a claim out of Conoco

20   Phillips, those are the pieces, if you will, in play.

21             MR. SUTTER:  I have never -- I've been in a lot of

22   payer cases and this is -- with regard to this little trio

23   of cases, for the first time I've never had settlement

24   discussions in any case.

25             MR. MIGIT:  Judge, we'd be happy to accept their

1  offer as to how much they want to pay Aetna and we'll go

2  from there.

3        MR. SUTTER:  First time we've never talked

4  settlement before in my career, and this first time, we

5  never even discussed --

6        THE COURT:  All right.

7        MR. MIGIT:  If they'd like to --

8        THE COURT:  This is a case going both ways.

9  Sometimes, I mean --

10        MR. MIGIT:  They've already shot their bullet,

11  Judge, and lost, now it's our turn.  So if they'd like, they

12  can offer as to how much they'd like to pay, we'll certainly

13  review it.

14        THE COURT:  You've got a RICO claim here, not sure

15  I love it, not sure I love yours either.

16        MR. SUTTER:  And we have a claim also that remains

17  in Judge Hoyt's court.

18        THE COURT:  Yeah.

19        MR. MIGIT:  Their claim that's left in Judge

20  Hoyt's court is less than $2 million for governmental plans.

21  I guess it's there, but if they put on the same expert,

22  since the Judge it out the first time, he's likely to throw

23  it out again.  Our claim is a big claim, they'll see the big

24  number a jury will get to decide it.

25        MR. SUTTER:  Well, I guess that answers your

1  question, Judge.

2          THE COURT:  It kind of does.  So do you think

3  you'd -- once you get your jury verdict if you get there,

4  would that kind of --

5          MR. SUTTER:  I think that would decide everything,

6  that's why this case is stayed depending on what Judge Hoyt

7  does at the end of the case.  And that's the only case --

8  motion that we can bring to Judge Lake, remember we tried --

9          THE COURT:  Yeah, yeah.

10          MR. SUTTER:  -- the others and they all got away.

11          THE COURT:  Yeah.

12          MR. SUTTER:  But the only motion we can bring to

13  Judge -- there's only two motions to be brought to Judge

14  Lake, their motion to dismiss, or a motion that the case has

15  been decided through Judge Hoyt, those are the two things

16  that Judge Lake permits us to do.  So that's where we are

17  with regard to settlement, it doesn't sound like there will

18  be any settlement discussion.

19          MR. SHELY:  Judge, we're the plaintiff in that

20  case, and they've taken their shot.  They've sued us, they -

21  - I'd be glad to take a letter from Mr. Sutter any time this

22  week as to how much he will pay Aetna for the cases to go

23  away, would love to receive it.

24          MR. SUTTER:  Well, I am more thrilled with the

25  judgment that Judge Hoyt gave binding the prompt pay does

1    not violate federal or state law, and that effects all of

2    these cases.

3            THE COURT:  Okay.

4            MR. SHELY:  The trouble with that, Judge, Rule 52

5    throughout Mr. Sutter's case, we haven't put on our evidence

6    yet, so the notion that anything that happened, has anything

7    to do with about this case is a fantasy.

8            THE COURT:  Right, but the judge hasn't entered a

9    final judgment yet, and it sounds like you think a final

10   judgment will include that declaration.

11           MR. SUTTER:  Of course it would, yes.

12           THE COURT:  So --

13           MR. SUTTER:  He's not going to change his mind on

14   what he's already ruled as a matter of law.

15           MR. SHELY:  That coming from an outfit that had

16   their entire case thrown out as a matter of law, Judge, but

17   at any rate, that's where we're at.

18           THE COURT:  Well, he's saying Judge Hoyt ruled on

19   it in some respect, right?

20           MR. SUTTER:  Sure he did.  Yeah, he ruled on it in

21   his memorandum and opinion.  That's exactly what --

22           MR. SHELY:  He did address the issue in an

23   opinion, but he, of course, has not heard our evidence.

24   And, of course, we've discovered some additional materials

25   since including the documents Dr. Behar got on there and

1  swore, to tell the truth, and he said that he followed the

2  lawyer's advice on prompt pay discount.  When those

3  documents are put into evidence, it's going to be a horse of

4  a different color.

5           THE COURT:  I might attend that trial.

6           MR. SHELY:  You should, Your Honor.  Maybe we can

7  --

8           MR. SUTTER:  That was a point, too, Judge, because

9  I thought that you had ruled the last time that, you know,

10  we -- you had made a verbal ruling, then there was a written

11  ruling about providing them with legal documents or emails

12  with regard to the provision of the prompt pay discount and

13  you'd ordered me to produce and which I did produce.

