United States District Court
Southern District of Texas

**ENTERED**

August 05, 2019

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| AETNA LIFE INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-491 |
| | § | |
| ROBERT A. BEHAR, NORTH | § | |
| CYPRESS MEDICAL CENTER | § | |
| OPERATING COMPANY, LTD., | § | |
| and NORTH CYPRESS MEDICAL | § | |
| CENTER OPERATING COMPANY | § | |
| GP, LLC, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**

Pending before the court[1] are Defendants North Cypress Medical

Center Operating Company, Ltd., and North Cypress Medical Center

Operating Company, GP, LLC's[2] (collectively, "NCMC" or "NCMC

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 271, Ord. Dated June 21, 2019.

[2] The court notes that, while the docket entries for the amended motion to dismiss and the supplement indicate that the motions were filed by all three Defendants, the amended motion and supplement specifically identify only NCMC Defendants as movants. See Doc. 241, NCMC Defs.' Am. Mot. to Lift Stay & to Dismiss Pl.'s Compl. pp. cover, 1 (captioning motion as "Defendants NCMC's Amended Motion . . .," specifically identifying only NCMC Defendants as movants, and, when referring to all three defendants, naming both Defendant Robert Behar ("Defendant Behar") and NCMC Defendants); Doc. 256, NCMC Defs.' Suppl. to Their Am. Mot. to Lift Stay & to Dismiss Pl.'s 1st Am. Compl. pp. i, viii, 8, 23 (captioning motion as "Defendants NCMC's Supplement . . .," defining NCMC as encompassing only the NCMC corporate entities, and, when referring to all three defendants, naming both Defendant Behar and NCMC Defendants); cf. also Doc. 255, Pl.'s 1st Am. Compl. p. 13 (stating that NCMC Defendants and Defendant Behar "are separate and distinct legal entities for purposes of the RICO claim). The difference, of course, being that NCMC Defendants cannot independently seek dismissal of the claims that were asserted only against Defendant Behar. As all three defendants are represented by the same attorneys, the court views the failure to list Defendant Behar as a movant to be an unintentional error. The court addresses the challenges to the claims against Behar as well as those against NCMC Defendants.

Defendants") Amended Motion to Lift Stay and to Dismiss Plaintiff Aetna's ("Plaintiff" or "Aetna") Complaint[3] (Doc. 241) and NCMC Defendants' Supplement to their Amended Motion to Lift Stay and to Dismiss Plaintiff's First Amended Complaint (Doc. 256). The court has considered the motion and supplemental motion, the response, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that NCMC Defendants' amended motion and supplement be **GRANTED IN PART AND DENIED IN PART**.

## I.  Case Background

Plaintiff filed this case (also referenced as "<u>Behar</u> case" or "<u>Behar</u> litigation") against a hospital entity and one of its officers, alleging breach of contract, tortious interference, and violations of Racketeer Influenced and Corrupt Organizations Act[4] ("RICO").

## A.  Factual Background

NCMC Defendants operate an acute-care, community hospital, and Defendant Robert Behar ("Defendant Behar") is a radiation oncologist, a private investor in NCMC, the chief executive officer of NCMC, and chairman of the NCMC board.[5] Defendant Behar "retained

---

[3]     NCMC Defendants' Motion to Lift Stay and to Dismiss Plaintiff's Complaint (Doc. 239) became moot upon the filing of their amended motion. The court previously ruled on the motion to lift stay. <u>See</u> Doc. 246, Min. Entry Dated Sept. 24, 2018.

[4]     <u>See</u> 18 U.S.C §§ 1961-1968.

[5]     <u>See</u> Doc. 255, Pl.'s 1st Am. Compl. pp. 1-2, 12-13.

the power and control to make all major and primary operational and management decisions at NCMC."[6]  Aetna offers healthcare benefit plans and policies of insurance.[7]  Plaintiff's healthcare benefit plans include coverage benefits for in-network and out-of-network services.[8]

NCMC Defendants are an out-of-network provider.[9]  They do not participate in Plaintiff's network of healthcare providers and do not have any contract with Plaintiff.[10]  Thus, NCMC Defendants submit healthcare claims for out-of-network benefits for their patients who have healthcare coverage through Plaintiff.[11]  Those patients' healthcare plans require that they "contribute a larger share of the cost of care rendered by non-participating providers through higher member cost-share (i.e., deductibles, co-pays, and co-insurance)" and that they pay charges for certain services that are not covered or exceed Plaintiff's reimbursement amount.[12]

"In early 2007, [Defendant] Behar advised a group of physicians that investing in NCMC was a 'financial opportunity of a lifetime,' and that[,] because NCMC's extensive fixed costs had

---

6    Id. p. 13.

7    See id. pp. 4-5.

8    See id. p. 5.

9    See id. pp. 2, 5, 15.

10   See id.

11   See id. p. 5.

12   Id.

already been paid off, any referrals to NCMC would result in 'straight profit' going directly into the pockets of the referring physicians."[13]  Physicians "began referring their patients to NCMC from clinical office practices throughout the Houston area."[14] Among the physicians interested in becoming investors in NCMC were certain Aetna in-network physicians.[15]

Pursuant to the in-network contracts with physicians, Aetna required that non-emergency patient referrals be made to available in-network facilities rather than out-of-network facilities such as NCMC Defendants.[16]  "Since at least January 2007," Defendants paid "hundreds of millions of kickback dollars" to in-network physicians for patient referrals to NCMC.[17]  On unspecified dates, Defendants paid three physicians, including Defendant Behar, millions of dollars each in exchange for patient referrals to NCMC.[18]

Defendants tracked the number of referrals made by each in-network physician.[19]  Those physicians who referred "a significant volume of patient[s] were allowed to invest" in NCMC.[20]  Those who

---

[13]    Id. p. 15.

[14]    Id.

[15]    See id. pp. 9, 16.

[16]    See id. p. 7.

[17]    Id. p. 9; see also id. p. 16.

[18]    See id. pp. 9, 16-17.

[19]    See id. pp. 8, 15.

[20]    Id. pp. 8, 15.

did not refer any or many patients "were reprimanded, threatened, and even forced to relinquish their ownership interests in NCMC."[21] Defendant Behar and the participating physicians kept this "remuneration-for-referral arrangement top secret[,]" never disclosing it to their Aetna-member patients.[22] This arrangement influenced the referral decisions of all involved physicians.[23]

On an unspecified date, Defendants implemented a discount program devised by Defendant Behar pursuant to which NCMC Defendants did not bill Aetna-member patients "the out-of-network cost-share amounts required by the terms of the patients' plans" but, rather, billed "patients only for the amounts that they would otherwise owe had they received treatment from an in-network facility."[24] "Specifically, NCMC systematically waived or reduced member cost-share and sought to colle[c]t only the in-network portion of member cost-share . . . ."[25]

Defendant Behar "and other referring physicians and personnel at NCMC under [Defendant] Behar's control, represented to Aetna members" that their costs for receiving out-of-network services would be no more than the costs billed to them for in-network

---

[21]     Id. p. 9; see also id. p. 16.

[22]     Id. p. 17.

[23]     See id. p. 16.

[24]     Id. p. 11.