14          Then your order came back, and I wasn't quite

15  sure, but to say that I'm supposed to tender them in camera

16  for a review to see if Dr. Behar had waived the

17  attorney/client.  I've already given it to them, I asked

18  them to claw it back, and they've refused to claw it back.

19          So I still think that under the order that you

20  have, we're supposed to give it to you to determine if

21  there's been a waiver of the attorney/client privilege.

22          MR. SHELY:  Judge, the man got on the stand and

23  said he followed the lawyer's advice and that is the prompt

24  pay discount.  They don't even dispute that he said it,

25  okay, we're not hearing that he didn't say it.  You ordered

1    him appropriately give them those documents.

2           The reason we didn't get to Judge Hoyt, drum roll,

3    because they hid them.  They didn't produce them because

4    there wasn't any methodology for us to compel in that case.

5    Here there is, that's the difference.

6           THE COURT:  All right.  Just so we're clear,

7    nothing I do in this case affects Judge Hoyt's ruling on any

8    evidentiary matter, I mean it just doesn't.

9           MR. SHELY:  Understood, Your Honor, understood.

10          THE COURT:  You all know that, so I don't want to

11   hear any argument coming back from Judge Hoyt that you

12   shouldn't be ruling in my case as far as claw back or it's

13   not relevant to me.  You're going to make all those

14   arguments to him --

15          MR. SHELY:  Yes, Judge.

16          THE COURT:  -- and then --

17          MR. SHELY:  I'll let them explain why they didn't

18   produce those documents when we have --

19          THE COURT:  Yeah.

20          MR. SUTTER:  We didn't produce them because we

21   were only required to produce 2009 forward, never before.

22   That's --

23          MR. SHELY:  Not just true, Judge, no matter how

24   many times he says it.

25          THE COURT:  Well, that's fine.  All right.  You

1   all can be excused.

2            MR. SHELY:  Thank you, Judge.

3            THE COURT:  When are you going to get me a copy of

4   those, all those emails?

5            MR. SUTTER:  We'll get on it and try to get them

6   in the next day or two, Your Honor.  I think we'll be able

7   to get them to you quickly, I'll get my paralegal to forward

8   them.  We need to get the order done, so I can get --

9            MR. SHELY:  Judge, can we have a date for when

10  we're going to get the list of the emails, if they get

11  additional documents, I'm not -- but otherwise, this rolls

12  down into they just don't want to produce it.

13            THE COURT:  So these are all the business emails

14  that you are running the filters on.

15            MR. SUTTER:  Yeah, that's what we said, we're

16  hopefully getting those in two weeks.

17            THE COURT:  Two weeks.

18            MR. SUTTER:  Yeah, two weeks.  And then we need to

19  get --

20            MR. KELLY:  If Mr. Shely was referring to results

21  of the second level search term on the archive server, what

22  we said was we think two weeks.

23            MR. SHELY:  Judge, I --

24            MR. KELLY:  If there's any issue about that, I'll

25  let him know, no question about it.  But it's a top

1    priority, Judge.

2           THE COURT:  Let's talk about, you know, just have

3    it get done by March 321st, and if not, tell me why.

4           MR. SHELY:  And, Judge, will we get to see at

5    least the list of documents that they determined were

6    business related to/from, you're not going to order, as you

7    previously indicated, a -- at least not an image of the

8    server, but surely we get the to/from list of what the

9    lawyers have determined is relevant for North Cypress,

10   surely we get to see that.

11          MR. SUTTER:  That's what we're searching from, and

12   it's not relevant, it's the body of everything that we're

13   searching.

14          MR. SHELY:  Judge, it wouldn't hurt for us to have

15   the to/from and if we have a disagreement from anything we

16   see there as to relevance, there might be emails relating to

17   a specific time frame that's important, we should be able to

18   see that list.

19          THE COURT:  You want a to/from and that includes

20   all the personal and the attorney/client?

21          MR. SHELY:  Not the attorney/client, Judge, I

22   understand your ruling on that.  At a minimum as to the

23   first, what they call bucket of business emails we should

24   get.  I think personal too.  If they have specific ones that

25   just don't want to show us, we can go over and work that

1   out.  We can have a sit down and why are you trying to

2   produce -- well, I talked to my rabbi or whatever it is that

3   they're going to say.  But I understand that.

4          But I simply cannot rely on them to determine what

5   is business and what should be on the list that they further

6   whittled down from.  So I think I should get, at a minimum,

7   you know where I am on the search of the image, Judge, but

8   at a minimum the to/from for the first two categories.