[25]     Id. p. 6.

services.[26]   In support of the discount program, Defendant Behar drafted a script to be used by his staff to explain the program to patients.[27]

On September 15, 2010, NCMC Defendants entered into a Participating Facility Agreement with MultiPlan, Inc., ("MultiPlan Agreement") which allowed NCMC Defendants to participate in a program that provided Plaintiff and its members "access to contracted rates for healthcare services performed by certain out-of-network providers."[28]   Under that agreement, NCMC Defendants agreed to "bill or collect" the applicable plan member's cost-share for out-of-network services.[29]   NCMC submitted claims under the MultiPlan Agreement and received payments from Aetna for healthcare services provided to its members from September 15, 2010, through August 31, 2012, without concomitantly billing for or collecting the out-of-network member cost-share amounts.[30]

From May 2009 or earlier, NCMC also routinely billed Aetna for procedures performed on NCMC's premises without a formal inpatient

---

[26]   Id. p. 20.

[27]   See id. p. 11.

[28]   Id. p. 5; see also Doc. 259-1, Sealed Ex. J to NCMC Defs.' Suppl. to Their Am. Mot. to Lift Stay & to Dismiss Pl.'s 1st Am. Compl., MultiPlan Agreement.

[29]   Doc. 255, Pl.'s 1st Am. Compl. p. 6; see also Doc. 259-1, Sealed Ex. J to NCMC Defs.' Suppl. to Their Am. Mot. to Lift Stay & to Dismiss Pl.'s 1st Am. Compl., MultiPlan Agreement.

[30]   See Doc. 255, Pl.'s 1st Am. Compl. p. 6.

admission.[31]   In those cases, patients were "held in an 'observation' status for long periods of time," that extended into multiple days without ever being admitted to the hospital.[32] NCMC was thereby able to avoid the prior-authorization process for inpatient services, which also avoided Aetna's option to transfer the patient to an in-network facility when medically safe to do so.[33] NCMC's charges for observation care were more than three times the market average.[34]

Defendant Behar orchestrated the observation billing system in several ways, billing under the codes for initial-observation care, hospital-observation service, and/or emergency-room treatment.[35] In the amended complaint, Plaintiff provided case examples from 2010-2012 in which Defendant Behar allegedly directed that the patient remain in the emergency room or under observation for unnecessarily lengthy periods and/or return to the emergency room on consecutive days for treatment.[36]

On an unspecified date, Defendant Behar issued a standing directive that required Aetna-member patients to be admitted through the emergency room, regardless of emergent status or

---

[31]   See id. p. 22.

[32]   Id.; see also id. p. 23.

[33]   See id. p. 22.

[34]   Id.

[35]   See id.

[36]   See id. pp. 22-24.

availability of inpatient beds.[37]   As with the utilization of observation, first contact in the emergency room allowed NCMC to avoid the prior-authorization requirements and the transfers of patients to in-network facilities.[38]   In the amended complaint, Plaintiff provided several case examples from 2013-2014 of how this process was accomplished.[39]

NCMC Defendants routinely billed emergency-room services under Current Procedural Terminology ("CPT") codes for higher patient acuity than the actual level of care required.[40]   Defendant Behar, who devised the practice, engaged in this type of billing in the NCMC emergency room and other departments.[41]   At an NCMC finance committee meeting held on an unspecified date, Defendant Behar and other NCMC executives concluded that NCMC needed to bill for emergency-room services under CPT codes for high acuity regardless of the patient's actual acuity level in order to avoid low reimbursement.[42]   As an example, Plaintiff pointed to an undated practice of billing for Image Guided Radiation Therapy, which received a higher reimbursement than Intensity Modulated Radiation

---

[37]   Id. p. 25.

[38]   See id.

[39]   See id. pp. 25-27.

[40]   See id. p. 28.

[41]   See pp. 28-29.

[42]   Id.

Therapy ("IMRT"), even when IMRT was actually performed.[43]

## B. **Procedural Background**

This case has a past.  NCMC filed suit against Aetna in 2013 ("Aetna I").[44]  Because the nature of the claims in Aetna I has relevance to the court's resolution of the pending motion in this case, a review of its procedural and substantive history is necessary.[45]

### 1. **Aetna I**

Aetna I had a long and tortured existence with two trials and two appeals.  It began on February 12, 2013, when NCMC filed suit in this district against Aetna, asserting violations of Employee Retirement Income Security Act[46] ("ERISA") and Texas state law for "intentionally under-paying out-of-network providers like NCMC."[47]  In its counterclaim, Aetna alleged "common law fraud, negligent misrepresentation related to NCMC's pricing and unjust enrichment in violation of Texas law."[48]

On January 12, 2015, almost two years after the filing of the

---

[43]    See id. p. 29.

[44]    See Koenig v. Aetna Life Ins. Co., Civ. Action No. H-13-359, Doc. 1, Compl. Dated Feb. 12, 2013.

[45]    As cited herein, the court relies on the Fifth Circuit's description of the district court proceedings in Aetna I, which it provided in N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co., 898 F.3d 461, 472-73 (5ᵗʰ Cir. 2018).

[46]    See 29 U.S.C. §§ 1001-1191c.

[47]    N. Cypress Med. Ctr. Operating Co., 898 F.3d at 472.

[48]    See id.

lawsuit, Aetna filed an opposed motion for leave to amend its counterclaim "to add claims related to NCMC's kickbacks for referring physicians and unjust enrichment."[49] On January 27, 2015, the Aetna I district court denied leave without explanation.[50]

In October 2015, the district court held a five-day bench trial on the ERISA claims[51]. After NCMC presented evidence and closed, Aetna moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Rule") 52(c), and the district court granted the motion because the evidence failed to establish any of NCMC's ERISA claims.[52]

Over several weeks in April and May 2015, the district court held a jury trial on the remaining state-law claims and counterclaims.[53] Aetna presented an expert witness on damages and offered evidence that "NCMC compensated physicians for patient

---

[49]     Id.; see also Doc. 23, Tr. of Hr'g Dated July 24, 2015 p. 2 (noting that the motion for leave was filed "approximately two years after the filing of [Aetna I]"); Koenig, Civ. Action No. H-13-359, Doc. 177, Aetna's Mot. for Leave to File 1st Am. Countercl. Dated Jan. 12, 2015.

[50]     See N. Cypress Med. Ctr. Operating Co., 898 F.3d at 472; Koenig, Civ. Action No. H-13-359, Doc. 181, Ord. Dated Jan. 27, 2015.

[51]     See N. Cypress Med. Ctr. Operating Co., 898 F.3d at 472; Koenig, Civ. Action No. H-13-359, Docs. 323, 328, 331, 335, 339, Min. Entries Dated Oct. 13-15, 19-20, 2015.

[52]     See N. Cypress Med. Ctr. Operating Co., 898 F.3d at 472; Koenig, Civ. Action No. H-13-359, Doc. 351, Mem. on Mot. for J. as a Matter of Law Dated Oct. 29, 2015.

[53]     See N. Cypress Med. Ctr. Operating Co., 898 F.3d at 472; Koenig, Civ. Action No. H-13-359, Docs. 460-61, 463, 467-68, 471, 476, 479, 483, 495, 506, 511, 513, 521, Min. Entries Dated Apr. 19-22, 25-29, May 2-6.

referrals."[54]  The district court rejected the expert's testimony "as biased and not reliable as a matter of law" and "rejected Aetna's offer of proof on [physician compensation]" as "both irrelevant and prejudicial."[55]  The district court also granted NCMC's motion for judgment as a matter of law pursuant to Rule 50(a)(1) on Aetna's fraud and negligent-misrepresentation claims, finding "that Aetna failed to establish *any* element of fraud."[56]

The jury considered NCMC's state-law claims and returned a no-liability verdict in favor of Aetna.[57]  As a result of the district court's rulings and the jury's verdict, the district court denied relief to both NCMC and Aetna.[58]  NCMC sought attorneys' fees, which the court denied without explanation.[59]

On appeal, Aetna challenged the district court's rulings on the fraud and misrepresentation claims, the exclusion of evidence, and Aetna's motion for leave to amend.[60]  As to the first of these challenges, the Fifth Circuit agreed, stating, "Assuming without deciding that Aetna established the other elements of fraud, we

---

[54]    N. Cypress Med. Ctr. Operating Co., 898 F.3d at 472.