9          I understand you've got the attorney/client and

10  that's --

11         THE COURT:  And I'm going to look at the

12  confidential stuff, too, so.

13         MR. KELLY:  We're sending you, as I understood

14  your ruling, you're accepting our tender, you're going to

15  look at it, and you're going to see whether we're being

16  accurate by saying, for example, I'm focused more on HIPAA,

17  you're not going to see Linda Johnson breast implant or

18  reduction surgery for her cancer, you don't get to see that

19  reference.

20         MR. SHELY:  Judge, there's --

21         MR. KELLY:  You just see the to and from, okay.

22  On --

23         THE COURT:  But that's on the business emails,

24  that's not -- you're not saying that's confidential -- you

25  know personal confidential, right?

1              MR. SUTTER:  No, that's the HIPAA.  On the

2    business, there's tons of HIPAA information.

3              THE COURT:  Is that on the first category or the

4    second category or the third category?

5              MR. SUTTER:  It's on the -- not on the

6    confidential, that's the personal.

7              THE COURT:  That's personal.

8              MR. SUTTER:  Then there's attorney/client, and

9    then there's general business that will contain a huge

10   amount of HIPAA information on different --

11             THE COURT:  That will talk about patients.

12             MR. SUTTER:  On -- about patients, sure.

13             THE COURT:  It'll say on the re line, you know --

14             MR. SUTTER:  Some will, some won't.  Judge --

15             THE COURT:  -- Miss so and so.

16             MR. SHELY:  Judge, here's the case law.  Notice

17   they haven't cited you anything.  There are exceptions in

18   the HIPAA and the other statutes that say --

19             THE COURT:  I know, I mean --

20             MR. SHELY:  -- for production of this with a

21   protective order, it's nonsense.

22             THE COURT:  I get it, but --

23             MR. SHELY:  And they've previously produced

24   information like this too.

25             THE COURT:  We're trying to get to a reasonable

1    body of production, not have everyone's medical information
2    but that doesn't have anything to do with your case.
3            MR. SHELY:  Sometimes it does, Judge, sometimes
4    Dr. Behar will say, I want this patient, make sure it's not
5    more than in network.  We know that.  So you cannot
6    categorically say that their process of how they get
7    patients is not is an email related to a patient, we have
8    some from the other case.  Categorically cannot say that.
9            THE COURT:  All right.  Well, I'm going to be
10   looking through those probably, you know, let's just see
11   where we come up on --
12           MR. KELLY:  All I'm asking, Judge, is what we
13   submit to you --
14           THE COURT:  -- that I --
15           MR. KELLY:  -- and they give us the search terms.
16           MR. SHELY:  Judge, you took back the imaging
17   issue, I understand that.  Don't take back the to/from, come
18   on, Judge, I mean, this is all in a Ouija Board --
19           THE COURT:  You're making me cry, Mr. Shely.
20           MR. SHELY:  Well, Judge, we've proven, we've
21   proven it.
22           THE COURT:  I get it.
23           MR. KELLY:  We'll give you the to/from and you can
24   -- you're handling this case obviously exactly according to
25   textbook, we ask that you keep doing that.

1            MR. SHELY:  They want to --

2            MR. KELLY:  We're going to get you where you need

3    to be.

4            MR. SHELY:  They want to keep it in secret, Judge,

5    and it is -- we certainly know the case better than you with

6    all due respect --

7            THE COURT:  I get it.

8            MR. SHELY:  -- and might be able to help you.  So

9    there's no reason at all we shouldn't get the to/from list

10   at a minimum for what they're calling business and

11   confidential.

12           MR. KELLY:  Thank you for hearing us, Judge, we'll

13   submit it to you.

14           MR. SHELY:  We should get that, Judge.

15           THE COURT:  All right.

16           MR. SHELY:  And can I have a ruling, Judge, as to

17   whether we get that or not, so we don't have a

18   misunderstanding.

19           THE COURT:  You cannot get that.  All right.

20       (Proceedings concluded at 3:35 p.m.)

21

22

23

24

25                      *  *  *  *  *

1          *I certify that the foregoing is a correct*

2     *transcript to the best of my ability produced from the*

3     *electronic sound recording of the proceedings in the above-*

4     *entitled matter, and this is an accurate transcript, as best*

5     *as is possible, due to the conditions of the recording.*

6     */S/ MARY D. HENRY*

7     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

8     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*D-337*

9     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

10    *JTT TRANSCRIPT #55047*

11    *DATE:  MARCH 29, 2016*