[55]    Id.

[56]    Id. at 474; see also id. at 472.

[57]    See id. at 472.

[58]    See id.

[59]    See id. at 472-73; Koenig, Civ. Action No. H-13-359, Doc. 560, Ord. Dated June 15, 2016.

[60]    See N. Cypress Med. Ctr. Operating Co., 898 F.3d at 473.

find Aetna could not have justifiably relied on any representation by NCMC."[61]  The Fifth Circuit did not rule on the district court's rejection of the expert testimony, which it said, if an error at all, was harmless because the judgment as a matter of law on the fraud and misrepresentation claims could have been granted notwithstanding any error.[62]

Regarding the evidence of physician compensation, the Fifth Circuit stated:

> Aetna has not shown how excluded evidence of physician compensation relates to any of NCMC's alleged material misrepresentations.  NCMC may have intended to build its business by incentivizing physicians to make patient referrals, but Aetna only alleges fraud based on what NCMC charged its patients and subsequently reported to Aetna.
>
> . . . .
>
> Aetna concedes that payments to physicians were part of a *different* fraudulent scheme. . . . NCMC's payments might explain why physicians referred patients to NCMC or indicate that NCMC violated the terms of Aetna's agreements, but they do not tend to explain NCMC's motive in adopting the prompt pay discount.  And these payments do not support allegations that NCMC misrepresented its billing practices.[63]

The Fifth Circuit discussed at length Aetna's third challenge, which concerned the denial of leave to amend.[64]  After discussing the applicable legal standards, the court determined that "[t]he

---

[61]    Id. at 474.

[62]    See id. at 476.

[63]    Id. at 477.

[64]    See id. at 477-81.

summary denial was an abuse of discretion under the circumstances presented here" and that "[t]he district court should have granted leave to amend, or alternatively, explained its denial."[65]   The Fifth Circuit then devoted its attention to deciding the appropriate remedy.[66]   Following a prior Fifth Circuit panel's approach, the court balanced multiple facts to reach "a disposition of the case as justice may require."[67]   The circuit court explained:

> Ordinarily, a district court's failure to explain its denial of leave to amend is an abuse of discretion justifying reversal.   But there is no indication this result is required.   Where our case law does not dictate a particular remedy, we retain authority to affirm, modify, vacate, set aside or reverse any order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances.   In determining whether to remand for the district court to explain its denial we consider whether remand enhances the interests of judicial economy, the convenience of parties, the likelihood of subsequent appeal once the court explains its denial, and any further delay to related litigation. Remanding to provide the district court with an opportunity to explain its denial is preferred.   But if, under the circumstances, remanding is not practical or efficient, we may examine the record to determine whether denial of leave to amend is justified.
>
> Under the circumstances presented in this appeal remanding would be an exercise in futility.   There is a high likelihood of a subsequent appeal if the district court were to deny the motion for leave to amend with reasons.   In this respect, remanding would diminish judicial economy; the same issue would return to us on a

---

[65]    Id. at 478.

[66]    See id. at 478-80.

[67]    Id. at 479 (quoting Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 819 (5th Cir. 2004)).

future appeal.  And Aetna has already filed a separate
suit alleging claims identical to those it sought to add
to its counterclaims.  That litigation has been on hold,
and remanding for further explanation would only further
prolong the underlying litigation in that case.  As a
result, we examine whether the record supports denial of
Aetna's motion for leave to amend.[68]

In its examination of the record, the Fifth Circuit determined

that Aetna's motion for leave to amend was untimely within the

context of the procedural history of the case, and, therefore, the

district court's denial of leave "was justified based on undue

delay."[69]  The Fifth Circuit articulated reasons that may have led

the district court to its decision to deny leave, including: (1)

the two-year gap between when the case was filed and when Aetna

sought leave to amend its counterclaim, (2) the proximity of

dispositive-motion and discovery deadlines; (3) Aetna's delay of

six months after receiving documents on which it based its

amendment; and (4) the prejudicial effect on NCMC's defense.[70]  The

Fifth Circuit mused, "The district court likely worried that

Aetna's delay would fundamentally change the nature of the

case—prejudicing NCMC."[71]

The Fifth Circuit concluded that, although the district court

abused its discretion, "remanding for an explanation would be

---

[68]    Id. at 479-80 (internal quotation marks, alterations, footnotes, and
citations omitted).

[69]    Id. at 480.

[70]    Id.

[71]    Id.

impractical and inefficient" because the amendment was "untimely and unduly prejudicial to NCMC."[72]  As a final thought, the Fifth Circuit offered, "This result does not foreclose Aetna's ability to pursue its claims.  Once this case is resolved, Aetna will be able to pursue its proposed additional claims in the Behar litigation."[73]

The Fifth Circuit turned to NCMC's arguments on its appeal of an evidentiary ruling and the judgment as a matter of law on its ERISA claims.[74]  The Fifth Circuit did not find any error in those rulings.[75]  However, the Fifth Circuit found that it was bound by precedent to vacate and remand the district court's denial of NCMC's motion for attorneys' fees for failure to provide an explanation.[76]

Following the district court's explanation of the denial of NCMC's request for attorneys' fees, NCMC filed Aetna I's second notice of appeal.[77]  The Fifth Circuit determined that, based on the explanation provided on remand, the district court did not abuse its discretion in deciding that NCMC was not entitled to attorneys'

---

[72]     Id.

[73]     Id. at 481.

[74]     See id. at 481-84.

[75]     See id.

[76]     See id. at 485-86.

[77]     See N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co., 737 F. App'x 233 (5th Cir. 2018).

15

fees.[78]

### 2. This Case

On February 23, 2015, about four weeks after the <u>Aetna I</u> district court denied Aetna's motion for leave to amendment its pleading, Aetna filed this action.[79]   In its original complaint here, Plaintiff raised four causes of action: (1) violations of RICO against Defendant Behar based on "secret remuneration-for-referral agreements with physicians," "inflat[ed] . . . charges for medical services," unnecessary and unreasonable observation services, and admissions by way of the emergency room; (2) tortious interference against all Defendants as to in-network agreements between Plaintiff and participating medical providers; (3) tortious interference against all Defendants as to healthcare benefit plans between Plaintiff and members or beneficiaries of the plans; (4) breach of the MultiPlan Agreement against NCMC Defendants.[80]   Per the original complaint, "the damages sought in this case pertain to facility fees and related fees charged by and paid to [NCMC]."[81]

On March 5, 2015, Defendants filed a motion to dismiss pursuant to the first-to-file rule, arguing that Plaintiff's complaint in this case substantially overlapped with issues in

---

[78]   <u>See</u> <u>id.</u> at 234.

[79]   <u>See</u> Doc. 1, Pl.'s Orig. Compl.; <u>cf. also</u> <u>Koenig</u>, Civ. Action No. H-13-359, Doc. 181, Ord. Dated Jan. 27, 2015.

[80]   Doc. 1, Pl.'s Orig. Compl. pp. 23-29.

[81]   <u>Id.</u> p. 3.

<u>Aetna I</u>.[82]   NCMC   Defendants   sought   dismissal   of   the   case   or   a
transfer   to   the   district   judge   presiding   over   <u>Aetna I</u>.[83]

In response to Defendants' motion, Plaintiff explained that
its counterclaims in <u>Aetna I</u> covered "a particular set of false and
misleading medical bills that [NCMC] submitted to Aetna for payment
*with dates of service from January 1, 2009[,] through January 24,*
*2014*."[84]  Plaintiff further explained that the causes of action in
issue in its <u>Aetna I</u> counterclaims were "common law fraud,
negligent misrepresentation, money had and received, unjust
enrichment, and alternative equitable relief under [ERISA,]" as
well as "declaratory and injunctive relief, including an injunction
preventing [NCMC] from engaging in its fraudulent billing scheme."[85]

Plaintiff argued that this case "concerns a different party,
different causes of action, and different medical claims[.]"[86]
Plaintiff listed the causes of action in this case and asserted
that none of the causes of action here was alleged in <u>Aetna I</u>.[87]
"Moreover, Aetna's claims in this lawsuit concern benefit claims

---

[82]      <u>See</u> Doc. 6, Defs.' Mot. to Dismiss Pl.'s Orig. Compl.

[83]      <u>See</u> <u>id.</u>

[84]      Doc. 8, Pl.'s Resp. to Mot. to Dismiss or, in the Alternative, to
Transfer pp. 3-4 (emphasis added).

[85]      <u>Id.</u> p. 4.

[86]      <u>Id.</u> p. 6 (emphasis omitted).

[87]      <u>See</u> <u>id.</u> pp. 6-7.

*with dates of service from January 25, 2014, to the present.*"[88]

On July 24, 2015, the court held a hearing to rule on Defendants' motion to dismiss.[89]  The court found that, although differences in claims and parties existed between this case and *Aetna I*, the cases were "factually related . . . and substantially overlap[ped] in the claims at issue."[90]  The court explained that the question whether the first-to-file rule applied was a close one but that the ruling in *Aetna I* denying leave to amend the counterclaim reduced the concerns of consistency and comity among courts because the district judge presiding over *Aetna I* had already decided that the claims presented here should not be considered in *Aetna I*.[91]  The court also noted that dismissing this case would deny Aetna a forum in which to present these claims.[92]  Given these considerations, the court entered a stay on all motions except those concerning discovery while *Aetna I* proceeded, stating, "The substantial overlap between [*Aetna I*] and this case pointed out in Defendants' briefing means that many issues related to this action may be resolved in [*Aetna I*]."[93]  The court found it possible that the rulings in *Aetna I* could resolve issues here "through

---

[88]   <u>Id.</u> p. 7 (emphasis added).

[89]   <u>See</u> Doc. 23, Tr. of Hr'g Dated July 24, 2015.

[90]   <u>Id.</u> p. 3.

[91]   <u>See id.</u> p. 4.

[92]   <u>See id.</u>

[93]   <u>Id.</u> pp. 4-5; <u>see also</u> Doc. 175, Ord. Dated Aug. 3, 2016.

18

application of rules of res judicata or collateral estoppel."[94]

Although partially stayed while _Aetna I_ advanced through the court system, this case continued with pleadings, discovery, evidentiary hearings, and other matters.[95]  During this period, Plaintiff maintained, in arguments concerning the scope of discovery, that Plaintiff was "actually suing from January 25th, 2014[,] to the present."[96]

The docket was silent between May 26, 2017, and August 9, 2018, after which time the court set a status conference following the issuance of the Fifth Circuit's first opinion in _Aetna I_.[97]  On September 11, 2018, about two weeks ahead of the court's setting, NCMC Defendants filed a motion to lift the stay and to dismiss Plaintiff's complaint and amended the motion less than a week later.[98]

On September 20, 2018, a few days in advance of the scheduled status conference, Plaintiff filed a notice of case status.[99] Therein, Plaintiff summarized the procedural history of _Aetna I_ and

---

[94]    Doc. 23, Tr. of Hr'g Dated July 24, 2015 p. 5.

[95]    _See, generally_, Docs. 16-237 Dated July 29, 2015, through May 26, 2017.

[96]    _See, e.g._, Doc. 98, Tr. for Hr'g Dated Nov. 30, 2015 p. 52.

[97]    _See_ Doc. 237, Not. to Ct. dated May 26, 2017; Doc. 238, Not. of Setting Dated Aug. 9, 2018; _N. Cypress Med. Ctr. Operating Co._, 898 F.3d at 461.

[98]    _See_ Doc. 238, Not. of Setting Dated Aug. 9, 2018 (setting a hr'g for Sept. 24, 2018); Doc. 239, NCMC's Mot. to Lift Stay & to Dismiss Pl.'s Compl.; Doc. 241, NCMC's Am. Mot. to Lift Stay & to Dismiss Pl.'s Compl.

[99]    _See_ Doc. 243, Pl.'s Not. of Case Status.

this case.[100]   Plaintiff conceded, "Shortly after filing the <u>Behar</u>
case, Aetna advised the [c]ourt that the <u>Behar</u> case then concerned
medical claims with dates of service from January 25, 2014[,] to
present."[101]   Plaintiff asserted that the Fifth Circuit found the
denial of leave to amend to be "an abuse of discretion [that]
resulted in harmless error because 'Aetna ha[d] already filed a
separate suit [this case] alleging claims identical to those it
sought to add to its counterclaims' in [<u>Aetna I</u>] 'and remanding for
further explanation would only further prolong the underlying
litigation in [this] case."[102]

On September 24, 2018, the court held a status conference.[103]
In response to the court's query about Plaintiff's previous
representations as to the scope of this case, Plaintiff explained
that, at the time of Defendants' 2015 motion to dismiss asserting
the first-to-file rule, Plaintiff represented to the court that
this case addressed healthcare claims with dates of service of
January 25, 2014, and beyond.[104]   A lengthy discussion ensued, during
which Plaintiff asserted, "That's always been our position."[105]   Yet,

---

[100]   <u>See</u> <u>id.</u>

[101]   <u>Id.</u> p. 2.

[102]   <u>Id.</u> (citing at <u>N. Cypress Med. Ctr. Operating Co.</u>, 898 F.3d 479-80).

[103]   <u>See</u> Doc. 246, Min. Entry Dated Sept. 24, 2018.

[104]   <u>See</u> Doc. 249, Tr. of Hr'g Dated Sept. 24, 2018 pp. 4-5; <u>see also</u> <u>id.</u>
pp. 11, 15, 19, 22, 24.

[105]   <u>Id.</u> p. 22.

Plaintiff argued that the Fifth Circuit's opinion allowed earlier healthcare claims to proceed in this lawsuit.[106]  When the court pressed, "So all of your claims in this lawsuit post-date January of '14," Plaintiff responded:

> No.  They did when we filed [this] suit.  But with the Fifth Circuit's Order, they're saying "You may pursue the claims that [the district court] would not let you pursue in [Aetna I] in [this] case."  So it's essentially putting the two halves together.
> So our three causes of action or four, if you count the two tortious interference claims, go back as far as, well, 2007.[107]

Defendants argued in response that Plaintiff cannot take back its representation that the relevant period was January 25, 2014, and beyond, which was offered in an effort to survive a motion to dismiss.[108]  Defendants also argued that the Fifth Circuit did not find that Plaintiff had a viable cause of action here, only that they could pursue the claims in this case.[109]  Defendants pointed out that the Fifth Circuit was not presented with any issue from this case.[110]

The court granted the amended motion to lift the stay but entered a stay on discovery pending resolution of the amended

---

[106]    See id. pp. 5-6, 8-9, 15.

[107]    Id. p. 7.

[108]    See id. pp. 11, 19-20, 24-25.

[109]    See id. pp. 13, 24.

[110]    See id. p. 24.

motion to dismiss.[111]  In an order dated September 26, 2018, the court addressed the Fifth Circuit's opinion in _Aetna I_ and determined that, "[a]s an aid to the court and in order to focus the parties on all the allegations Aetna intends to pursue in this suit," Plaintiff needed to file an amended complaint.[112]  The court ordered Plaintiff to do so and, in the amended complaint, to "outlin[e] each cause of action, the facts supporting each claim, and when that cause of action arose."[113]  Additionally, the court required that Plaintiff state whether each cause of action was encompassed in the Fifth Circuit's ruling in _Aetna I_ or pled first in this case.[114]

On October 29, 2018, Plaintiff filed its amended complaint, re-alleging, for the most part, the causes of action from its original complaint: (1) breach of contract against NCMC Defendants; (2) tortious interference with in-network agreements against all Defendants; (3) tortious interference with non-ERISA plans against all Defendants; (4) violations of RICO against Defendant Behar; and (5) conspiracy to violate RICO against Defendant Behar.[115]

As to the first-listed of these causes of action, Plaintiff

---

[111]   _See_ Doc. 246, Min. Entry Dated Sept. 24, 2018.

[112]   Doc. 247, Ord. Dated Sept. 26, 2018 p. 2.

[113]   _Id._

[114]   _See id._

[115]   _See_ Doc. 255, Pl.'s Am. Compl. pp. 4-32.

alleged that NCMC Defendants breached the MultiPlan Agreement, to which Plaintiff was a third-party beneficiary, by failing to bill or collect member patients' out-of-network cost-share amounts for NCMC services.[116]  The claim of tortious interference with in-network agreements concerned the allegations that Defendants paid kickbacks to in-network physicians for referrals, thereby enticing the physicians to breach their in-network contracts with Plaintiff.[117] With regard to the second-pled tortious-interference claim, Plaintiff alleged that NCMC Defendants implemented the discount plan to entice Aetna members to choose the NCMC Defendants' facilities over in-network providers, thereby interfering with Plaintiff's non-ERISA plans that required out-of-network cost-sharing by Aetna members who received services from NCMC Defendants.[118]

Plaintiff's two RICO claims both relate to the same racketeering activities allegedly committed by Defendant Behar.[119] The first-asserted is a substantive RICO claim, and the second is a claim for conspiracy to commit RICO violations.[120]  Plaintiff identified NCMC Defendants as the enterprise under RICO with the

---

[116]     See id. p. 6.

[117]     See id. p. 9.

[118]     See id. p. 11.

[119]     See id. pp. 12-32.

[120]     See id.

purpose of "provid[ing] hospital, emergency, and other related medical services to patients who were insured by policies of insurance or members of healthcare benefit plans for which benefits were determined by payors/third-party claims administrators such as Aetna, Blue Cross and Blue Shield, Cigna, Humana, United Healthcare, Medicare, and others."[121]

Plaintiff alleged that Defendant Behar's participation in NCMC Defendants' affairs through secret physician remuneration for patient referrals constituted racketeering activity under RICO in that his actions, in both receiving and conferring remuneration, were chargeable as bribery under state criminal law.[122]  Plaintiff also alleged that Defendant Behar's participation in NCMC Defendants' affairs through the following five schemes was indictable as mail or wire fraud under federal criminal law:[123] (1) patient solicitation by secret remuneration for referrals; (2) patient solicitation by discount program; (3) excessive observation billing; (4) emergency room admissions; and (5) upcoded charging.[124]

---

[121]   Id. p. 13.

[122]   Id. pp. 17-18 (citing Tex. Penal Code § 32.43, which states that a fiduciary who, "without the consent of his beneficiary, . . . intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary" or "offers, confers, or agrees to confer any [such] benefit").

[123]   See id. p. 19 (citing 18 U.S.C. §§ 1341, 1343, which make it illegal to "devise[] or intend[] to devise any scheme or artifice to defraud[] or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and to utilize mail or wire for purpose of executing the scheme or artifice).

[124]   See id. pp. 19-30.

The first of these alleged schemes is based on the same conduct that underlies Plaintiff's bribery RICO claim.[125] The second scheme, a discount program, is based on the allegation that Aetna members were offered discounts on their cost-sharing obligations in exchange for receiving out-of-network services at NCMC, "making it appear as though NCMC was no different than an in-network facility[.]"[126]

The alleged scheme concerning observation billing involved "systematically holding Aetna members in an 'observation' status for lengthy, unwarranted, and unnecessary periods of time without admitting the member to the hospital so that NCMC could then bill and collect higher out-of-network fees from Aetna for alleged observation care."[127] In the fourth alleged scheme, NCMC Defendants "systematically admitt[ed] non-emergency patients through the emergency room so that NCMC could then bill and collect higher out-of-network emergency-room fees from Aetna despite the lack of any medical emergencies."[128]

The fifth alleged scheme of upcoding the level of medical services allowed NCMC Defendants to "bill and collect out-of-network payments from Aetna for higher-level services that were

---

[125]    See id. pp. 19-20.

[126]    Id. p. 20; see also p. 21.

[127]    Id. pp. 21-22.

[128]    Id. p. 25.

never actually provided."[129]   For all five of these schemes, Plaintiff alleged that each claim submission made at Defendant Behar's direction was a separate instance of mail or wire fraud under RICO.[130]   The final cause of action raised in Plaintiff's amended complaint was conspiracy to violate RICO, which alleged that Defendant Behar conspired with individual members of NCMC's Board of Managers, NCMC officers and personnel, and referring physician investors.[131]

As to counts one through four, Plaintiff alleged that it had sought leave to amend in <u>Aetna I</u>, that the district court denied the request but that the Fifth Circuit's ruling entitled Plaintiff to pursue each of the causes of action in this lawsuit.[132]   Plaintiff further asserted that those four causes of action each related back to May 31, 2013, the date of filing the original complaint in <u>Aetna I</u>.[133]   Plaintiff did not make these assertions with regard to the RICO conspiracy claim.[134]

Plaintiff alleged actual damages, consequential damages, and incidental damages resulting from the alleged breach of the MultiPlan Agreement and the alleged tortious interference with non-

---

[129]   <u>Id.</u> p. 28.

[130]   <u>See</u> <u>id.</u> pp. 21, 25, 27, 30.

[131]   <u>See</u> <u>id.</u> pp. 31-32.

[132]   <u>See</u> <u>id.</u> pp. 6, 10, 11-12.

[133]   <u>See</u> <u>id.</u> pp. 6-7, 10, 12.

[134]   <u>See</u> <u>id.</u> pp. 31-32.

ERISA plans, but did not plead the nature of those damages.[135] Plaintiff was more specific in its allegation of damages for the tortious interference with in-network agreements, stating that the damages were "no less than the difference between what Aetna would have paid for the relevant medical services had they been performed at an available in-network facility and the amount that Aetna paid to NCMC."[136]  For the RICO claims, Plaintiff alleged that it "was injured in its business and property . . . and . . . incurred substantial and tangible financial losses."[137]  Plaintiff provided more detail for the substantive RICO claim:

> Aetna was injured in its business or property, including but not limited to, substantial and tangible financial losses through disruption of Aetna's ability to provide cost-effective healthcare options for its members, plan sponsor customers, and policies of insurance through an efficient network of qualified physicians, and by overpaying millions on healthcare claims submitted by NCMC [Defendants] pursuant to [Defendant] Behar's schemes . . . .[138]

On November 12, 2018, NCMC Defendants filed a supplement to their amended motion, and, on November 28, 2018, Plaintiff filed a response.[139]  Therein, Plaintiff again acknowledged its clarification of the original complaint limiting this case to "medical claims

---

[135]     See id. pp. 6-7, 11-12.

[136]     Id. p. 9.

[137]     Id. p. 32.

[138]     Id. pp. 30-31.

[139]     See Doc. 256, NCMC Defs.' Suppl. to Their Am. Mot. to Lift Stay & to Dismiss Pl.'s 1st Am. Compl.; Doc. 261, Pl.'s Resp. to NCMC Defs.' Suppl. to Am. Mot. to Lift Stay & Dismiss Pl.'s Compl.

with dates of service from January 25, 2014[,] to present."[140]
Additional briefs were filed in December 2018 and January 2019.[141]
On June 21, 2019, the case was referred to the undersigned.[142]

## II.  Dismissal Standard

Rule 12(b)(6) allows dismissal of an action whenever the complaint, on its face, fails to state a claim upon which relief can be granted.  The court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts.  Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 803 n.44 (5th Cir. 2011)(quoting True v. Robles, 571 F.3d 412, 417 (5th Cir. 2009)).

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. 678.  A plaintiff must

---

[140]     Doc. 261, Pl.'s Resp. to NCMC Defs.' Suppl. to Am. Mot. to Lift Stay & Dismiss Pl.'s Compl. p. 7.

[141]     See Doc. 266, NCMC Defs.' Reply to Pl.'s Resp. to NCMC Defs.' Suppl. to Their Mot. to Lift Stay & to Dismiss Pl.'s 1st Am. Compl.; Doc. 268, Pl.'s Sur-Response to NCMC's Reply in Support of Mot. to Dismiss; Doc. 269, Letter from Douglas Sutter to the Ct. Dated Jan. 10, 2019.

[142]     See Doc. 271, Ord. Dated June 21, 2019.

provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555.  In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. 678.

### III. Analysis

In NCMC Defendants' amended motion to dismiss, they focus their arguments in favor of dismissal on the first-to-file rule[143] and the absence of damages.  In their supplement to the amended motion, filed after Plaintiff amended its complaint, NCMC Defendants broaden the scope of their motion to encompass arguments on waiver and estoppel, res judicata, collateral estoppel, and limitations.  They contend that determinations made in Aetna I prevent Plaintiff's pursuit of causes of action not specifically tried in that former case.

In both the amended motion to dismiss and the supplement, NCMC Defendants argue that, by judicial admission to the court clarifying its complaint in this case, Plaintiff limited the scope of this case to "discrete benefit claims with dates of service from

---

[143]    Defendants raised the first-to-file rule in their first motion to dismiss filed in March 2015.  The court denied the motion, explaining that enforcing the rule would not satisfy the interests of consistency and comity among courts because the Aetna I judge already denied leave to add substantially overlapping claims.  Thus, Defendants received a ruling on that issue, which does not warrant reconsideration now.  As the court pointed out in March 2015, res judicata or collateral estoppel, not the first-to-file rule, could apply after the conclusion of Aetna I.

January 25, 2014, to the present."[144]   The court begins with this
contention.

## A.   <u>Judicial Admission</u>

A judicial admission is a statement that is "(1) made in a
judicial proceeding; (2) contrary to a fact essential to the theory
of recovery; (3) deliberate, clear, and unequivocal; (4) such that
giving it conclusive effect meets with public policy; and (5) about
a fact on which a judgment for the opposing party can be based."
<u>Heritage Bank v. Redcom Labs., Inc.</u>, 250 F.3d 319, 329 (5th Cir.
2001).   Statements in briefs are appropriately treated as binding
judicial admissions of fact.   <u>Dick v. Colo. Hous. Enters., L.L.C.</u>,
No. 18-10900, 2019 WL 2909232 at *3 n.3 (5th Cir. July 5,
2019)(unpublished)(quoting <u>City Nat'l Bank v. United States</u>, 907
F.2d 536, 544 (5th Cir. 1990)).

Plaintiff does not deny that it narrowed the scope of this
case to healthcare claims submitted after January 24, 2014.   Nor
can it.   In its response to NCMC Defendants' motion to dismiss,
which Plaintiff filed on March 26, 2015, Plaintiff stated:

> The crux of Defendants' Motion is their assertion
> that in both this case and [Aetna I] "Aetna sues on the
> same 66,000+ claims involving the identical 3,500± plans
> and policies for the same four year period of 2009
> through 2013."   In fact, however, Aetna is suing on
> different medical claims involving different healthcare
> plan members over a different time period.   Contrary to

---

[144]   Doc. 256, NCMC Defs.' Suppl. to Their Am. Mot. to Lift Stay & to
Dismiss Pl.'s 1st Am. Compl. p. 3 (quoting Doc. 8, Pl.'s Resp. to Mot. to Dismiss
or, in the Alternative, to Transfer pp. 3, 7); <u>see also</u> Doc. 241, NCMC Defs.' Am.
Mot. to Lift Stay & to Dismiss Pl.'s Compl. p. 37.

> Defendants' assertion, Aetna is ***not*** suing on the same medical claims in the two cases—and, to remove any possible cavil by Defendants, stipulates as much.
>
> . . . .
>
>     Moreover, Aetna's claims in this lawsuit concern benefit claims with dates of service from January 25, 2014, to the present. ***None*** of these claims are at issue in Aetna's counterclaim in [Aetna I].[145]

Plaintiff repeated this factual admission in a hearing on November 30, 2015, in the context of the scope of discovery and acknowledged that the admission had been made in response to Defendants' motion to dismiss. Even after the Fifth Circuit issued its opinion in Aetna I, Plaintiff confirmed that it made the statement and intended it to have effect.

Plaintiff deliberately, clearly, and unequivocally stated in this judicial proceeding that it was limiting this case to healthcare claims submitted after January 24, 2014, and indicated that it was doing so in order to avoid dismissal or transfer pursuant to the first-to-file rule. That limitation was contrary to a more expansive theory of recovery for claims that predated January 24, 2014, and concerned a fact on which judgment in Defendants' favor could be based for all prior healthcare claims. Public policy supports giving the statement conclusive effect, particularly in this situation where Plaintiff uttered it to avoid an adverse ruling. In fact, not giving Plaintiff's statement

---

[145]    Doc. 8, Pl.'s Resp. to Mot. to Dismiss or, in the Alternative, to Transfer pp. 3, 7.

conclusive effect would offend public policy.[146]  As all elements of the definition of a judicial admission are clearly met, the court finds Plaintiff's limitation of the scope of this case to be binding.

Despite having clarified that this case has *always* involved only healthcare claims with dates of service post January 24, 2014, Plaintiff argues that the Fifth Circuit relieved it of the binding effect of its judicial admission.[147]  Aside from the obvious flaw in arguing that the Fifth Circuit gave back claims that Plaintiff has confirmed never were intended to be part of this case, Plaintiff's position is untenable for other reasons as well.

First, Plaintiff finds meaning in the Fifth Circuit's dicta that simply is not there.  By cobbling together several parts of

---

[146]    When a party makes representations to the court, in a pleading, a written motion, or another paper, "whether by signing, filing, submitting, or later advocating it[,]" an attorney certifies that "it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation[.]" Fed. R. Civ. P. 11(b).  Plaintiff initially limited the scope of this lawsuit to avoid the possibility of dismissal under the first-to-file rule and reiterated it in the discovery process.  After the resolution of <u>Aetna I</u>, no other case exists with which this case would be more appropriately tried, and the concerns of consistency and comity addressed by the first-to-file rule are no longer applicable.  Plaintiff repeated the judicial admission since the first iteration.  Although this court stops short of finding a violation of Rule 11, the court finds these circumstances negate any persuasiveness in Plaintiff's assertion that injustice would result if it were not allowed to pursue litigation on healthcare claims with dates of service prior to January 25, 2014.  <u>See</u> Doc. 261, Pl.'s Resp. to NCMC Defendants' Suppl. to Am. Mot. to Lift Stay & Dismiss Pl.'s Compl. p. 8 ("Given the Fifth Circuit's sweeping opinion that Aetna can pursue all of [sic] additional claims in this litigation, it would be manifestly unjust to deny Aetna the opportunity to pursue causes of action for claims before January 25, 2014.").

[147]    <u>See</u> Doc. 261, Pl.'s Resp. to NCMC Defs.' Suppl. to Am. Mot. to Lift Stay & Dismiss Pl.'s Compl. p. 7 ("When the Fifth Circuit declared[] that 'Aetna will be able to pursue its proposed additional claims in the <u>Behar</u> litigation, . . . it was declaring that Aetna could pursue *all* additional claims.")(citing <u>N. Cypress Med. Ctr. Operating Co.</u>, 898 F.3d at 481).

the Fifth Circuit's analysis on the denial of leave to amend, Plaintiff misrepresents the gist of the Fifth Circuit's statement on pursuing Aetna's claims here.  Plaintiff argues that the Fifth Circuit found the denial of leave to amend to be an abuse of discretion that resulted in harmless error because Aetna had already filed this case and remanding would only further prolong this case.[148]  The Fifth Circuit did not say that the Aetna I district court's denial of leave to amend was harmless error *because of* the filing of this case.  In fact, the Fifth Circuit did not say that the error was harmless at all.  See N. Cypress Med. Ctr. Operating Co., 898 F.3d at 478-81.

In the context of fashioning the appropriate remedy for the district court's abuse of discretion,[149] the Fifth Circuit said that "remanding would diminish judicial economy," citing both the likelihood that the same issue would return on a subsequent appeal and the prolongation of the stay in this case.  Id. at 479-80.  The circuit court found Aetna's motion untimely and postulated that "[t]he district court likely worried that Aetna's delay would fundamentally change the nature of the case—prejudicing NCMC."  Id. at 480.  On this basis, the circuit court ultimately found the

---

[148]    See Doc. 243, Pl.'s Not. of Case Status p. 2.

[149]    The Fifth Circuit found that the denial of leave without explanation was an abuse of discretion but, rather than remand, fashioned an appropriate remedy, in consideration of "interests of judicial economy, the convenience of parties, the likelihood of subsequent appeal once the court explain[ed] its denial, and any further delay to related litigation."  N. Cypress Med. Ctr. Operating Co., 898 F.3d at 479; see also id. at 478.

denial of leave, albeit an abuse of discretion, to be warranted, rendering remand for explanation "impractical and inefficient." <u>Id.</u>

Plaintiff also misinterpreted the import of the Fifth Circuit's comments on the claims in this case.  The Fifth Circuit did not "clarif[y] that Aetna **is** entitled to proceed with its claims in this . . . case."[150]  The Fifth Circuit said that the result it reached with regard to the denial of leave to amend "d[id] **not foreclose** Aetna's ability to pursue its claims" here, and, after <u>Aetna I</u> was resolved, Aetna could do just that, "pursue its proposed additional claims" in this case.  <u>Id.</u> at 481 (emphasis added).  By saying that Plaintiff could *pursue* its claims here, the Fifth Circuit did not eliminate all other impediments that would foreclose Aetna's ability to prevail on the claims proposed in <u>Aetna I</u>, most notably, its judicial admission in this case or any applicable defense.

Second, the court finds nothing in the <u>Aetna I</u> record to indicate that the Fifth Circuit had been informed of Plaintiff's judicial admission in this case.  In fact, nothing suggests that the Fifth Circuit had contemplated anything more about this case than the general nature of the claims and the stay pending the conclusion of <u>Aetna I</u>.  Nothing the Fifth Circuit wrote reflects an intention to impede this court's jurisdiction, which brings this

---

[150]    Doc. 243, Pl.'s Not. of Case Status p. 2.

court to the third flaw.

Third and most importantly, the Fifth Circuit did not have jurisdiction over this case.  In general, the Fifth Circuit may exercise appellate jurisdiction over final decisions of district courts and a circumscribed set of interlocutory orders.  28 U.S.C. §§ 1291, 1292.  Thus, the Fifth Circuit gains the authority to issue rulings in a case upon a properly filed appeal in that particular case.

Nothing from this case was pending before the Fifth Circuit. No appeal had been filed in this case, and this case did not meet the conditions upon which appeal was allowed.  That is, no final decision had been issued in this action, and no party had appealed any interlocutory order issued by this court.  Plaintiff has failed to articulate a basis for the Fifth Circuit's jurisdiction over this action.  Thus, the Fifth Circuit could not issue this court a mandate or other instruction on the scope of this suit or any other matter for application in this case.

Having clarified the effect of the Fifth Circuit's dicta concerning Plaintiff's pursuit of claims in this action, the court must now assess the effect of Plaintiff's judicial admission on Plaintiff's causes of action.

### 1.  Contract Cause of Action

The elements of a breach-of-contract cause of action under Texas law are: "(1) the existence of a valid contract; (2)

performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." Mullins v. TestAmerica, Inc., 564 F.3d 386, 418 (5th Cir. 2009)(internal quotation marks omitted)(quoting Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App.–Houston [14th Dist.] 2005, pet. denied)).

Plaintiff alleged that Defendants NCMC violated the MultiPlan Agreement by not collecting the out-of-network cost-share amounts for services provided by NCMC. Plaintiff pled that, from September 15, 2010, through August 31, 2012, NCMC Defendants obtained millions of dollars in payments from Aetna on healthcare claims. Plaintiff did not allege that NCMC Defendants submitted any healthcare claims for payment pursuant to the MultiPlan Agreement at any time after that. Plaintiff's judicial admission narrowing the scope of healthcare claims to dates of services after January 24, 2014, effectively dismissed this cause of action because, according to Plaintiff's live pleading, no healthcare claims were submitted for dates of service during the relevant period. That is, Plaintiff did not plead that it suffered damages during the modified period.[151]

---

[151]   According to Defendants, the MultiPlan Agreement was canceled by Aetna on August 31, 2012. See Doc. 256, Def. NCMC's Suppl. to Am. Mot. to Lift Stay & Dismiss Pl.'s Compl. p. 20.   Although not mentioned in Plaintiff's pleading, the alleged cancellation does coincide with the latest date of payments alleged.   If the MultiPlan Agreement was canceled in August 2012, Plaintiff also would be unable to meet the first element of its breach-of-contract claim, the existence of a contract during the relevant period.

## 2.  Tortious-Interference Causes of Action

The elements of tortious interference with a contract are: (1) a contract existed; (2) the defendant "willfully and intentionally interfered with that contract;" (3) the interference proximately caused damage; and (4) the plaintiff suffered actual damages. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207 (Tex. 2002).

The first of Plaintiff's two tortious-interference causes of action alleged that Defendants enticed physicians to breach their in-network agreements with Aetna by referring patients to NCMC's out-of-network facility through a remuneration-for-referral scheme. Plaintiff alleged that its damages were the difference between the out-of-network costs paid to NCMC for services provided and the costs of those services had they been performed in network.  The healthcare claims filed by NCMC Defendants are central to proving the damages element of the cause of action.  Therefore, Plaintiff's judicial admission applies.

Plaintiff's other tortious-interference cause of action alleged that Defendants enticed Aetna's members to receive treatment out of network through a discount program that breached the members' obligations under the plans[152] with Aetna to pay a greater portion of the costs for out-of-network services.  As with the other tortious-interference cause of action, Plaintiff's

---

[152]    NCMC Defendants argue that, by their own terms, the planes are not contracts.  See Doc. 256, NCMC Defs.' Suppl. to Their Am. Mot. to Lift Stay & to Dismiss Pl.'s 1st Am. Compl. p. 24.

damages stem from the difference between the out-of-network costs and the costs had services been performed in network.

Both of the tortious interference causes of action are limited to healthcare claims submitted from January 25, 2014, to the present.

### 3.   RICO Causes of Action

Plaintiff's RICO causes of action fall under 18 U.S.C. §§ 1962, 1964, which allow a private civil action by any person injured by RICO violations against "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare, 781 F.3d 182, 202 (5th Cir. 2015).  "Racketeering activity," which is commonly referred to as a "predicate act," is defined to include any act which is chargeable under state law and punishable by more than a year of imprisonment and any act indictable pursuant to Title 18 of the United States Code.  See 18 U.S.C. § 1961 (defining "racketeering activity"); Waste Mgmt. of La., L.L.C. v. River Birch, Inc., 920 F.3d 958, 964 (5th Cir. 2019)(referring to racketeering activity as "predicate act").

Plaintiff's RICO claims are based on predicate acts of bribery under state law, which applies to a fiduciary who, without the consent of the beneficiary, accepts or confers a benefit based on an understanding that the benefit will influence the fiduciary's

conduct in relation to the beneficiary, and mail and/or wire fraud under federal law, which applies to a person who devises a scheme to obtain money by means of false or fraudulent pretenses through the utilization of mail and/or wire. See 18 U.S.C. §§ 1341, 1343; Tex. Penal Code § 32.43.

Plaintiff pled that, among other objectives, the alleged remuneration-for-referral (bribery) scheme was intended to allow NCMC to bill and obtain payment from Aetna.[153]  Plaintiff alleged that its injury derived in part from the overpayment of millions of dollars on healthcare claims.[154] Because Plaintiff circumscribed the healthcare claims involved in this case, this cause of action is limited to the acts of bribery by which Plaintiff was harmed on healthcare claims with dates of service after January 24, 2014.

For the mail-and-wire-fraud RICO allegations, the submissions of healthcare claims comprised the predicate acts regardless of the alleged scheme.  These allegations are therefore also subject to Plaintiff's judicial admission.[155]

---

[153]    See Doc. 255, Pl.'s 1st Am. Compl. p. 18.

[154]    See id. pp. 30-31.

[155]    Because all of the causes of action are limited to healthcare claims for dates of service after January 24, 2014, and this case was filed on February 23, 2015, none are barred by the applicable statute of limitations.  See Tex. Civ. Prac. & Rem. Code § 16.003 (setting two years as the limitations period for tortious interference); Rogers v. McDorman, 521 F.3d 381, 387 (5th Cir. 2008)(citing Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987))(affirming that civil RICO is subject to a four-year statute of limitations); Nationwide Bi-Weekly Admin. Inc. v. Belo Corp., 512 F.3d 137, 146 (5th Cir. 2007)(applying Texas law and stating that tortious interference is subject to a two-year limitations period).  As a result, the court need not address Plaintiff's relation-back argument.

**B.   <u>Res Judicata</u>**

The doctrine of res judicata states that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." <u>Houston Prof'l Towing Ass'n v. City of Houston</u>, 812 F.3d 443, 447 (5th Cir. 2016).  It encompasses both claim preclusion (true res judicata), which "bars the litigation of claims that have been litigated or should have been raised in an earlier suit," and issue preclusion (collateral estoppel), which "precludes relitigation of only those issues actually litigated in the original action" regardless of whether the second lawsuit alleges different causes of action.  <u>Id.</u> (quoting <u>Moch v. E. Baton Rouge Par. Sch. Bd.</u>, 548 F.2d 594, 596 (5th Cir. 1977), and <u>Test Masters Educ. Servs., Inc. v. Singh</u>, 428 F.3d 559, 571 (5th Cir. 2005)).  "Res judicata is an affirmative defense that should not be raised as part of a [Rule] 12(b)(6), but should instead be addressed at summary judgment or at trial."  <u>Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.</u>, 115 F. App'x 662, 664 n.1 (5th Cir. 2004)(unpublished).

The elements of claim preclusion are: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions."  <u>Houston</u>

Professional Towing Ass'n, 812 F.3d at 447.  The elements of issue preclusion are: (1) "the issue at stake [is] identical to the one involved in the prior litigation;" (2) "the issue has been actually litigated in the prior litigation;" and (3) "the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action."  Rabo Agrifinance, Inc. v. Terra XXI, Ltd., 583 F.3d 348, 353 (5th Cir. 2009).

Although the first three elements of claim preclusion are met with regard to the NCMC Defendants, the causes of action raised in this case were not litigated in Aetna I.  Moreover, the causes of action that were tried in Aetna I covered a period of years prior to the dates of service involved in this case.  Additionally, Defendant Behar was not a party in Aetna I, and NCMC Defendants have not shown that he was in privity with NCMC Defendants.  Claim preclusion does not apply to bar Plaintiff's causes of action.

The crux of NCMC Defendants' argument is that Plaintiff's claims in this case are affected by rulings in Aetna I because they involve the same theories of wrongdoing.  NCMC Defendants point to rulings by the district and circuit courts in Aetna I that they contend preclude Plaintiff from establishing one or more elements of the causes of action here.  For example, NCMC Defendants argue that Aetna failed to establish justifiable reliance and damages in Aetna and that Aetna failed to show that the remuneration-for-referral scheme was related to any of the alleged

misrepresentations in <u>Aetna I</u>.

These issues are not identical to those in this case. Moreover, they are bits and pieces selectively chosen from an extensive litigation history. From this court's vantage point, whether those matters were actually litigated and how critical and necessary the courts' rulings were to the judgment in that action are hard to discern. What this court can ascertain is that those rulings were based, at least in part, on evidence or lack thereof proving facts that were not pled in this action. As this case is at the pleading stage, the court finds that it would not be prudent to foreclose Plaintiff's opportunity to produce evidence in support of its properly pled causes of action. If the evidence in this case supports Defendants' arguments on issue preclusion, they may reassert the affirmative defense pursuant to Rule 56.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that NCMC Defendants' amended motion and supplement be **GRANTED IN PART AND DENIED IN PART**.

If this Memorandum and Recommendation is adopted, Plaintiff may proceed with its tortious-interference and RICO claims, as limited above by Plaintiff's judicial admission. Presumably because Plaintiff amended its complaint while operating under the misunderstanding that it was no longer bound by its judicial admission limiting the case to claims January 25, 2014, and beyond,

Plaintiff identified only one claim with a date of service in 2014. However, the court finds that it is not necessary for Plaintiff to identify in its pleading every billing claim on which it is suing and that Plaintiff's amended complaint gives Defendants sufficient information to defend against the causes of action as limited by this Memorandum and Recommendation.   On the other hand, if Plaintiff is not aware of any claim submitted during the relevant period for a particular cause of action, Plaintiff must immediately file a motion to dismiss that claim in order to avoid sanctions authorized by Rule 11.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002-13.   Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 5th day of August, 2019.

_____
Nancy K. Johnson
United States Magistrate Judge

43